AO 91 (Rev. 11/11) Criminal Complaint

AUSA Saurish Appleby-Bhattacharjee (312) 469-6045
AUSA Paige Nutini (312) 697-4071




**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NUMBER: 20CR352 |
| v. | **UNDER SEAL** |
| SAMUEL UCHENNA ANIUKWU, also known as "Uchenna Samuel Aniukwu" and "Sammy Maxwell"; ANTHONY EMEKA IBEKIE, also known as "Emeka Toni Ibe"; and JENNIFER GOSHA | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From in or around 2016 to on or about June 18, 2020, at Oak Park, Illinois, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1343 and 1349 | conspired with each other, and others known and unknown, to commit a wire-fraud scheme |

This criminal complaint is based upon these facts:

_X_ Continued on the attached sheet.

_____
SIXTO J. LUCIANO
Special Agent, Homeland Security Investigations

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: July 10, 2020

_____
*Judge's signature*

City and state: Chicago, Illinois

SHEILA M. FINNEGAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

### AFFIDAVIT

I, SIXTO J. LUCIANO, being duly sworn, state as follows:

## I. INTRODUCTION AND AFFIANT BACKGROUND

1.     I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so employed since 2008. As part of my duties as a Special Agent, I investigate criminal violations relating to white-collar crime, including mail, wire, and bank fraud, as well as other financial and cyber-crimes. Before my employment with HSI, I worked as a Postal Inspector with the U.S. Postal Inspection Service from about April 2008 through August 2008, and as a Special Agent with the Internal Revenue Service, Criminal Investigation from about January 2001 through April 2008. In my capacity as an investigator with these agencies, I have participated in the execution of multiple federal search warrants and arrest warrants.

2.     This affidavit is submitted in support of a criminal complaint alleging that Samuel Uchenna Aniukwu, also known as "Uchenna Samuel Aniukwu" and "Sammy Maxwell" ("ANIUKWU"), Anthony Emeka Ibekie, also known as "Emeka Toni Ibe" ("IBEKIE"), and Jennifer Gosha ("GOSHA") have violated Title 18, United States Code, Sections 1343 and 1349.

3.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law-enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being

submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging ANIUKWU, IBEKIE, and GOSHA with conspiracy to commit wire fraud, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

4.     This affidavit also describes portions of written and recorded conversations, which I have summarized. These summaries do not necessarily refer to all of the topics covered during each conversation. In addition, these summaries do not include every conversation made by every writer/author or speaker on the topic being described. Portions of the conversations that are quoted are preliminary transcriptions, which may be subject to modification upon further review. For some conversations, I have offered my understandings and/or interpretations of the conversation, which are based upon my experience and knowledge of the investigation to date, the content and context of the conversations, the experience of other investigators with whom I have consulted, as well as my professional training and experience as a law-enforcement agent.

## II.     FACTS SUPPORTING PROBABLE CAUSE THAT ANIUKWU, IBEKIE, AND GOSHA HAVE CONSPIRED TO COMMIT WIRE FRAUD

### A.     INVESTIGATIVE BACKGROUND

5.     This complaint application stems from an ongoing investigation into individuals in the Northern District of Illinois, and elsewhere, who are suspected of facilitating, or laundering the proceeds of, various online fraud schemes. As detailed

further below, this investigation has recently involved the use of an undercover agent to communicate with suspected co-conspirators, which, when coupled with other information obtained over the course of the investigation, has generated probable cause to believe that ANIUKWU, IBEKIE, and GOSHA, with others known and unknown, have conspired to commit wire fraud.

6. To date, this investigation has identified several individuals who have conducted overt and affirmative acts in the Northern District of Illinois in furtherance of various online schemes and artifices. Such overt and affirmative acts include the incorporation of business entities and the opening of bank accounts at financial institutions—including those that are federally insured—to facilitate the receipt of funds fraudulently induced from victims through false pretenses, representations, promises, and concealment of material facts, and the subsequent transfer of these funds to accounts maintained abroad.

7. The co-conspirators, known and unknown, have used various means— some of which involve interstate wire communications—to conduct the above overt acts, including the use of telephones, computers, vehicles, correspondence, and the United States Postal Service.

8. In summary, and as explained in more detail herein, the individuals and entities at issue in this investigation were involved in opening accounts at financial institutions in the Northern District of Illinois, and elsewhere, to facilitate the receipt and subsequent transfer of proceeds fraudulently obtained from victims of the following three categories of schemes:

3

a. <u>Business Email Compromise</u>: a scheme targeting businesses that perform wire transfers. The scheme is typically carried out by: (1) compromising legitimate business e-mail accounts through social engineering or computer-intrusion techniques to gain unauthorized access to the business-email account; (2) blocking or redirecting communications to or from the email account; and then (3) using the compromised email account or a separate fraudulent email account to communicate with personnel from a victim company, attempting to induce the victim company into making a wire transfer under fraudulent pretenses.

b. <u>Romance Fraud</u>: a scheme to defraud a victim on the Internet, whereby a co-conspirator contacts a victim online and builds trust through an online romance. At some point, the co-conspirator will convince a victim to send money to a predetermined recipient under the false pretense that the victim will either get paid back in the future or that the money being sent is part of a business transaction. Romance scams typically target persons looking for romantic partners or friendship on dating websites and other social-media platforms. The scammers may create profiles using fictitious or fake names, locations, images, and personas, allowing the scammers to cultivate relationships with prospective romance-scam victims. Victims may be convinced to provide money or gifts to the scammers, or may be asked to conduct transactions on behalf of the scammers.

c. <u>Inheritance-Fraud Scheme</u>: a variation of an online-investment-fraud scheme, in which a victim is tricked into sending money from his/her bank

account under the false pretense that the victim is about to receive a substantial inheritance.

### B. SUMMARY OF EVIDENCE ESTABLISHING THAT **ANIUKWU, IBEKIE,** AND **GOSHA** ENGAGED IN A CONSPIRACY TO COMMIT WIRE FRAUD

9.     Since in or around 2016, Samuel ANIUKWU (a Nigerian citizen or national with extensive foreign ties), has incorporated or registered several business entities in the Northern District of Illinois with Anthony IBEKIE (also a Nigerian citizen or national with extensive foreign ties), and other known and unknown co-conspirators. ANIUKWU and IBEKIE have created bank accounts for these entities in the Northern District of Illinois together, and with other co-conspirators including Jennifer GOSHA.

10.     These bank accounts have collectively received hundreds of thousands of dollars in funds fraudulently obtained from various victims through the use of business-email-compromise, romance-fraud, and inheritance-fraud schemes. Upon their receipt, these fraudulently obtained funds have been disposed by ANIUKWU, IBEKIE, GOSHA, and others through: (1) cash withdrawals in amounts deliberately designed to avoid bank-reporting requirements; (2) interbank transfers used as a means of concealing the original source of the funds; and (3) wire transfers to foreign bank accounts, including those in IBEKIE's name.

11.     Emails sent or received by ANIUKWU, as well as account-subscriber information, implicate him in past and ongoing inheritance-fraud schemes bearing characteristics, and involving the use of methods, that are nearly identical to those discovered in the course of an undercover operation. Likewise, emails sent or received

by IBEKIE, as well as account-subscriber information and the results of a forensic fingerprint examination, implicate him in the same inheritance-fraud schemes as ANIUKWU, including the one discovered in the course of the undercover operation.

12.     The foregoing undercover operation culminated in a controlled delivery of fraudulently obtained funds to GOSHA, at her residence, around June 18, 2020. At the direction of co-conspirators, an undercover agent was directed to mail these funds to a business entity bearing GOSHA's residence as its mailing address. (That entity, believed to be a fictional business, was registered by a co-conspirator connected to IBEKIE and ANIUKWU through email communications, further described herein.) During the controlled delivery, GOSHA answered the door at her residence, confirmed that the delivery address and recipient were correct, and then attempted to justify receiving mail addressed to a business entity by saying that she was working from home. (In truth, GOSHA is believed to be an employee of the U.S. Postal Service.) GOSHA also indicated that she had been waiting for delivery of the fraudulently obtained funds, which she expected to arrive earlier that same day.

13.     Like ANIUKWU and IBEKIE, GOSHA is the registered agent of—or authorized signer for bank accounts associated with—fictional business entities that have received funds fraudulently obtained from various victims. For at least one such account, which has itself received tens of thousands of dollars in fraudulent funds, GOSHA is an authorized co-signer with IBEKIE.

14.     As further detailed herein, ANIUKWU, IBEKIE, and GOSHA, together and with others known and unknown, agreed to participate in a scheme to defraud in

which it was reasonably foreseeable that an interstate-wire facility would be used in furtherance of the scheme. Probable cause therefore exists to charge each of these defendants with conspiracy to commit a wire-fraud scheme, in violation of Title 18, United States Code, Sections 1343 and 1349.

C. PRIOR WARRANTS

15. On or about April 20, 2020, the Honorable Virginia M. Kendall, United States District Judge, issued a warrant in Case No. 20 M 215 (the "Gmail Warrant"), authorizing the search of two Gmail accounts associated with ANIUKWU. My application and affidavit in support of the Gmail Warrant (the "April 2020 Luciano Affidavit"), attached as Exhibit 1 and incorporated by reference, details relevant findings of the investigation, including, in pertinent part:

a. Providing background information regarding the co-conspirators that law enforcement has identified, to date, as being involved in the fraudulent schemes mentioned herein, including ANIUKWU and IBEKIE;

b. Summarizing various business entities suspected of being used to facilitate the fraudulent schemes at issue in the investigation, including the corporate formation of those entities, as well as each entity's receipt of fraudulently obtained funds from a victim individual or victim business; and

c. Detailing evidence of international outgoing wire transfers of funds suspected to have been generated through the fraudulent schemes as well as interactions between Customs and Border Protection ("CBP") officials, IBEKIE, and ANIUKWU, including evidence of suspected fraud obtained during a border search of digital devices in ANIUKWU's possession.

7

16.     On or about July 8, 2020, the Honorable Sheila Finnegan, United States Magistrate Judge, issued warrants in Case Nos. 20 M 364, 20 M 365, and 20 M 366 (collectively, the "Premises Warrant"), authorizing the search of three residential premises associated with ANIUKWU, IBEKIE, and GOSHA (namely, the "Oxbow Premises," "Weber Premises," and "Harlem Premises," as further defined therein). The application and affidavit of Internal Revenue Service Criminal Investigation ("IRS-CI") Special Agent Amy C. Mansker in support of the Premises Warrant (the "Mansker Affidavit"), attached as Exhibit 2 and incorporated by reference, details additional findings of the investigation to date, including, in pertinent part, an undercover operation resulting in sufficient probable cause to search the Oxbow, Weber, and Harlem Premises for evidence, fruits, and instrumentalities of fraud.

### D.     BACKGROUND REGARDING INTERSTATE-WIRE COMMUNICATIONS

17.     Throughout this affidavit, reference is made to email communications exchanged via accounts serviced by AOL, Yahoo, and Google, among others, including email communications originating from or received by computers or digital devices in Illinois and Michigan. Based on my training and experience, and my conversations with agents familiar with investigations involving electronic communications, I know the following:

a.     Email and other similar electronic-wire communications travel through the Internet, a global hierarchical network of computers. The backbone of the Internet is made up of physically connected communication cables, switches, and routers that are owned and operated by commercial, government, academic, and other high-capacity network centers.

b.      Typically, when an individual (in this context, a "client") attempts to access a commercial-email service (*e.g.*, those provided by Google, Yahoo, or AOL) to send an email, the client's computer must first connect to a Domain Name Server ("DNS"). The DNS, in turn, acts as a phonebook for the Internet. For example, when www.google.com is entered into an Internet browser, the DNS will look up the IP address for Google and forward the browser onto the relevant IP address. During a typical DNS query, approximately four different servers (DNS Resolver, Root Server, Top Level Domain Server, and Authoritative Name Server) are accessed before the webpage is finally resolved. The aforementioned DNS servers are located in disparate geographic locations, both within and outside of the United States, and virtually always cross state lines.

c.      Similarly, when the DNS resolves the IP Address of a commercial-email provider, such as Yahoo! Mail, the IP address provided will not be for the email service itself, but rather the IP address of a Yahoo.com edge server. In the case of Yahoo.com, the edge server—located in New York—is responsible for forwarding the client computer to the IP address of one of Yahoo's multiple mail servers, which are located throughout the world. The edge server will connect the client to the closest, best-performing mail server accounting for the amount of network activity the email provider is experiencing at any given time. This process allows the email provider to distribute connection activity evenly across its network and is commonly referred to as "load balancing."

9

d.      Thus, any email communications discussed in this affidavit, the April 2020 Luciano Affidavit, and the Mansker Affidavit, which were sent or received from domains serviced by AOL, Yahoo, and Google, are either: (1) actual interstate-wire communications; or (2) communications for which the use of an interstate-wire facility is reasonably foreseeable.

18.     Additionally, throughout this affidavit, reference is made to domestic wire transfers of funds, in addition to international wire transfers. Domestic wire transfers conducted within the United States are cleared through the Fedwire funds-transfer system, an electronic interbank system operated by the Federal Reserve. Based on my training and experience, and other agents' interviews of Federal Reserve employees in prior investigations, I know that Fedwire does not process wire transfers in Illinois but rather in New Jersey and/or Texas. Thus, any Fedwire transfers received by financial institutions in Illinois, as discussed throughout this affidavit, the April 2020 Luciano Affidavit, and the Mansker Affidavit are interstate-wire transactions.

### E.      HISTORICAL EVIDENCE TYING ANIUKWU, IBEKIE, AND GOSHA TO FICTITIOUS BUSINESSES RECEIVING FRAUDULENT PROCEEDS

19.     As detailed further in Section III.B of the April 2020 Luciano Affidavit and Section II.C of the Mansker Affidavit, ANIUKWU, IBEKIE, and GOSHA— among others—have incorporated or registered several business entities with the Illinois Secretary of State ("ILSOS"), and also created individual bank accounts for each entity. In the course of this investigation, agents have tied bank accounts for the entities to the receipt of fraudulently obtained funds from various victim individuals

and victim businesses. These funds were obtained, variously, through the use of business-email-compromise, romance-fraud, and inheritance-fraud schemes. These include, in pertinent part, the following entities and transactions:

      a.    As detailed further in Section III.B.2 of the April 2020 Luciano Affidavit, EMPERORCHILLS was incorporated with the ILSOS in or around June 2017, with IBEKIE as its registered agent and ANIUKWU as its director and incorporator. In or around June 2017, multiple accounts were opened in EMPERORCHILLS's name at federally-insured banks, with ANIUKWU as the authorized signer. In or around September 2017, one of these accounts received approximately $119,938 in funds fraudulently obtained through a business-email compromise scheme targeting Victim Business B.E.F. The same day as those funds were received by EMPERORCHILLS, approximately four checks made payable to "Aniukwu Samuel" were drawn from the account, each in the amount of between $9,300 and $9,600. Photos obtained from bank-security cameras appear to show ANIUKWU and IBEKIE at a teller counter during the timeframe that two of these checks were deposited at a bank in Naperville, Illinois.

      i.    Based on my training and experience, I know that financial institutions are required by law to file a currency transaction report ("CTR") with the Financial Crimes Enforcement Network ("FinCEN") for a cash deposit, withdrawal, or exchange of currency exceeding $10,000. I also know, based on my training and experience, that criminal enterprises routinely limit the amount of any individual deposit or withdrawal of unlawfully obtained currency, in an effort to prevent the

filing of a CTR and thereby avoid detection by law enforcement. This practice—known as "structuring"—is prohibited under federal law, namely, Title 31, United States Code, Section 5324. Here, as noted above, the checks made payable to "Aniukwu Samuel" from the EMPERORCHILLS account were between $400 and $700 below the CTR threshold for FinCEN.

b.      As detailed further in Section III.B.3 of the April 2020 Luciano Affidavit, MEKAS Construction Inc. was incorporated with the ILSOS in or around July 2017, with IBEKIE as its registered agent and ANIUKWU and IBEKIE as its directors. In or around September and October 2017, multiple accounts were opened in MEKAS's name at federally-insured banks, with Co-Conspirator 1, Co-Conspirator 2, or IBEKIE as the authorized signers. In or around October and November 2017, more than one of these accounts collectively received approximately $17,055 in funds fraudulently obtained through business-email compromise, inheritance-fraud, and romance-fraud schemes targeting Victim Business M.W., Victim Individual J.B., and Victim Individual D.J.

i.      The inheritance-fraud scheme—in particular—involved a payment to MEKAS's bank account to retain Pierre Delouis ("Delouis"), a putative attorney supposedly employed by the law firm Hall and Hall Chamber in Toronto, Canada. As noted further in Section II.F.2, below, this is the same putative attorney that an undercover agent was directed to retain in connection with a nearly-identical inheritance-fraud scheme in which ANIUKWU, IBEKIE, and GOSHA are implicated.

12

c.     As detailed further in Section III.B.4 of the April 2020 Luciano Affidavit, SAMTONI Medical Equipment was incorporated with the ILSOS in or around November 2017, with ANIUKWU as its registered agent. In or around November 2017, multiple accounts were opened in SAMTONI's name at federally-insured banks, with ANIUKWU or IBEKIE (sometimes using variants of their names) as the authorized signers. In or around December 2017, one of these accounts received approximately $45,000 in funds fraudulently obtained through a romance-fraud scheme targeting Victim Individual C.B.

d.     As detailed further in Section III.B.5 of the April 2020 Luciano Affidavit, INNOCORD Inc. was incorporated with the ILSOS in or around November 2017, with ANIUKWU as its registered agent and incorporator. Between in or around December 2017 and February 2018, multiple accounts were opened in INNOCORD's name at federally-insured banks, with ANIUKWU (using a variant of his name) as the authorized signer. In or around March 2018, one of these accounts received approximately $36,850 in funds fraudulently obtained through a business-email compromise scheme targeting Victim Business F.M. Over an approximately five-day period after the fraudulent funds were received, numerous cash withdrawals of between $159.99 and $9,700—each falling below FinCEN's reporting threshold for CTRs, but together amounting to approximately $42,609.99 in withdrawals—were made from the same account. Withdrawal tickets received to date for these transactions all appear, upon lay inspection, to reflect ANIUKWU's signature as seen in bank records and other documents obtained over the course of the investigation.

e.     As detailed further in Section III.B.6 of the April 2020 Luciano Affidavit, GREEN HOUSE For Food Industry Inc. was incorporated with the ILSOS in or around December 2017, with ANIUKWU (using a variant of his name) as its registered agent and incorporator. Within days of its incorporation, multiple accounts were opened in GREEN HOUSE's name at federally-insured banks, with ANIUKWU (sometimes using a variant of his name) as the authorized signer. Between in or around February 2018 and April 2019, more than one of these accounts collectively received approximately $48,980.75 in funds fraudulently obtained through inheritance-fraud and business-email compromise schemes targeting Victim Individual C.H. and Victim Business F.M.

i.     The inheritance-fraud scheme—in particular—involved Victim Individual C.H.'s payment to GREEN HOUSE's bank account of a retainer fee for putative attorney Delouis, the same person appearing in several other inheritance-fraud schemes discussed herein, including in the undercover operation noted in Section II.F.2, below.

f.     As detailed further in Section III.B.8 of the April 2020 Luciano Affidavit, GODMEKS Inc. was incorporated with the ILSOS in or around April 2018, with ANIUKWU (using a variant of his name) as its registered agent and incorporator. In or around May 2018, multiple accounts were opened in GODMEKS's name at federally-insured banks, with ANIUKWU (using variants of his name) as the authorized signer. In or around August 2019, one of these accounts received

approximately $45,925.75 in funds fraudulently obtained through an inheritance-fraud scheme targeting Victim Individual D.P.

      i.     This inheritance-fraud scheme involved Victim Individual D.P.'s payment to GODMEKS's bank account of a retainer fee for putative attorney Delouis, the same person appearing in several other inheritance-fraud schemes discussed herein, including in the undercover operation noted in Section II.F.2, below.

      g.     As detailed further in Section III.B.11 of the April 2020 Luciano Affidavit, SAMCHINA Trucking Inc. was incorporated with the ILSOS in or around July 2018, with ANIUKWU and Co-Conspirator 3 as its incorporators. Between in or around August 2018 and July 2019, multiple accounts were opened in SAMCHINA's name at federally-insured banks, with ANIUKWU as the authorized signer. In or around June 2019, a cashier's check for approximately $31,000 was deposited into one of these accounts, consisting of funds fraudulently obtained through a romance-fraud scheme targeting Victim Individual M.S. After the check was deposited, the account made an attempted wire transfer to Nigeria for approximately $23,000, for "cleaning containers." Security photos obtained from bank-security cameras appear to show ANIUKWU at a teller counter during the timeframe that these transactions occurred at the subject bank.

      h.     As detailed further in Section III.B.7 of the April 2020 Luciano Affidavit and Section II.C.1 of the Mansker Affidavit, HALL & HALL Global Inc. was incorporated with the ILSOS in or around April 2018, with Co-Conspirator 1 as its registered agent and ANIUKWU (using a variant of his name) as its incorporator.

Within days of its incorporation, multiple accounts were opened in HALL & HALL's name at federally-insured banks, with Co-Conspirator 1 as the authorized signer. In or around April and May 2018, more than one of these accounts collectively received approximately $204,367.75 in funds fraudulently obtained through business-email compromise and inheritance-fraud schemes targeting Victim Business G.F.E., as well as Victim Business V.M.C. and its principals, Victim Individual V.M. and his/her spouse, Victim Individual R.U. Within days of receiving these funds, withdrawals of several thousands of dollars (including cash withdrawals falling below FinCEN's reporting threshold for CTRs) were made from these accounts by Co-Conspirator 1, as confirmed by a review of withdrawal tickets. Tens of thousands of dollars in funds were also transferred among accounts in Co-Conspirator 1's or HALL & HALL's name at different banks, and at least one wire transfer of approximately $23,000 was made from Co-Conspirator 1's bank account to a Nigerian bank account in IBEKIE's name.

      i.    The inheritance-fraud scheme—in particular—involved Victim Individual R.U.'s payment to HALL & HALL's bank account of a retainer fee for putative attorney Delouis, the same person appearing in several other inheritance-fraud schemes discussed herein, including in the undercover operation noted in Section II.F.2, below.

      i.    As detailed further in Section II.C.2 of the Mansker Affidavit, JENANT Inc. was incorporated with the ILSOS in or around December 2018, with GOSHA as its registered agent, and SETRACO Services, Inc. was incorporated with the ILSOS in or around March 2019 with "Sammy Maxwell" as its registered agent.

In or around January 2019, an account was opened in JENANT's name at a federally-insured bank, with GOSHA as the authorized signer. In or around March 2019, an account was opened in SETRACO's name at the same bank, with "Sammy Maxwell" as the authorized signer. Further, in or around March 2019, these accounts for JENANT and SETRACO collectively received approximately $206,867.75 in funds fraudulently obtained through an inheritance-fraud scheme targeting Victim Individual C.L. Within days of receiving these funds, withdrawals of several thousands of dollars (including cash withdrawals falling below FinCEN's reporting threshold for CTRs) were made from these accounts by GOSHA or ANIUKWU (who was using the alias "Sammy Maxwell"), as confirmed by a review of withdrawal tickets and bank-security footage. Between in or around March and September 2019, tens of thousands of dollars in funds were also transferred among accounts in SETRACO's name at different banks, and at least one wire transfer of approximately $25,000 was made from a SETRACO bank account to a Nigerian bank account in IBEKIE's name.

        i.     This inheritance-fraud scheme involved Victim Individual C.L.'s payment to either JENANT's or SETRACO's bank account of a retainer fee for putative attorney Delouis, the same person appearing in several other inheritance-fraud schemes discussed herein, including in the undercover operation noted in Section II.F.2, below.

        j.     As detailed further in Section III.B.9 of the April 2020 Luciano Affidavit and Section II.C.3 of the Mansker Affidavit, SAMCORD Inc. was

incorporated with the ILSOS in or around June 2018, with IBEKIE (using a variant of his name) as its registered agent and incorporator. Several days later, an account was opened in SAMCORD's name at a federally-insured bank, with IBEKIE and GOSHA as authorized signers. In or around July 2018, this same account received approximately $25,000 in funds fraudulently obtained through a romance-fraud scheme targeting Victim Individual A.W. (who later told agents that s/he estimated that s/he lost over $267,000 as a result of the scheme). Within days of receiving these funds, withdrawals of several thousands of dollars (including cash withdrawals falling below FinCEN's reporting threshold for CTRs) were made from these accounts, including one by IBEKIE, as confirmed by a review of withdrawal tickets.

20.     Based on my training and experience, knowledge of this investigation, and conversations with other investigators, I know the following:

a.     Criminal enterprises involved in fraud routinely attempt to conceal the origins of illegally obtained money, including through transfers of funds between accounts belonging to fictional business entities, or wire transfers to foreign banks. Here, as demonstrated above, accounts in the name of numerous fictional business entities associated with IBEKIE, ANIUKWU, and their co-conspirators received hundreds of thousands of dollars in fraudulently obtained funds between 2017 and 2019, frequently via wire transfers. Within days of receipt, tens of thousands of dollars were withdrawn from these accounts as checks, or in cash withdrawals falling below FinCEN's reporting threshold for CTRs.

b. The withdrawals were, in turn, re-deposited into other accounts in the name of fictional business entities associated with IBEKIE, ANIUKWU, and their co-conspirators at other banks. Further, tens of thousands of dollars from accounts in the name of fictional business entities associated with IBEKIE, ANIUKWU, and their co-conspirators were wire-transferred to foreign accounts in IBEKIE's name. This sort of financial activity is consistent with a money-laundering scheme designed to hide the origins of fraudulently obtained funds.

### F. EVIDENCE OF ANIUKWU'S, IBEKIE'S, AND GOSHA'S PERSONAL INVOLVEMENT IN INHERITANCE-FRAUD SCHEMES

#### 1. TRASH PULL AT LINCOLN PREMISES & FINGERPRINT ANALYSIS OF FORM LETTERS USED IN INHERITANCE-FRAUD SCHEME

21. As noted in Section III.A.1, III.A.2, and III.A.7 of the April 2020 Luciano Affidavit, ANIUKWU and IBEKIE formerly resided at 5206 Lincoln Avenue, in Lisle, Illinois (the "Lincoln Premises"), as confirmed through physical surveillance, driver's license information, telephone subscriber and toll records, and declarations made by these individuals to immigration officials, among other sources of information. ANIUKWU and IBEKIE appear to have vacated the Lincoln Premises, however, in or around April or May 2019. According to ILSOS records, between in or around June 2015 and April 2019, approximately fourteen entities were incorporated with the ILSOS bearing the Lincoln Premises as their address, including EMPERORCHILLS, MEKAS, SAMTONI, GREEN HOUSE, GODMEKS, HALL & HALL, ESIJEMINE, and SAMCHINA.

22. On or about May 1, 2019, agents obtained the trash abandoned outside the curtilage of the Lincoln Premises, as described further in Section III.D of the April

19

2020 Luciano Affidavit and Section II.D of the Mansker Affidavit. In the trash, agents found what appeared to be form letters addressed to various individuals from the same person, "John Delon," informing each addressee that Delon was interested in representing him/her in obtaining an approximately $9.2 million inheritance left behind by a putative deceased relative. (The same individual, Delon, was involved in the inheritance-fraud scheme targeting Victim Individual C.L., as noted above and in Section III.C.2.b of the Mansker Affidavit.) Agents also recovered handwritten notes from the trash, including one bearing username "JohnJeanDelon Gmail Account," password "JohnJean5206."

a.   "5206," as noted previously, is the numerical street address for the Lincoln Premises, the location where the above-mentioned trash pull occurred.

23.   As described further in Section II.D of the Mansker Affidavit, in or around February and March 2020, three similar letters as those recovered during the Lincoln Premises trash pull were returned to 503 North County Farm Road, Wheaton, Illinois, which is the address for the DuPage County State's Attorney Office. (Based on the investigation to date, agents have not yet determined why form letters used in furtherance of the schemes under investigation bore this particular return address.) The subject mailings also appeared to be form letters addressed to various individuals from the same person, "Peter Pfizer,"  informing each addressee that Pfizer was interested in representing him/her in obtaining an approximately $11.6 million inheritance left behind by a putative deceased relative, and requesting that the addressee contact Pfizer at Ppfizer456@aol.com. (The same individual,

Pfizer, exchanged communications with an undercover agent, as noted below and in Section III.D.3 of the Mansker Affidavit.) Agents submitted two of the letters for fingerprint analysis to the IRS-CI National Forensic Laboratory, which concluded that one latent print located on one of the envelopes was made by IBEKIE.

### 2. SUMMARY OF UNDERCOVER OPERATION AND CONTROLLED DELIVERY OF FUNDS OBTAINED THROUGH USE OF INHERITANCE-FRAUD SCHEME

24.     On or about May 1, 2020, an IRS-CI Special Agent operating in an undercover capacity (the "UCA") sent an email to Ppfizer456@aol.com in response to one of the letters received by the DuPage County State's Attorney Office purporting to be a relative of one of the addressees, Victim Individual W.B. The UCA informed Peter Pfizer that s/he handles the affairs of Victim Individual W.B. and would like to proceed with the transaction on behalf of Victim Individual W.B. At all relevant times during the undercover operation, the UCA was physically located in Michigan.

25.     As described further in Section III.D.3 of the Mansker Affidavit:

a.     The UCA received a response from Pfizer the same day, on or about May 1, 2020. What followed over the next several days were a series of communications wherein Pfizer directed the UCA to fill out certain forms to lay claim to a putative deceased relative's bank account with Standard Chartered Bank (the "Inheritance Account"). The UCA was later directed to contact Standard Chartered's affiliate bank, TD Canada Trust, using the email address ued@tdcanadagroup.com. Several victims cited in the April 2020 Luciano Affidavit (*see* Sections III.B.3.c, III.B.6.b, and III.B.7.b, therein) corresponded with ued@tdcanadagroup.com.

b.      In late-May, 2020, the UCA was directed by both a representative of TD Canada Trust and Pfizer to retain the services of Pierre Delouis, a putative attorney with the firm HALL & HALL (the same individual appearing in inheritance-fraud schemes targeting multiple other victims, as noted herein). On or about June 5, 2020, the UCA signed a retainer agreement with Delouis and requested bank-account information related to the payment of certain associated fees. That same day, the UCA had a recorded call with Pfizer, who was using an unknown number. Pfizer instructed the UCA regarding what to say to bank personnel when the UCA wired money to pay the fees due to Delouis, emphasizing that the UCA should tell the bank that s/he was wiring money to purchase goods or merchandise. Further, that same day, Delouis contacted the UCA via email and instructed the UCA to pay the pending fees through a wire transfer to a Chase Bank account in the name of EMETECH Solutions Inc., with an address of the Oxbow Premises (which, as noted below and in the Mansker Affidavit, is IBEKIE's current residence).

i.      A search of ILSOS online databases disclosed EMETECH was incorporated on or about March 6, 2020, with IBEKIE as its registered agent. Further, on or about March 10, 2020, a checking account was opened in the name of EMETECH at JP Morgan Chase Bank. The signature card for this account lists Co-Conspirator 4 as the authorized signer and President of EMETECH. The signature card also lists the Oxbow Premises as the address for EMETECH.

c.      On or about June 9, 2020, Delouis sent an email to the UCA with revised payment instructions, directing the UCA to send a cashier's check, made

22

payable GLOBAYO LLC, to 1419 N. Harlem Avenue, Suite B, Oak Park, Illinois 60302 (*i.e.*, the Harlem Premises). As set forth in Section II.E.2 of the Mansker Affidavit, GOSHA resides at the Harlem Premises.

        i.     A search of ILSOS online databases disclosed GLOBAYO was incorporated on or about June 1, 2017, with Co-Conspirator 5 as its registered agent. Pertinent communications exchanged via email among Co-Conspirator 5, ANIUKWU, and IBEKIE are described further below.

        d.     On or about June 15, 2020, the UCA obtained a cashier's check for $1,100 made payable to GLOBAYO (the "UCA Check"). The next day, with the assistance of the U.S. Postal Inspection Service ("USPIS"), agents prepared a U.S. Postal Service Express Mail parcel (the "Express Parcel"). Then, before they placed the UCA Check inside the Express Parcel, agents added a handwritten notation to its face stating: "For Pierre Delouis – Legal Fees." The Express Parcel was addressed to "Globayo LLC" at the Harlem Premises.

        e.     On or about June 18, 2020, after a BMW SUV currently registered to GOSHA arrived at the Harlem Premises, a Postal Inspector posing as a mail carrier conducted a controlled delivery of the Express Parcel containing the UCA Check to the Harlem Premises. GOSHA answered the door.[1] When asked about the Express Parcel being addressed to a business entity at a residential address, GOSHA looked at the label on the Express Parcel and confirmed that its delivery address was correct.

---

[1] As detailed in the Mansker Affidavit, GOSHA was identified based on agents' review of an audio-video recording of the controlled delivery, and their general familiarity with GOSHA's appearance from photographs and driver's license records in law-enforcement databases.

GOSHA further said that she had been working from home, an apparent explanation for receiving mail addressed to a business entity at her residence. (From information obtained in the investigation to date, agents believe that GOSHA actually works for the U.S. Postal Service.) Further, GOSHA complained that the Express Parcel should have arrived that morning instead of in the afternoon, indicating her knowledge of the Express Parcel and anticipation of its arrival. Then, GOSHA signed for the parcel as "JGosha."

26.     USPIS obtained a list of all IP addresses that were used to track the Express Parcel delivered to the Harlem Premises. One IP address used to track the Express Parcel around June 17, 2020 was 2600:1700:1cb0:2d80:fc85:e5c4:3128:1fae. Subscriber records obtained from AT&T showed that this IP address is registered to ANIUKWU at the Oxbow Premises (which, as noted below and in the Mansker Affidavit, is IBEKIE's current residence).[2] Further, IP addresses associated, between February and April 2020, with online activity for ued@standardgroupservices.com and Ppfizer456@aol.com—two email addresses used to communicate with the UCA, as noted further in Section II.F of the Mansker Affidavit—are also registered to ANIUKWU at the Oxbow Premises.

---

[2] As detailed in the Mansker Affidavit, IBEKIE or vehicles known to be used by him have been seen at the Oxbow Premises on over a dozen occasions between January and June 2020. During these instances, IBEKIE was identified based on agents' general familiarity with his appearance from photographs and driver's license records in law-enforcement databases.

### 3. PERTINENT EMAIL COMMUNICATIONS EXCHANGED AMONG ANIUKWU, IBEKIE, AND THEIR CO-CONSPIRATORS

#### i. Evidence Tying IBEKIE to Use of Specific Gmail Accounts

27.     Information obtained from Google showed that the subscribers for two email accounts, aibekie@gmail.com and aristoblake@gmail.com, are "Anthony Ibekie" and "Aristo Blake," respectively. Both accounts have the same recovery email address, however, of emekarn@yahoo.com. Further, data obtained pursuant to pen-trap orders issued by the Honorable Rebecca R. Pallmeyer, Chief United States District Judge, on or about June 15, 2020, in Case No. 19 GJ 060 (collectively, the "Pen/Trap"), show that the IP address 104.185.26.48 was used to access the account aibekie@gmail.com on or about June 17, 2020.

28.     Subscriber records obtained from AT&T show this same IP address is registered to ANIUKWU at the Oxbow Premises (though ANIUKWU resides at the Weber Premises, as detailed further in Section II.G of the Mansker Affidavit). Information obtained from Continental Properties, the management company for the Oxbow Premises and Weber Premises, shows that IBEKIE applied to be added as a tenant of the Oxbow Premises on or about April 29, 2020. Moreover, surveillance and other information obtained over the course of the investigation, as detailed further in Section II.F of the Mansker Affidavit, establishes that the Oxbow Premises—the same address where the account aibekie@gmail.com was accessed on or about June 17, 2020, according to IP address records—is IBEKIE's current residence (and a location where ANIUKWU has not been seen on multiple instances of surveillance).

29. Information obtained from Continental Properties additionally shows that ANIUKWU is the current tenant at the Weber Premises, with a lease term through November 14, 2020.[3] A lease application dated on or about November 14, 2019, which was submitted by ANIUKWU, listed IBEKIE as ANIUKWU's emergency contact and prior landlord. Contact information listed for IBEKIE on this application included the email address aristoblake@gmail.com. Further, communications from aristoblake@gmail.com to other email accounts, discussed further below, are signed by "Tony" (a common abbreviation for IBEKIE's first name, Anthony).

30. Based on my training and experience, knowledge of this investigation, review of the foregoing subscriber records and other information, as well as the contents of email communications detailed below and in the Mansker Affidavit, I believe that the accounts aibekie@gmail.com and aristoblake@gmail.com are used by IBEKIE.

### ii. Evidence Tying ANIUKWU to Use of Specific Gmail Accounts

31. On or about November 8, 2019, ANIUKWU was subjected to a border inspection by Customs and Border Patrol ("CBP") officers, upon his return to O'Hare International Airport from a trip abroad. The information obtained from that border inspection is described more fully in Section III.F of the April 2020 Luciano Affidavit.

---

[3] As detailed in the Mansker Affidavit, ANIUKWU has been seen at the Weber Premises on multiple occasions since April 2020, and as recently as July 7, 2020. During these instances, ANIUKWU was identified based on agents' general familiarity with his appearance from photographs and driver's license records in law-enforcement databases. ANIUKWU was not, however, seen at the Oxbow Premises during any instances of physical surveillance conducted by agents there (though multiple IP addresses associated with relevant account activity are subscribed to ANIUKWU at the Oxbow Premises).

During a border search of a MacBook Pro laptop in ANIUKWU's possession, agents saw an email application had data related to the accounts saniukwu1@gmail.com (the "ANIUKWU Gmail Account"), and constantconsultant200@gmail.com (the "Constant Gmail Account").

32.     Information obtained from Google showed that the subscriber for the ANIUKWU Gmail Account is ANIUKWU, and that the subscriber for the Constant Gmail Account is "Opia Samuel," with the same recovery-email address as used for the ANIUKWU Gmail Account.

33.     Based on my training and experience, knowledge of this investigation, review of the foregoing subscriber records and other information, as well as the contents of email communications detailed below and in the Mansker Affidavit, I believe that the ANIUKWU Gmail Account and Constant Gmail Account are used by ANIUKWU.

34.     On or about April 21, 2020, agents executed the Gmail Warrant, which authorized the search of the ANIUKWU Gmail Account and Constant Gmail Account. The results of that search are detailed further in Sections II.G.1 and II.G.2 of the Mansker Affidavit. What follows below are examples of pertinent data recovered from the ANIUKWU and Constant Gmail Accounts, including communications exchanged with aibekie@gmail.com and aristoblake@gmail.com, two accounts that are believed to be used by IBEKIE, as noted above.

### iii. Pertinent Communications Exchanged from the ANIUKWU Gmail Account

35.     As detailed further in Section II.G.1.b of the Mansker Affidavit, on or about May 15, 2017, an email was sent from the ANIUKWU Gmail Account to IBEKIE at email address aibekie@gmail.com, which included—as an attachment—a form letter used as part of an apparent inheritance-fraud scheme. The substantive content of the letter was similar to those: (1) obtained from the Lincoln Premises trash pull; (2) returned to the DuPage County State's Attorney Office, one of which bore IBEKIE's fingerprint on its envelope; and (3) used during the undercover operation discussed above to initiate contact with Peter Pfizer.

36.     As detailed further in Section II.G.1.b of the Mansker Affidavit, on or about June 10, 2018, an email was received by the ANIUKWU Gmail Account from Co-Conspirator 5 at [Co-Conspirator 5]@globayo.com, copying IBEKIE as well. The email identified Co-Conspirator 5 as the "President & CEO" of GLOBAYO, IBEKIE as the "CEO of African Money Union," and ANIUKWU as "Chief Operating Officer of African Money Union."

        a.      GLOBAYO is the company to which the UCA was instructed to pay fees associated with retaining putative attorney Delouis, and Co-Conspirator 5 is the registered agent for GLOBAYO, as described above. The UCA Check was made payable to GLOBAYO and delivered to the Harlem Premises through a Controlled Delivery, as further described above. African Money Union is referenced and further described in Section III.E.2 of the April 2020 Luciano Affidavit.

37.     As detailed further in Section II.G.1.b of the Mansker Affidavit, on or about September 21, 2019, the ANIUKWU Gmail Account received an email from aristoblake@gmail.com, which included—as an attachment—a form letter used as part of an apparent inheritance-fraud scheme, signed by "Mr. Peter Pfizer." The substantive content of the letter was similar to those: (1) obtained from the Lincoln Premises trash pull; (2) returned to the DuPage County State's Attorney Office, one of which bore IBEKIE's fingerprint on its envelope; and (3) used during the undercover operation discussed above to initiate contact with Peter Pfizer.

38.     As detailed further in Section II.G.1.b of the Mansker Affidavit, on or about December 19, 2019, an email was sent from the ANIUKWU Gmail Account to an unidentified recipient at seselambo@yahoo.com, which included—as an attachment—a form letter that appeared to be identical to the letter described above in paragraph 35.

39.     As detailed further in Section II.G.1.b of the Mansker Affidavit, an email was sent from the ANIUKWU Gmail Account to an unidentified recipient at peterpf172@gmail.com, which included—as an attachment—approximately 199 form letters addressed to various recipients in alphabetical order, with last names starting with the letters C and D. Each letter was signed by "Mr. Peter Pfizer." The substantive content of the letters was similar to those: (1) obtained from the Lincoln Premises trash pull; (2) returned to the DuPage County State's Attorney Office, one of which bore IBEKIE's fingerprint on its envelope; and (3) used during the undercover operation discussed above to initiate contact with Peter Pfizer.

### iv. Pertinent Communications Exchanged from the Constant Gmail Account

40.     As detailed further in Section II.G.2.b of the Mansker Affidavit, on or about June 11, 2017, the Constant Gmail Account received an email from aristoblake@gmail.com, copying Hallmark_security@hotmail.com, which was signed by "Tony" (a common abbreviation for IBEKIE's first name, Anthony). That same day, the Constant Gmail Account received another email from aristoblake@gmail.com, again copying Hallmark_security@hotmail.com, which contained the following text referencing form letters used as part of an apparent inheritance-fraud scheme:

> *Emeka,*
>
> *On another thought, since you have the direct mail addresses and I have sent you a sample of the merged email, i suggest you do the merging yourself and send me the already merged letter in a bulk of 100 each, then i can print it, place the stamp in the single window envelope and put them in the mail, i know you said you have 1500 direct mail addresses, that fine, when we exhaust it we can start using the 3000 (selective pre screened direct mail)I just ordered.*
>
> *God will have mercy on us one day.*
>
> *Please forward our correspondences to Onowu*
>
> *Here is our number*
>
> *Tony 630XXX0699*
> *Sama 630XXX5959*
> *Onowu 080XXXX11430*

a.     In documents filed by IBEKIE and ANIUKWU with immigration authorities in or around 2016 and 2017, IBEKIE's contact number is listed as (630) XXX-0699, and ANIUKWU's contact number is listed as (630) XXX-5959, as discussed further in Sections III.A.1 and III.A.2 of the April 2020 Luciano Affidavit.

## III.    CONCLUSION

41.    Based on the foregoing, as well as the facts set forth in the April 2020 Luciano Affidavit and the Mansker Affidavit (which are each incorporated herein by reference), probable cause exists that ANIUKWU, IBEKIE, and GOSHA, conspired with each other, and others known and unknown, to commit a wire-fraud scheme, in violation of Title 18, United States Code, Sections 1343 and 1349.

FURTHER AFFIANT SAYETH NOT.

SIXTO J. LUCIANO
Special Agent,
Homeland Security Investigations

SUBSCRIBED AND SWORN to before me on July 10, 2020.

Honorable SHEILA M. FINNEGAN
United States Magistrate Judge

31

# Exhibit 1:

Application and Affidavit of HSI SA
Sixto J. Luciano in Support of Gmail
Search Warrant in Case No. 20 M 215

AO 106 (REV 4/10) Affidavit for Search Warrant      AUSA Saurish Appleby-Bhattacharjee, (312) 469-6045

**FILED**

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

APR 20 2020

**UNDER SEAL**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

In the Matter of the Search of:

Case Number:

The Google accounts saniukwu1@gmail.com and
constantconsultant200@gmail.com, further described
in Attachment A

**20 M 215**

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Sixto J. Luciano, a Special Agent of the Homeland Security Investigations, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A

located in the Northern District of California, there is now concealed:

### See Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and fruits.

The search is related to a violation of:

*Code Section*

Title 18, United States Code, Sections 1341 and 1343

*Offense Description*

mail and wire fraud

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

_Telephonically_

*Applicant's Signature*

SIXTO J. LUCIANO, Special Agent
Homeland Security Investigations
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: April 20, 2020

*Judge's signature*

City and State: Chicago, Illinois

VIRGINIA M. KENDALL, U.S. District Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
    )
NORTHERN DISTRICT OF ILLINOIS    )

### AFFIDAVIT

### TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | INTRODUCTION AND AFFIANT BACKGROUND | 1 |
| II. | BACKGROUND INFORMATION REGARDING GOOGLE | 3 |
| III. | STATEMENT OF PROBABLE CAUSE | 5 |
| A. | Investigative Background and Summary | 5 |
| | 1. Uchenna Samuel Aniukwu, aka Samuel Uchenna Aniukwu ("ANIUKWU") | 9 |
| | 2. Anthony Emeka Ibekie ("IBEKIE") | 11 |
| | 3. Lasheena Washington ("WASHINGTON") | 12 |
| | 4. Williette Asanji ("ASANJI") | 13 |
| | 5. Treonda Steadman ("STEADMAN") | 13 |
| | 6. Lawrence Berry III ("BERRY") | 14 |
| | 7. The Lincoln Premises and its associated business entities | 15 |
| B. | Receipt of Victim Funds By Various Entities Associated with ANIUKWU, IBEKIE, and their Co-Conspirators | 17 |
| | 1. NU-MEKS Healthcare Inc. | 17 |
| | a. Corporate Formation | 17 |
| | b. Receipt of Funds from Victim Individual S.K. | 18 |
| | 2. EMPERORCHILLS | 20 |
| | a. Corporate Formation | 20 |
| | b. Receipt of Funds from Victim Business B.E.F. | 20 |
| | 3. MEKAS Construction Inc. | 23 |
| | a. Corporate Formation | 23 |
| | b. Receipt of Funds from Victim Business M.W. | 23 |
| | c. Receipt of Funds from Victim Individuals J.B. and S.B. | 25 |
| | d. Receipt of Funds from Victim Individual D.J. | 27 |
| | 4. SAMTONI Medical Equipment | 29 |
| | a. Corporate Formation | 29 |
| | b. Receipt of Funds from Victim Individual C.B. | 30 |

5. INNOCORD Inc............................................................................34
a. Corporate Formation...........................................................34
b. Receipt of Funds from Victim Business F.M.........................34
6. GREEN HOUSE For Food Industry Inc. .............................35
a. Corporate Formation...........................................................35
b. Receipt of Funds from Victim Individual C.H......................36
c. Receipt of Funds from Victim Business F.M.........................37
d. Receipt of Funds from Victim Individual K.D......................39
7. HALL & HALL Global Inc. ...............................................41
a. Corporate Formation...........................................................41
b. Receipt of Funds from Victim Business V.M.C. and Victim Individuals R.U. and V.M. .................................................41
c. Receipt of Funds from Victim Business G.F.E......................44
8. GODMEKS Inc. .................................................................45
a. Corporate Formation...........................................................45
b. Receipt of Funds from Victim Individual D.P.......................45
9. SAMCORD Inc...................................................................48
a. Corporate Formation...........................................................48
b. Receipt of Funds from Victim Individual D.P.......................48
c. Receipt of Funds from Victim Individual A.W. .....................49
10. ESIJEMINE Lucky Nengite Inc. .......................................51
a. Corporate Formation...........................................................51
b. Receipt of Funds from Victim Individual A.W. .....................51
c. Receipt of Funds from Victim Individual R.A. ......................52
11. SAMCHINA Trucking Inc...................................................54
a. Corporate Formation...........................................................54
b. Receipt of Victim Funds......................................................55
C. Evidence of International Outgoing Wire Transfers .................58
D. Trash Pull at the Lincoln Premises.........................................59
E. CBP Encounters with IBEKIE ...............................................62
1. October 1, 2018 Border Inspection .....................................62
2. April 5, 2019 Border Encounter..........................................63
3. October 31, 2019 Border Encounter ....................................64

F.     CBP November 8, 2019 Border Encounter with ANIUKWU ....................... 64

     1.    Border Search of ANIUKWU's Laptop ................................................... 66

G.    Probable Cause to Believe that Subject Accounts 1 and 2 Contain Evidence of Fraud....................................................................................................... 70

IV.   SEARCH PROCEDURE FOR SUBJECT EMAIL ACCOUNTS ................. 73

V.    CONCLUSION ........................................................................................... 74

I, Sixto Luciano, being duly sworn, state as follows:

## I.    INTRODUCTION AND AFFIANT BACKGROUND

1.    I am a Special Agent with the U.S. Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI") and have been so employed since 2008. As part of my duties as a Special Agent, I investigate criminal violations relating to white-collar crime, including mail, wire, and bank fraud, as well as other financial and cyber-crimes. Before my employment with HSI, I worked as a Postal Inspector with the U.S. Postal Inspection Service from about April 2008 through August 2008, and as a Special Agent with the Internal Revenue Service, Criminal Investigation from about January 2001 through April 2008. In my capacity as an investigator with these agencies, I have participated in the execution of multiple federal search warrants.

2.    This affidavit is made in support of an application for a warrant to search—pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A)—for information associated with certain account(s) that are stored at the premises owned, maintained, controlled, or operated by Google, a free web-based electronic mail-service provider located at 1600 Amphitheatre Parkway, Mountain View, California, 94043. The accounts to be searched are saniukwu1@gmail.com ("**Subject Account 1**") and constantconsultant200@gmail.com ("**Subject Account 2**") (collectively, "the **Subject Accounts**"), which are further described in the following paragraphs and in Part II of Attachment A. As set forth below, there is probable cause to believe that in the **Subject Accounts**, described in Part II of

Attachment A, and in Google's possession, there exists evidence, instrumentalities, and fruits concerning mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses, in violation of Title 18, United States Code, Sections 1341, 1343, 1956, and 371.

3.      The statements in this affidavit are based on my personal knowledge, and on information I have received from other law-enforcement personnel, as well as from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 1341, 1343, 1956, and 371, are located in the **Subject Accounts**.

4.      This affidavit also describes portions of written conversations, which I have summarized. These summaries do not necessarily refer to all of the topics covered during each conversation. In addition, these summaries do not include every conversation made by every writer/author on the topic being described. Portions of the conversations that are quoted are preliminary transcriptions, which may be subject to modification upon further review. For some conversations, I have offered my understandings and/or interpretations of the conversation, which are based upon my experience and knowledge of the investigation to date, the content and context of the conversations, the experience of other investigators with whom I have consulted, as well as my professional training and experience as a law-enforcement agent.

## II.   BACKGROUND INFORMATION REGARDING GOOGLE

5.     Based on my training and experience and information available from Google's website (google.com), I have learned the following information about Google and Gmail:

a.     Google offers a collection of Internet-based services, including e-mail and online data storage, which is owned and controlled by Google. The services are available at no cost to Internet users, though there are certain options, such as additional online data storage, that users may elect to pay money to receive. Subscribers obtain an account by registering on the Internet with Google and providing Google with basic information, including name, gender, zip code, and other personal/biographical information. Subscribers are given a Google account which ends in "@gmail.com" which is utilized to access these online services.

b.     Google maintains electronic records pertaining to the individuals and entities who maintain Google online subscriber accounts. These records often include account access information, e-mail transaction information, account application information, and in some circumstances billing and payment information.

c.     Any e-mail that is sent to a Google online account subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the storage limits preset by Google. If the message is not deleted by the subscriber, the account is below the maximum storage limit, and the subscriber accesses the account periodically, that message can remain on Google's servers indefinitely.

3

       d.     When a subscriber sends an e-mail, it is initiated by the user, transferred via the Internet to Google's servers, and then transmitted to its end destination. Google online account users have the option of saving a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the Google server, the e-mail may remain on the system indefinitely.

       e.     Google online account subscribers can store files, including but not limited to e-mails, documents, and image files, on servers maintained and/or owned by Google. The online data storage service is known as "Google Drive."

       f.     Google online account subscribers can also utilize a feature known as "History" that allows a user to track various historical account activity, including past Google Internet searches performed, information regarding devices which have been used to login to the Google online account, and physical location information regarding from where the Google online account was accessed.

       g.     Google keeps records that can reveal accounts accessed from the same electronic device, such as the same computer or mobile phone, including accounts that are linked by "cookies," which are small pieces of text sent to the user's Internet browser when visiting websites.

       6.     Therefore, the computers of Google are likely to contain all the material just described, including stored electronic communications and information concerning subscribers and their use of Google, such as account access information, transaction information, and account application. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of

Google, to protect the rights of the subjects of the investigation and to effectively pursue this investigation, authority is sought to allow Google to make a digital copy of the entire contents of the information subject to seizure specified in Section II of Attachment A. That copy will be provided to me or to any authorized federal agent. The contents will then be analyzed to identify records and information subject to seizure pursuant to Section III of Attachment A.

## III.   STATEMENT OF PROBABLE CAUSE

### A.   INVESTIGATIVE BACKGROUND AND SUMMARY

7.     This warrant application stems from an ongoing investigation into individuals in the Northern District of Illinois, and elsewhere, who are suspected of facilitating, or laundering the proceeds of, various online fraud schemes.

8.     To date, the investigation has identified several individuals who have conducted overt and affirmative acts in the Northern District of Illinois in furtherance of various online schemes and artifices, such as the incorporation of business entities and the opening of bank accounts at financial institutions—including those that are federally insured—in order to facilitate the receipt of funds fraudulently induced from victims through false pretenses, representations, promises, and concealment of material facts, and subsequently transfer the funds to accounts maintained abroad.

9.     The co-conspirators, known and unknown, have used various means to conduct the above overt acts, including the use of telephones, computers, vehicles, correspondence, and the United States Postal Service, evidence of which are believed to be maintained in the **Subject Accounts**, as described further in Attachment A.

5

10.    In summary, and as explained in more detail herein, the below individuals and entities were involved in opening accounts at financial institutions in the Northern District of Illinois, and elsewhere, to facilitate the receipt and subsequent transfer of proceeds fraudulently obtained from victims of the following categories of schemes:

a.    <u>Business Email Compromise</u>: a scheme targeting businesses that perform wire transfers. The scheme is typically carried out by: (1) compromising legitimate business e-mail accounts through social engineering or computer-intrusion techniques to gain unauthorized access to the business-email account; (2) blocking or redirecting communications to or from the email account; and then (3) using the compromised email account or a separate fraudulent email account to communicate with personnel from a victim company, attempting to induce the victim company into making a wire transfer under fraudulent pretenses.

b.    <u>Romance Fraud</u>: a scheme to defraud a victim on the Internet, whereby a co-conspirator contacts a victim online and builds trust through an online romance. At some point, the co-conspirator will convince a victim to send money to a predetermined recipient under the false pretense that the victim will either get paid back in the future or that the money being sent is part of a business transaction. Romance scams typically target persons looking for romantic partners or friendship on dating websites and other social-media platforms. The scammers may create profiles using fictitious or fake names, locations, images, and personas, allowing the scammers to cultivate relationships with prospective romance-scam victims. Victims

may be convinced to provide money or gifts to the scammers, or may be asked to conduct transactions on behalf of the scammers.

      c.    <u>Inheritance Fraud Scheme</u>: a variation of an online-investment-fraud scheme, in which a victim is tricked into sending money from his/her bank account under the false pretense that the victim is about to receive a substantial inheritance.

11.    The Statement of Probable Cause in this affidavit is divided into the following sections:

      a.    Sections III.A.1 through III.A.6 provide background information regarding the co-conspirators that law enforcement has identified, to date, as being involved in the fraudulent schemes mentioned herein, including Samuel ANIUKWU, whose email accounts are the subject of this warrant application.

      b.    Section III.A.7 identifies the "Lincoln Premises," a residential address formerly associated with several co-conspirators, including ANIUKWU and Anthony IBEKIE, as well as various business entities registered to that address that are relevant to this investigation.

      c.    Sections III.B.1 through III.B.11 summarize various business entities suspected of being used to facilitate the fraudulent schemes mentioned herein, including the corporate formation of those entities, as well as each entity's receipt of fraudulently obtained funds from a victim individual or victim business.

        d.      Section III.C summarizes evidence of international outgoing wire transfers of funds suspected to have been generated through the fraudulent schemes mentioned herein.

        e.      Section III.D summarizes evidence obtained by law enforcement during the search of discarded trash at the Lincoln Premises on or about May 1, 2019.

        f.      Section III.E summarizes interactions between Customs and Border Protection ("CBP") officials and suspected co-conspirator IBEKIE during three separate border encounters at the Chicago O'Hare International Airport between October 2018 and October 2019.

        g.      Section III.F—which has particular relevance to this warrant application—summarizes interactions between CBP officials and HSI agents, including myself, with suspected co-conspirator ANIUWKU at the Chicago O'Hare International Airport on or about November 8, 2019. This section also summarizes the findings from my border search of ANIUWKU's laptop (on which data from the **Subject Accounts** was stored). As noted below, at the time that I conducted the border search of ANIUWKU's laptop, I was aware of the details of this investigation set forth in Sections III.A through Section III.E, and held—based on my knowledge of those details—a reasonable suspicion that any digital devices in ANIUWKU's possession at the border would contain evidence, fruits, or instrumentalities of the fraudulent schemes mentioned herein.[1]

---

[1] On or about November 8, 2019, I also conducted a border search of a cellphone device in ANIUWKU's possession. This affidavit does not cite or rely upon any information obtained

h.     Section III.G summarizes why probable cause exists to search the **Subject Accounts** for the evidentiary items specified in Attachment A.

      **1.    Uchenna Samuel Aniukwu, aka Samuel Uchenna Aniukwu ("ANIUKWU")**

12.     ANIUKWU is a citizen or national from Nigeria, who, until about early-2019, resided at 5206 Lincoln Avenue in Lisle, Illinois ("the Lincoln Premises"), and then later moved to 2726 Alyssa Drive, in Naperville, Illinois (the "Alyssa Premises").

13.     Physical surveillance, driver's license information, analysis of telephone subscriber and toll records, and declarations made by ANIUKWU to CBP officials (described further below in Section III.F) indicate that ANIUKWU resided at the Alyssa Premises until around late-2019. Further, a review of commercial databases and physical surveillance indicates that ANIUKWU and co-conspirator Anthony IBEKIE (discussed further below) have moved from the Alyssa Premises in late-2019, and that ANIUKWU may now be residing at either 716 S. Weber Rd, Unit #512, in Romeoville, Illinois, or 673 Hearth Lane, in Carol Stream, Illinois. The latter address, as discussed below, is the residence of co-conspirator Lasheena WASHINGTON.

14.     A Form 485, Application to Register Permanent Residence, dated on or about May 18, 2018, and filed with the United States Citizenship and Immigration Service ("USCIS") in ANIUKWU's name, lists the Lincoln Premises as ANIUKWU's physical address from on or about April 4, 2016 to the date of the application. The form further lists ANIUKWU's occupation as a self-employed marketer, also located

---

during the border search of ANIUWKU's cellphone, but rather, only upon information obtained during the border search of ANIUWKU's laptop.

at the Lincoln Premises, and provides **Subject Account 1** and (630) XXX-7666 ("Subject Phone 2") as ANIUKWU's email address and telephone contact number. T-Mobile records identified NU-MEKS Healthcare Inc (discussed further below in Section III.B.1) at the Lincoln Premises as the subscriber for Subject Phone 2 from on or about November 22, 2017 to November 14, 2018.

15. Documents filed with the USCIS reflect IBEKIE as a joint sponsor for ANIUKWU to obtain status as a permanent resident of the United States. Further, a Form 864A, Contract between Sponsor and Household Member, dated on or about November 12, 2016, filed with the USCIS in the name of IBEKIE lists ANIUKWU as IBEKIE's cousin. Additionally, a Form 864, Affidavit of Support filed with the USCIS in the name of IBEKIE, dated on or about June 6, 2017, lists ANIUKWU's contact number as (630) XXX-5959 ("Subject Phone 3"), while another Form 864, dated on or about November 2, 2016, lists ANIUKWU's contact number as Subject Phone 1 (*i.e.*, the same number listed as IBEKIE's contact number in IBEKIE's own Application for Naturalization, described further below). T-Mobile records identified NU-MEKS Healthcare Inc at the Lincoln Premises as the subscriber for Subject Phone 3 from on or about October 19, 2016 to December 4, 2017.

16. On or about November 8, 2019, CBP officials conducted an inspection of ANIUKWU at O'Hare upon his arrival into the United Sates, as discussed further in Section III.F. During the inspection, ANIUKWU had a Samsung SM-960U phone in his possession using phone number (630) XXX-3378 ("Subject Phone 4"). T-Mobile records identify ANIUKWU as the subscriber for Subject Phone 4.

### 2. Anthony Emeka Ibekie ("IBEKIE")

17.     IBEKIE is a citizen or national from Nigeria, and a lawful permanent resident of the United States, who, until about early- to mid-2019, resided at the Lincoln Premises.

18.     A review of commercial databases, physical surveillance, analysis of telephone subscriber and toll records, and declarations made by IBEKIE to CBP officials (described further below in III.E) indicate that IBEKIE resided at the Alyssa Premises until around late-2019, but that he currently resides at 797 Oxbow, Unit #110, in Oswego, Illinois as of approximately January 2020.

19.     A Form N-400, Application for Naturalization, dated on or about August 22, 2017, and filed with the USCIS in IBEKIE's name, lists the Lincoln Premises as IBEKIE's address from on or about January 1, 2010 to the date of the application. The form further lists IBEKIE's occupation as a registered nurse with Numeks Healthcare Inc., also at the Lincoln Premises, and provides (630) XXX-0699 ("Subject Phone 1") as IBEKIE's telephone number. T-Mobile records identified NU-MEKS Healthcare Inc at the Lincoln Premises as the subscriber for Subject Phone 1 from on or about July 8, 2015 to November 14, 2018.

20.     Documents filed with the USCIS indicate that IBEKIE was married to Tonyanika Fogle from on or about April 27, 2001 through April 7, 2006, and later to Treonda STEADMAN (described further below in Section II.A.5) from on or about January 18, 2007 through September 15, 2015.

21.     On or about October 31, 2019, CBP officials conducted an inspection of IBEKIE at the Chicago O'Hare International Airport ("O'Hare") upon his arrival into

11

the United Sates, as discussed further in Section III.E. During the inspection, IBEKIE had a Samsung SM-G965V phone in his possession utilizing phone number (630) XXX-4947 ("Subject Phone 5"). T-Mobile records identified SAMTONI Medical Equipment Inc (discussed further in Section III.B.4) at the Alyssa Premises as the subscriber for Subject Phone 5.

### 3. Lasheena Washington ("WASHINGTON")

22.     WASHINGTON is a United States citizen, who, according to commercial databases, driver's license information, personal bank statements, and physical surveillance, resides at 673 Hearth Lane, Apartment 209 in Carol Stream, Illinois.

23.     Documents filed with the USCIS list WASHINGTON as ANIUKWU's spouse and joint sponsor of ANIUKWU's application for permanent residence in the United States. The documents further state that WASHINGTON and ANIUKWU were married in DuPage County on or about May 20, 2016.

24.     A Form 864, Affidavit of Support filed with the USCIS in the name of WASHINGTON, dated on or about November 12, 2016, lists IBEKIE as WASHINGTON's brother-in-law. Further, a lease agreement executed by IBEKIE, ANIUKWU, and WASHINGTON, dated on or about January 2, 2017, and filed with the USCIS reflects that IBEKIE is the putative owner of the Lincoln Premises, with ANIUKWU and WASHINGTON as IBEKIE's tenants.

25.     According to DuPage County court records, on or about April 17, 2019, IBEKIE stipulated to being the father of WASHINGTON's son in the course of a paternity lawsuit filed by WASHINGTON against IBEKIE in Case No. 2018F640.

### 4. Williette Asanji ("ASANJI")

26.    ASANJI is a naturalized United States citizen, originally a citizen or national from Cameroon, who, according to filings with the USCIS, commercial databases, driver's license information, and personal bank statements, resides at 2084 Mark Circle, in Bolingbrook, Illinois.

27.    On or about October 18, 2017, Naperville Police Department officers conducted a traffic stop of IBEKIE, who was driving a 2008 black Mercedes, bearing a temporary Texas license plate. During the stop, IBEKIE told officers that he purportedly lived in Wisconsin, that he had purchased the vehicle in El Paso, Texas, and that his ex-wife resided at the Lincoln Premises.

28.    Through a database check, officers found that the temporary Texas license plate, as well as the insurance card and vehicle title that IBEKIE provided, were not valid, and that the car was actually registered to ASANJI. Upon being confronted with this information, IBEKIE admitted to the officers that the car, in fact, belong to ASANJI, whom IBEKIE purportedly paid for its use.

29.    A search of law enforcement databases reflects a black, 2008, four-door, Mercedes bearing the same vehicle identification number as the vehicle driven by IBEKIE during the above incident was registered in the name of ASANJI, with plate 455508, until about October 2018. No current registration was found for the vehicle.

### 5. Treonda Steadman ("STEADMAN")

30.    STEADMAN is a United States citizen, who, according to commercial databases, driver's license information, and physical surveillance, resides at 16512

13

South Mueller Circle, in Plainfield, Illinois. Documents filed with the USCIS reflect that STEADMAN and IBEKIE have two children together.

31.     As previously mentioned in Section III.A.2, documents filed with the USCIS indicated that STEADMAN was married to IBEKIE from on or about January 18, 2007 through September 15, 2015.

### 6.    Lawrence Berry III ("BERRY")

32.     BERRY is believed to be a United States citizen, who, according to records obtained from the Lisle Police Department, was a former tenant at the Lincoln Premises.

33.     In a letter filed with the USCIS, dated on or about October 2, 2017, BERRY purports to be the property manager for the building located at the Lincoln Premises, listing Subject Phone 1 (*i.e.*, the same number listed as IBEKIE's contact number in IBEKIE's own Application for Naturalization) as BERRY's contact number. In this letter, BERRY further represents that ANIUKWU and WASHINGTON have been tenants at the Lincoln Premises since 2017.

34.     On or about January 3, 2018, BERRY filed a report with the Lisle Police Department, in which he provided the following information:

      a.     In or around August 2017, BERRY entered into a one-year lease and moved into the basement of the Lincoln Premises. He was concerned that his landlord, IBEKIE, would throw out BERRY's dogs and belongings because BERRY failed to pay rent.

      b.     According to BERRY, IBEKIE was formerly a doctor in Nigeria, who now rented out rooms to his cousins from Nigeria and also acquired and shipped

14

vehicles to Nigeria for repairs. Further, IBEKIE instructed BERRY to set up personal checking and savings accounts to accept money transfers from unknown sources. IBEKIE informed BERRY that the funds were being deposited into BERRY's accounts in order to keep them hidden from IBEKIE's wife. BERRY was to withdraw those funds when instructed, and to provide them to IBEKIE.

        c.     BERRY complied with IBEKIE's request to open bank accounts out of fear of being evicted, and—according to BERRY's report to officers—IBEKIE had previously become physically aggressive with BERRY and threatened him. This aggression typically surfaced when BERRY was unable to withdraw funds from the accounts that he opened on IBEKIE's behalf.

### 7.     The Lincoln Premises and its associated business entities

35.     According to open-source research and physical surveillance, the Lincoln Premises—IBEKIE's and ANIUKWU's listed residence with the USCIS—is a single-family rental residence.

36.     According to a Lisle Police Department record dated on or about October 27, 2017, IBEKIE reported a home invasion in progress at the Lincoln Premises and said that he was locked in a bedroom in the rear of the residence. Officers responded to the Lincoln Premises, where they encountered five individuals, including IBEKIE; an individual sleeping in the southeast corner of the residence; and an individual named "Larry" in the basement.[2] The report indicates that the officers had to make a

---

[2] Based on my training, experience, and knowledge of this investigation, as well as my conversations with other investigators familiar with the facts of this investigation, I believe that "Larry" was Lawrence BERRY.

forced entry into a locked bedroom on the first floor of the residence. Further, in the report, the responding officers concluded that the incident resulted from a "misunderstanding that occurred when some guests were invited in the home by a resident."

37.    According to Illinois Secretary of State ("ILSOS") records, between on or about June 16, 2015 and April 2, 2019, approximately 14 entities were incorporated with the ILSOS reflecting the Lincoln Premises as either the initial registered office in the articles of incorporation, or as the principal address for the corporation in other filings, including, but not limited to, the following:

| NAME | DATE | AGENT |
|---|---|---|
| NU-MEKS HEALTHCARE INC. | June 17, 2015 | IBEKIE (DIRECTOR) |
| EMPERORCHILLS INC. | June 16, 2017 | IBEKIE |
| MEKAS CONSTRUCTION INC. | July 12, 2017 | IBEKIE |
| SAMTONI MEDICAL EQUIPMENT INC. | November 1, 2017 | ANIUKWU |
| GREEN HOUSE FOR FOOD INDUSTRY INC. | December 14, 2017 | ANIUKWU SAM UCHE |
| GODMEKS INC. | April 13, 2018 | UCHENNA ANI SAMUEL |
| HALL & HALL GLOBAL INC. | April 13, 2018 | WILLIETTE ASANJI |
| ESIJEMINE LUCKY NENGITE INC. | July 9, 2018 | EMEKA IBEKIE |
| SAMCHINA TRUCKING INC. | July 9, 2018 | LASHEENA WASHINGTON |

38.    As discussed in Section III.D, on or about May 1, 2019, investigators obtained the trash abandoned outside the curtilage of the Lincoln Premises. In the trash, investigators discovered numerous items appearing to belong to IBEKIE and ANIUKWU. Based on my training and experience, as well as the experience of other law-enforcement officers familiar with the investigation, it appears the occupants of the Lincoln Premises moved out sometime in or around April or May, 2019.

**B.** RECEIPT OF VICTIM FUNDS BY VARIOUS ENTITIES ASSOCIATED WITH ANIUKWU, IBEKIE, AND THEIR CO-CONSPIRATORS

39.     ANIUKWU, IBEKIE, and their known and unknown co-conspirators incorporated or registered several business entities with the ILSOS, and also created individual bank accounts for each entity. In the course of this investigation, agents have tied bank accounts for the entities to the receipt of fraudulently obtained funds from the victim individuals and victim businesses described herein. These funds were obtained, variously, through the use of business-email-compromise, romance-fraud, and inheritance-fraud schemes. What follows in Sections III.B.1 through III.B.11 below is a summary of: (1) the creation of the subject business entities and their related bank accounts; (2) the receipt of fraudulently obtained funds by the entities; and (3) agents' interviews with victims concerning how they were defrauded.

**1.     NU-MEKS Healthcare Inc.**

**a.     Corporate Formation**

40.     On or about June 17, 2015, Nu-Merks Healthcare Inc was incorporated with the ILSOS. Later, on or about August 11, 2015, articles of amendment were filed with the ILSOS changing the corporation's name to Nu-Meks Healthcare Inc. ("NU-MEKS"). Approximately one year later, on or about June 20, 2016, a domestic/foreign corporation annual report was filed with the ILSOS listing IBEKIE as a Director and Operations Manager for NU-MEKS. The annual report listed NU-MEK's principal address as the Lincoln Premises.

41.     A domestic/foreign corporation annual report for NU-MEKS filed with the ILSOS on or about June 7, 2017, lists ANIUKWU as a director for NU-MEKS.

17

The signature line reflects that this report was authorized by IBEKIE in his capacity as Director of NU-MEKS.

42.     A notice of resignation of registered agent filed with the ILSOS on or about December 19, 2018 reflects that NU-MEKS's principal office address is 790 Royal St George Drive, Suite 141 #111, in Naperville, Illinois. Based on open-source research and agent surveillance, that address appears to be a shipping, mailing, printing, and mailbox-rental business inside a shopping center in Naperville, Illinois.

### b.     Receipt of Funds from Victim Individual S.K.

43.     Between on or about August 5, 2016 and May 4, 2017, bank accounts were opened in the names of both NU-MEKS and Nu-Merks Healthcare Inc at Bank of America, TCF Bank, Wells Fargo Bank, and Fifth Third Bank.[3] IBEKIE is listed on the signature cards for the accounts as their authorized signer. The NU-MEKS account maintained at Bank of America also includes STEADMAN, IBEKIE's ex-wife, as an authorized signer.

44.     On or about August 5, 2016, a checking account (XXXX XXXX 1017) in the name of NU-MEKS was opened at Bank of America. The signature card for the account reflects that IBEKIE is the president of NU-MEKS and the authorized signer for the account.

---

[3] Based on a search of the Federal Deposit Insurance Corporation ("FDIC") online "BankFind" database, which allows users to locate FDIC-insured banking institutions, my training and experience, my work on other fraud investigations, as well as my conversations with other agents experienced in investigating bank fraud, I know that each of these banks is insured by the FDIC.

45. On or about November 25, 2016, the above checking account in the name of NU-MEKS received an approximately $29,280 wire transfer from JP Morgan Chase Bank indicating it was for the benefit of Victim Individual S.K. Bank of America later received a Uniform Indemnification Agreement from Fidelity Investments, dated on or about November 28, 2016, describing the transfer as an "unauthorized transaction(s)" from the account of Victim Individual S.K., and requesting the funds from the transfer be blocked.

46. On or about August 27, 2019, I conducted a telephonic interview with Victim Individual S.K., who said that someone purporting to be him/her contacted Fidelity Investments via telephone and initiated an approximately $36,600 withdrawal from his/her retirement account. Victim Individual S.K. stated that s/he learned the funds had been transferred from his/her retirement account at Fidelity Investments upon returning from vacation in another state. Victim Individual S.K. explained the withdrawal from his/her account incurred a fee payable to the Internal Revenue Service, resulting in the net transfer to NU-MEKS totaling approximately $29,280. Victim Individual S.K. stated s/he is not familiar with NU-MEKS and did not authorize the transaction. Victim Individual S.K. also said that Fidelity Investments ultimately reimbursed him/her for the withdrawal, so s/he did not incur a loss.

## 2.   EMPERORCHILLS

### a.   Corporate Formation

47.   On or about June 16, 2017, EMPERORCHILLS was incorporated with the ILSOS. Its articles list IBEKIE as the registered agent, and ANIUKWU as a director and incorporator. The articles further list the Lincoln Premises as IBEKIE's and ANIUKWU's address.

### b.   Receipt of Funds from Victim Business B.E.F.

48.   Between on or about June 27, 2017 and June 30, 2017, multiple accounts were opened in the name of EMPERORCHILLS at Wells Fargo Bank, BMO Harris Bank, JP Morgan Chase Bank, and West Suburban Bank.[4] The signature cards for the accounts reflect the name ANIUKWU, or what appear to be variations of ANIUKWU's name, such as "Uchenna A Samuel" and "Uchenna Samuel Aniukwu," as the authorized signer. The signature cards further appear, upon lay inspection, to bear the same or similar signatures.

49.   On or about June 30, 2017, a checking account (XXXXXX2298) was opened in the name of EMPERORCHILLS at West Suburban Bank.

50.   On or about September 6, 2017, the above checking account in the name of EMPERORCHILLS received an incoming wire from Victim Business B.E.F. in the amount of approximately $119,938. A Bank of Oklahoma wire-transfer request, dated on or about September 6, 2019, reflects that the wire was conducted on behalf of

---

[4] Based on a search of the FDIC "BankFind", which allows users to locate FDIC-insured banking institutions, my training and experience, my work on other fraud investigations, as well as my conversations with other agents experienced in investigating bank fraud, I know that each of these banks is insured by the FDIC.

Victim Business B.E.F. and lists a reference to Business C.A. in the "additional information" section of the request.

51.    Records obtained from the Bank of Oklahoma include a series of emails between representatives of Victim Business B.E.F. and Business C.A. In one email, dated on or about August 31, 2017, a representative of Business C.A. informed a representative from Victim Business B.E.F. that Business C.A. would no longer be receiving payments at a specified Bank of America account, and would be sending the representative of Victim Business B.E.F. details for another bank account for a future wire. In another email, dated on or about September 1, 2017, the representative of Business C.A. provided the representative of Victim Business B.E.F. with the details for the EMPERORCHILLS bank account at West Suburban Bank.

52.    Bank of Oklahoma records also include a series of emails between representatives of Bank of Oklahoma and Victim Business B.E.F. The emails indicate the wire sent to the EMPERORCHILLS account at West Suburban Bank had been conducted as a result of fraud and discussed attempts by Bank of Oklahoma to recall the funds.

53.    On or about August 13, 2019, agents interviewed representatives of Business C.A., including the representative noted in the emails described above. The representative explained that Business C.A. sells vehicles to Business J.V.M., to whom Victim Business B.E.F. provides lines of credit. The representative explained Business C.A. only utilizes an account maintained at Bank of America to receive wires. The representative then reviewed the emails described above and informed

investigators s/he did not send the email informing Victim Business B.E.F. that Business C.A. would no longer be receiving wires at the Bank of America account. The representative stated that s/he also did not send the email providing Victim Business B.E.F. with the details for the EMPERORCHILLS account at West Suburban Bank. Further, the representative informed investigators that information technology personnel at Business C.A. found his/her email had been hacked, and immediately terminated use of the email account.

54.     West Suburban Bank records reveal four checks were negotiated from the EMPERORCHILLS bank account on or about September 6, 2017, the same day that account received the wire from the Bank of Oklahoma. The checks, sequentially numbered from 1226 to 1229, were made payable to "Aniukwu Samuel." Upon lay inspection, the same or similar signature as is seen on the signature card for the EMPERORCHILLS bank account appears on the signature and endorsement lines on the front and back of each check.

55.     Checks 1226 and 1227, each in the amount of approximately $9,500, were negotiated at the West Suburban Bank branch located at 1296 East Chicago Avenue, in Naperville, Illinois at approximately 11:54 a.m. and 12:05 p.m., respectively. Photos obtained from bank-security cameras appear to show ANIUKWU and IBEKIE (whose known photographs I have reviewed in law-enforcement databases) at the counter during the timeframe of the transactions.

56.    Check 1228, in the amount of approximately $9,300, was negotiated approximately four miles away at the West Suburban Bank branch located at 2020 Feldott Lane, in Naperville, Illinois, at approximately 12:37 p.m.

57.    Lastly, Check 1229, in the amount of approximately $9,600, was negotiated approximately 12 miles away from the Feldott Lane branch, at the West Suburban Bank branch located at 295 West Loop Road in Wheaton, Illinois, at approximately 1:08 p.m.

58.    Based on my training and experience, I am aware that federal law typically requires financial institutions to report currency (meaning, cash or coin) transactions over $10,000 conducted by, or on behalf of, one person on a FinCEN Form 104, Currency Transaction Report ("CTR"). Further, based on my training and experience, I am aware that individuals trying to avoid these reporting requirements will often break up, or "structure", transactions into smaller amounts falling under the $10,000 CTR threshold.

### 3.    MEKAS Construction Inc.

#### a.    Corporate Formation

59.    On or about July 12, 2017, Mekas Construction Inc. ("MEKAS") was incorporated with the ILSOS. Its articles list IBEKIE as the registered agent with an address at the Lincoln Premises, and further identify IBEKIE and ANIUKWU as directors for MEKAS, also at the Lincoln Premises.

#### b.    Receipt of Funds from Victim Business M.W.

60.    On or about September 8, 2017, a checking account (XXXX XXXX 1240) and savings account (XXXX XXXX 5920) were opened in the name of MEKAS at Bank

of America. Signature cards for the accounts list ASANJI as the President of MEKAS and the authorized signer for the Bank of America accounts.

61.     On or about October 12, 2017, the MEKAS Bank of America checking account received a wire transfer from Victim Business M.W. for approximately $10,500.

62.     According to Saukville, Wisconsin Police Department ("Saukville PD") records, on or about October 13, 2017, Victim Individual R.W., the owner of Victim Business M.W., a machinery business in Wisconsin, contacted the Saukville PD and reported suffering a loss of funds due to an email compromise. The police report for this incident includes the following information:

a.     Victim Individual R.W. explained s/he attempted to contact his/her personal banker the previous day to conduct two wire transfers as part of his/her business, including one in the amount of $10,500 to Company H.M. The personal banker replied to Victim Individual R.W., advising him/her that Company H.M.'s bank did not accept wire transfers and that Victim Individual R.W. would have to reach out to Company H.M. and find an alternate bank to transfer the funds.

b.     Victim Individual R.W. forwarded the email from the personal banker to a person s/he believed was the owner of Company H.M., however, the email was directed to an email address ending in @contractor.net, instead of actual email for the owner of Company H.M., ending in @comcast.net. The receiver of the email responded and provided Victim Individual R.W. with information for Bank of America account (XXXX XXXX1240) in the name of MEKAS.

24

c.      Only later, after receiving an email from the owner of Company H.M. inquiring about the payment, Victim Individual R.W. discovered the emails had been spoofed and immediately attempted to recall the transaction through his/her bank. Upon further inquiries with Victim Business M.W.'s email-hosting service, Victim Individual R.W. learned that an unauthorized mail forwarder had been installed on his/her emails, which were being forwarded to mohit29032930@gmail.com. Subscriber information for the account indicates mohit29032930@gmail.com was registered in the name of Shailendra Singh on or about July 08, 2017, with a recovery email of anil.hospineed@gmail.com, and a Nigerian phone number +234XXXXX99944.

### c.      Receipt of Funds from Victim Individuals J.B. and S.B.

63.      On or about October 10, 2017, a checking account (XXXXXX2982) and savings account (XXXXXX2045) were opened in the name of MEKAS at Wells Fargo Bank. Signature cards reflect ASANJI as the authorized signer on the Wells Fargo accounts. The following day, on or about October 11, 2017, a checking account (XXXXX3508) and savings account (XXXXXX0882) were opened in the name of MEKAS at JP Morgan Chase Bank. Signature cards list BERRY as the president of MEKAS and the authorized signer for these JP Morgan Chase accounts.

64.      On or about October 31, 2017, the MEKAS JP Morgan Chase checking account received a wire transfer from Victim Individual J.B. for approximately $6,405.

65.     On October 21, 2019, I conducted a telephonic interview with Victim Individual J.B., who said that s/he was contacted regarding a purported relative who passed away in Canada and left behind an inheritance. Victim Individual J.B. indicated s/he entered into an agreement with a banker to obtain the inheritance funds in return for a 50% fee. Victim Individual J.B. did not recognize the name MEKAS, but explained that his/her spouse, Victim Individual S.B., had documentation related to the transaction, and would be able to provide additional information.

66.     Thereafter, I conducted a telephonic interview with Victim Individual S.B. and learned the following:

        a.      Victim Individual S.B. was aware that his/her spouse, Victim Individual J.B., had fallen victim to a fraudulent scheme related to a letter addressed from an individual purportedly named Jean EMMANUEL.

        b.      The $6,405 wire transfer to MEKAS was a payment related to a retainer agreement with Pierre DELOUIS, a putative attorney with the law firm Hall and Hall Chamber, to whom Victim Individual J.B. had been referred in connection with the alleged inheritance. Victim Individual S.B. explained, however, that s/he and his/her spouse thought it was odd that the payment was going to a construction company.

67.     Victim Individuals S.B. and J.B. had retained copies of emails sent by Victim Individual J.B. to others related to the supposed inheritance. When Victim Individual S.B. began looking into names and addresses from the communications

26

related to the inheritance with Victim Individual J.B.'s secretary, many of the addresses were associated with empty lots, and there appeared to be no information related to the other named individuals.

68.     After making the initial $6,405 payment to MEKAS for the retainer agreement with putative attorney DELOUIS, Victim Individual J.B. was asked to make an additional payment. In response, Victim Individual J.B. said s/he did not have immediate funds to make the payment and purposely created delays with the individuals with whom s/he was communicating. These communications lasted from approximately mid-October 2017 through mid-November 2017.

69.     The couple was never reimbursed for the payment and sustained a loss of in the amount of $6,405, corresponding to the wire-transfer made to MEKAS.

70.     Victim Individual S.B. provided me with emails between Victim Individual J.B. and jeanemmanuel619@gmail.com, ued@tdcanadagroup.com, and pdelouis@hallhallchamber.com, related to the supposed inheritance, including a Confidentiality and Trust Agreement between Victim Individual J.B. and EMMANUEL, dated on or about October 24, 2017, an Attorney Retainer Agreement from Barrister DELOUIS of Hall and Hall Chamber in Toronto, Canada, dated on or about October 30, 2017, and an Inheritance Claim Approval Letter from TD Canada Trust in Toronto Canada, dated on or about November 1, 2017.

### d.     Receipt of Funds from Victim Individual D.J.

71.     On or about November 21, 2017, a checking account (XXXXXX5981) was opened in the name of MEKAS at TCF Bank. The signature card for this account reflects IBEKIE as the authorized signer.

27

72.     On or about December 11, 2017, a complaint was filed with the Federal Bureau of Investigation ("FBI") Internet Crime Complaint Center ("ICCC") in the name of Victim Individual D.J., who reported falling victim to a romance scam resulting in a loss of approximately $150. In the complaint, Victim Individual D.J. described applying for emergency leave for a Captain Steven Kelvin CLARK, who was utilizing email addresses captainclark@yahoo.com and stevenclarky2010@gmail.com, and who was purported to have been stationed in Kabul, Afghanistan with the United States Military. Additionally, Victim Individual D.J. provided the text of an email purported to have been sent from the United States of America Joint Force with North Atlantic Treaty Organization-Afghanistan Keeping Base, United States Military International Leave Board. The email, sent from unitedstatesarmy-departmentofemergencyleave@outlook.com, requested that Victim Individual D.J. send $1,150, $2,300, or $4,000, depending on the length of emergency leave requested, to the MEKAS TCF Bank account, with the Lincoln Premises noted as the beneficiary address.

73.     On or about August 7 and August 21, 2019, I conducted telephonic interviews with Victim Individual D.J., who confirmed s/he filed the above-described complaint and stated the information therein was correct. Victim Individual D.J. explained that s/he initially met the individual purporting to be CLARK via Facebook and corresponded with CLARK for approximately two to three months via Google Hangouts. Victim Individual D.J. said that CLARK initially asked for Apple iTunes cards to listen to music. On or about November 12, 2017, Victim Individual D.J.

purchased an iTunes card in the amount of approximately $50 through Amazon.com for CLARK. When CLARK claimed that the code for the iTunes card did not work, Victim Individual D.J. contacted Amazon.com, who sent a replacement card in the amount of approximately $50 on or about November 23, 2017. Victim Individual D.J. purchased a second iTunes card for CLARK via Amazon.com on or about December 2, 2017. In response to receiving this iTunes card, CLARK tersely replied: "That's all you can do?" Victim Individual D.J. explained s/he became aware the communications from CLARK were not legitimate after s/he received a request from CLARK to marry him, as well as a request to pay for his leave within a short time frame. To that end, CLARK informed Victim Individual D.J. that he no longer had any family in the United States, and that Victim Individual D.J. marrying him would be the only way he would be able to take leave. Victim Individual D.J. stated s/he never sent funds for CLARK to the account in the email listed in his/her complaint, and that Victim Individual D.J. stopped further communications with CLARK.

### 4. SAMTONI Medical Equipment

#### a. Corporate Formation

74. On or about November 1, 2017, SAMTONI Medical Equipment Inc ("SAMTONI") was incorporated with the ILSOS. Its articles list ANIUKWU as the registered agent with an address at the Lincoln Premises.

**b.    Receipt of Funds from Victim Individual C.B.**

75.    On or about November 8, 2017, a checking account was opened at US Bank in the name of SAMTONI.[5] A Resolution of Corporation for the US Bank account lists "Uchenna Samuel Aniukwu" as the owner of SAMTONI. Further, on or about November 17, 2017, a checking account (XXXXX7952) was opened at JP Morgan Chase Bank in the name of SAMTONI. The signature card for the JP Morgan Chase account lists "Tony Emeka Ibekie" as the president of SAMTONI.

76.    On or about, November 21, 2017, a TCF Bank account (XXXXXX5980) was opened in the name of SAMTONI. The signature card for the account lists IBEKIE as the authorized signer. This account was opened on the same day as a TCF BANK account (XXXXXX5981) in the name of MEKAS, which—as described above— also listed IBEKIE as the authorized signer. Further, the signature card for the SAMTONI TCF Bank account reflects the same business address (at 790 Royal St George Drive, Suite 141, in Naperville, Illinois) as listed in the Notice of Resignation for NUMEKS that was filed with the ILSOS on or about December 19, 2018.

77.    On or about December 11, 2017, the SAMTONI TCF Bank account received a wire transfer from Victim Individual C.B. for approximately $45,000.

78.    On or about August 5 and August 13, 2019, I conducted telephonic interviews with Victim Individual C.B., who said the above transfer was related to transactions s/he initially believed to have been an investment in Dubai, but now

---

[5] Based on a search of the FDIC "BankFind", which allows users to locate FDIC-insured banking institutions, my training and experience, my work on other fraud investigations, as well as my conversations with other agents experienced in investigating bank fraud, I know that US Bank is insured by the FDIC.

30

believes possibly involved Nigerian nationals utilizing the pictures of others online. In relevant part, Victim Individual C.B. provided the following information, as well as relevant emails s/he exchanged, which allowed investigators to learn the following:

      a.    Victim Individual C.B. met an individual purportedly named Diego DARIO through Facebook and began communicating with him over an approximately six-month period. Victim Individual C.B. provided investigators with copies of email communications s/he exchanged with DARIO, as well as others related to the above transaction.

      b.    In emails between Victim Individual C.B. and others, including email addresses: diegodario712@yahoo.com, diegodario611@hotmail.com, kamesinvestmentplc@consultant.com, admin@globalancebankonline.com, globalancebankonline@swissmail.com, and info@globalance-online.com, DARIO told Victim Individual C.B. that he was employed as a consultant fund manager with Kames Investment ("Kames") and was involved in fund-management activities with major investors. Sometime after informing Victim Individual C.B. of the alleged passing of his mother, DARIO said that he would be traveling to Dubai to conduct a final business deal before resigning from Kames to be with Victim Individual C.B.

      c.    During the purported trip in Dubai, DARIO informed Victim Individual C.B. that his clients in Dubai wanted to enter into a private partnership agreement with DARIO and provide him with a substantial amount of compensation, but he could not do so due to an existing agreement with Kames. DARIO informed Victim Individual C.B. that he could only enter into the agreement with his clients in

31

Dubai by using another person as his representative, suggesting Victim Individual C.B. serve as his nominee, to which Victim Individual C.B. agreed.

       d.     DARIO, in emails with Victim Individual C.B., said that his clients in Dubai compensated him and Victim Individual C.B. through shares of the "MEGELLAN" fund managed by Kames. Victim Individual C.B. instructed Kames to sell the MEGELLAN shares in his/her name, purportedly resulting in the receipt of $11,691,464, maintained at Globalance Bank ("Globalance") in Switzerland.

       e.     In order to obtain access and be able to transfer the funds, at the direction of a purported representative of Globalance, Victim Individual C.B. transferred $30,000 to SunTrust Bank account XXXXXXXXX3754 in the name of Sparks Concepts LLC in Randallstown, Maryland to open an account at Globalance Bank.

       f.     After opening the SunTrust Bank account, Victim Individual C.B. was later informed by a purported representative of Globalance that s/he needed to send an additional Cost of Transfer, or "COT", payment—which s/he understood to be a type of transfer tax—in the amount of $117,000, via cashier's check, to the SAMTONI JP Morgan Chase account. Victim Individual C.B. attempted, but had been unable to, send funds to the above account, because JP Morgan Chase Bank only allowed transfers between accounts via wire transfer and not via cashier's check.

       g.     Victim Individual C.B. then told DARIO that s/he could only send $45,000 towards the COT payment. In response, s/he was directed to send the funds

to the SAMTONI TCF Bank account, while DARIO said that he would purportedly send the remaining balance of the $117,000 payment.

      h.    Victim Individual C.B. first became aware the transactions were fraudulent after s/he was requested to send additional funds by DARIO. At that point, Victim Individual C.B. contacted Kames in London and was informed that no person named DARIO worked there. A representative at Kames also informed Victim Individual C.B. that Kames does "not have a MEGELLAN fund," that it was likely that Kames's name had been used fraudulently, and suggested Victim Individual C.B. contact his/her local law enforcement.

    79.    Victim Individual C.B. also provided agents an email that included a photo of an Italian passport in the name of Diego Benco DARIO. A search of law-enforcement databases revealed that the number on the passport in the image was associated with an Italian passport issued to a female with a different name. Based on my training and experience, as well as my conversations with other investigators who have experience with Italian passports, I am aware Italian passports are not typically reassigned. The passport in the image provided to Victim Individual C.B. reflects an issue date of December 30, 2011, and an expiration date of December 30, 2021. Yet, based on my training and experience, as well as my conversations with other law-enforcement agents who have experience with Italian passports, I am aware Italian passports typically expire on the day before the tenth year. Accordingly, the proper expiration date for an authentic Italian passport issued on December 30, 2011 would be December 29, 2021.

5.    **INNOCORD Inc.**

a.    **Corporate Formation**

80.    On or about November 27, 2017, INNOCORD Inc. ("INNOCORD") was incorporated with the ILSOS. Its articles list ANIUKWU as the registered agent and incorporator with an address of 1042 Maple Avenue in Lisle, Illinois.

b.    **Receipt of Funds from Victim Business F.M.**

81.    On or about December 11, 2017, a checking account in the name of INNOCORD was opened at JP Morgan Chase Bank. The signature card lists "Sam Uche Aniukwu" as the president of INNOCORD and authorized signer for the JP Morgan Chase account. Further, on or about February 9, 2018, a checking account (XXXXXX1058) in the name of INNOCORD was opened at TCF Bank. The signature card lists the Lincoln Premises as the address for INNOCORD and "Sam Uche Aniukwu" as the authorized signer for the TCF Bank account.

82.    On or about March 1, 2018, the INNOCORD TCF Bank account received a wire transfer from Victim Business F.M. for approximately $36,850.

83.    On or about March 17 and March 28, 2018, law enforcement interviewed representatives from Victim Business F.M., who explained Victim Business F.M.'s accounting manager received a series of emails from approximately February 26, 2018 through March 21, 2018, purporting to be from Victim Business F.M.'s fleet sales manager, several of which were sent while the sales manager was out of town on vacation. The emails requested that the accounting manager make wire payments to various bank accounts in the name of different companies. On March 28, 2018, Victim Business F.M.'s fleet manager said that an employee confirmed his/her email

34

had been "hacked" while s/he was on vacation. Representatives from Victim Business F.M. provided law enforcement copies of the emails suspected to be fraudulent, which showed the following:

a.     On or about March 1, 2018, Victim Business F.M.'s accounting manager received an email purporting to be from Victim Business F.M.'s fleet sales manager requesting "$36850" be wired to the INNOCORD TCF Bank account. In response, Victim Business F.M.'s accounting manager arranged for the requested wire transfer to be executed.

b.     On or about March 1, 2018, the same day the wire transfer was deposited in the INNOCORD TCF Bank account, three withdrawals were conducted from the account in the amounts of approximately $6,000, $9,500, and $159.99. TCF Bank records also showed that on or about March 2, 2018, two withdrawals were conducted from the same account in the amounts of approximately $9,700 and $7,000, followed by three withdrawals on or about March 5, 2018, in the amounts of approximately $5,000, $2,250, and $3,000. Withdrawal tickets received to date for the above transactions all appear, upon lay inspection, to reflect ANIUKWU's signature.

### 6.     GREEN HOUSE For Food Industry Inc.

#### a.     Corporate Formation

84.     On or about December 14, 2017, Green House For Food Industry Inc. ("GREEN HOUSE") was incorporated with the ILSOS. Its articles list "Aniukwu Sam Uche" as the registered agent and incorporator with an address of "Unit 4" at the Lincoln Premises.

### b.    Receipt of Funds from Victim Individual C.H.

85.    Between December 16 and December 30, 2017, multiple accounts were opened in the name of GREEN HOUSE at TCF Bank, Bank of America, and Wells Fargo Bank.

86.    On or about December 16, 2017, a checking account (XXXXXX4960) was opened in the name of GREEN HOUSE at TCF Bank. The signature card lists "Sam Uche Aniukwu" as the authorized signer on the TCF Bank account.

87.    On or about April 4, 2019 and April 6, 2019, the GREEN HOUSE TCF Bank account received wire transfers from Victim Individual C.H. in the amounts of approximately $6,405 and $27,725.75, respectively.

88.    On or about May 28, 2019, an investigator conducted a telephonic interview with Victim Individual C.H, who said that s/he received a letter via United States Postal Service from an individual purportedly named Jean DRAPEAW of TD Canada Trust, dated on or about March 7, 2018, informing Victim Individual C.H. that an individual had died intestate, leaving behind an unclaimed account containing approximately $9.2 million. Victim Individual C.H. said s/he contacted DRAPEAW and then began communicating with multiple individuals. Victim Individual C.H. said s/he also worked with a lawyer from Hall and Hall Chamber in Toronto that was referred to him/her.

89.    Victim Individual C.H. provided investigators with documents and emails related to the inheritance referencing jdrapeaw@gmail.com, ued@tdcanadagroup.com, and pdelouis@hallhallchamber.com. The email and documents listed several phone and fax numbers, including: 419-XXX-2688 and 416-

XXX-1513 for TD Canada Trust; and 416-XXX-9012 and 416-XXX-5611 for Hall and HALL Chamber.

90.     The documents provided by Victim Individual C.H. included the initial letter s/he received, in which DRAPEAW offered to present Victim Individual C.H. as the deceased's next of kin and beneficiary of the account in return for a share of the funds. The documents also included an Attorney Retainer Agreement referencing Pierre DELOUIS, a purported attorney with the firm Hall and Hall Chamber in Toronto, Canada (the same putative attorney and law firm used to defraud Victim Individual J.B., through MEKAS's bank account, as noted in Section III.B.3.c, above).

91.     On or about October 23, 2019, I spoke with Victim Individual C.H., who said that the $6,405 s/he sent to GREEN HOUSE was purportedly payment for half of the legal fees related to the inheritance, which were to be split with DRAPEAW. Further, Victim Individual C.H. said s/he became suspicious about the inheritance when additional payments kept being asked of him/her. Victim Individual C.H. realized the inheritance was fraudulent after hearing something in the background during a phone call with DRAPEAW that made him/her suspicious. Victim Individual C.H. could not recall what had been said, but said that after the phone call, in the course of researching the names and companies related to the inheritance, s/he found information for a DRAPEAW, with a slightly different spelling, reflecting a different picture than a license photo that DRAPEAW provided to him/her.

### c.     Receipt of Funds from Victim Business F.M.

92.     On or about December 18, 2017, two checking accounts (XXXX XXXX 2530, and XXXX XXXX 2921) in the name of GREEN HOUSE were opened at Bank

of America. The signature cards list ANIUKWU as the president of GREEN HOUSE and the authorized signer for both Bank of America accounts.

93.     On or about February 27, 2018, GREEN HOUSE Bank of America account (XXXX XXXX 2921) received a wire transfer from Victim Business F.M., for approximately $14,850.

94.     As previously described in Section III.B.5.b, above, Victim Business F.M.'s representatives informed investigators that Victim Business F.M.'s accounting manager received a series of emails purporting to be from Victim Business F.M.'s fleet sales manager. One of the emails, received on or about February 26, 2018, stated:

> *I need your help. We seem to have an overdue invoice i forgot to forward it to you before I leave,please wire USD14850 to this account below.i'll forward support document later on. i appreciate if you can handle it before bank cut off time.I cant take calls now so email correspondence will be fine.*

95.     The foregoing email also provided the banking information for GREEN HOUSE Bank of America account (XXXX XXXX 2921). As previously described in Section III.B.5.b, above, Victim Business F.M.'s representatives told agents that the fleet sales manager was out of the office during the time of the transaction and did not send the emails requesting the transfer of funds to Bank of America account in the name of GREEN HOUSE. Rather, the above transaction information appears to have been sent by a compromised business email account.

**d.** **Receipt of Funds from Victim Individual K.D.**

96.     On or about February 27, 2018, one GREEN HOUSE Bank of America account received a counter credit in the form of a check from Victim Individual K.D., for approximately $38,200, with the notation, "Yellow Tag."

97.     On or about May 4, 2018, the ICCC received a complaint from Victim Individual K.D. who reported falling victim to an online-fraud scheme while trying to assist a purported U.S. Army member by the name of Siegel CLARK, using the email clarkseigel@gmail.com, (a similar putative soldier as used to defraud Victim Individual D.J. through MEKAS's bank account, as discussed above in Section III.B.3.d, above) return home from Afghanistan. Victim Individual K.D. reported that s/he was instructed to pay the $38,200 for CLARK's "yellow tag" with England Customs. Victim Individual K.D. reported s/he transferred $38,200 into an account ending in 2921. Later, Victim Individual K.D. found out that s/he had been victimized upon performing a reverse image search on a website dedicated to exposing instances of fraud and observing that an image of CLARK had been used to victimize another individual, this time using the name Aiden CLARK. Victim Individual K.D. reported that s/he lost approximately $50,000 as a result of the fraud.

98.     Victim Individual K.D. attached the text of two emails s/he received to the ICCC complaint. The first, purportedly from the United States of America Joint Force with North Atlantic Treaty Organization-Afghanistan Keeping Base United States Military International Leave Board, requested payment in the form of Western Union or MoneyGram transfers to "Deborah Tyler" at 137 Largen Street in Virginia. The second, purportedly from England Customs, requested a payment of

39

approximately $38,200 to release CLARK and gold/precious stones in CLARK's possession from custody. The email instructed the payment be made to a BMO Harris Bank in Munster, Indiana, into account XXXXXX3614 in the name of Anthony IBEKIE with an address at the Lincoln Premises.

99.    Subscriber records for clarkseigel@gmail.com indicate that the account was registered in the name of Clark Siegel on or about June 26, 2013, using Great Britain telephone number XXXXXXXX4742.

100.   On or about August 6, 2019, I conducted a telephonic interview with Victim Individual K.D., who acknowledged filing the above ICCC complaint. Victim Individual K.D. said s/he initially met CLARK through the dating site Match.com and communicated with CLARK through Google Hangouts. Further, s/he received images from CLARK of gold and rare gems purportedly recovered from the Taliban and ISIS during his deployment abroad. Victim Individual K.D. received an email requiring payment for CLARK's flight since CLARK was not scheduled to receive leave. Victim Individual K.D. also explained s/he later received an email purporting to be from England Customs, which stated that s/he needed to pay $38,200 to release CLARK. Victim Individual K.D. was unable to wire funds, so all of the funds s/he transferred on behalf of CLARK were deposited into accounts maintained at Bank of America. Additionally, Victim Individual K.D. kept being asked for money, when CLARK later purportedly ended up in Mexico and needed funds for another tag. In total, Victim Individual K.D. estimated that s/he lost approximately $80,000 as a result of the scheme.

### 7. HALL & HALL Global Inc.

#### a. Corporate Formation

101.    On or about April 13, 2018, Hall & Hall Global Inc. ("HALL & HALL") was incorporated with the ILSOS. Its articles list ASANJI as the registered agent and "Uchenna Ani Samuel" as the incorporator, both with an address of "Unit 1A" at the Lincoln Premises.

#### b. Receipt of Funds from Victim Business V.M.C. and Victim Individuals R.U. and V.M.

102.    On or about April 16, 2018, an account (XXXXXX3717) was opened in the name of HALL & HALL at TCF Bank. The signature card lists "Asanji P Willette" ASANJI as the authorized signer for the TCF Bank account. The same day, on or about April 16, 2018, a checking account (XXXXXX5950) and savings account (XXXXXX2312) were opened in the name of HALL & HALL at JP Morgan Chase Bank. The signature cards list ASANJI as the president of HALL & HALL and authorized signer for the JP Morgan Chase accounts.

103.    On or about April 25, 2018, the HALL & HALL TCF Bank account received a wire from Victim Business V.M.C. for approximately $6,405. A few days later, on or about May 1, 2018, the account received another wire from Victim Business V.M.C. for approximately $22,962.75. Then, on or about May 4, 2018, the Hall JP Morgan Chase savings account received a wire in the amount of approximately $125,000 from Victim Business V.M.C.

104. On or about October 15, 2019, agents contacted Victim Individual V.M, who said that his/her spouse, Victim Individual R.U., handles the finances related to Victim Business V.M.C.

105. On or about October 15, 2019, I conducted a telephonic interview with Victim Individual R.U., who said that s/he had received a letter via the United States Postal Service sometime in or around early-April 2018, from an individual purporting to be named Fred LOOKAS of TD Canada Trust, regarding an individual with the same last name as Victim Individual R.U. who allegedly passed away in Canada and left behind an inheritance. Victim Individual R.U., whose grandfather had been from Canada, explained that s/he was instructed to send funds in order to obtain the inheritance, allegedly worth $11 million, or else the funds would be turned over to the government of Canada.

106. Victim Individual R.U. also said that as part of the process to obtain the inheritance, s/he was referred to an attorney in Canada named Pierre DELOUIS of the firm Hall and Hall Chamber (the same putative attorney and law firm used to defraud Victim Individuals J.B. and C.H., as noted in Sections I.B.3.c and I.B.6.b, above). Victim Individual R.U. said the payment to the HALL & HALL TCF Bank account for $6,405 constituted a payment to retain the services of DELOUIS, and that s/he believed the payment in the amount of $22,962.75 was possibly for additional attorney fees. Victim Individual R.U. said s/he was also required to make a payment in the amount of $125,000 to settle a purported lien on the alleged inheritance.

42

107. Further, Victim Individual R.U. said s/he was informed the payments were being made into an account in Illinois in order to avoid having to pay a tax on the transaction. But Victim Individual R.U. became suspicious of the numerous payments required to obtain the inheritance and—after attempting to verify the individuals and entities with whom s/he was communicating—Victim Individual R.U. discovered the phone numbers and addresses provided to him/her did not appear legitimate. After s/he confronted the individuals involved in the transaction, Victim Individual R.U. recalled that s/he was contacted by an individual with a slight accent who threatened to turn Victim Individual R.U. into the authorities for fraud.

108. Victim Individual R.U. provided me email communications and documents s/he exchanged with fredlookas@gmail.com, ued@tdcanadagroup.com, and pdelouis@hallhallchamber.com, which included attachments sent to Victim Individual R.U. with wire instructions for US Bank account (XXXXXXX5229) in the name of GODMEKS INC (a fraudulent entity discussed further below in Section III.B.8), TCF Bank account XXXXX5980 in the name of SAMTONI (a fraudulent entity discussed further above in Section III.B.4), and TCF Bank account XXXXXX3717 in the name of HALL & HALL. Also included in the emails were attachments purporting to be receipts of international money transfers from LOOKAS to Bank of America accounts XXXXXXXX4851 and XXXXXX3717 in the name of HALL & HALL, JP Morgan Chase Bank account XXXXXX2312 in the name of HALL & HALL, and TCF Bank account XXXXXX5980 account in the name of SAMTONI.

43

### c.    Receipt of Funds from Victim Business G.F.E.

109.    On or about May 1, 2018—the same day that Victim Individual R.U. sent a wire transfer for approximately $22,962.75 to HALL & HALL TCF Bank account XXXXXX3717—that same TCF Bank account received a wire transfer from Victim Business G.F.E. for approximately $50,000.

110.    On or about October 11, 2019, I conducted a telephonic interviewed Victim Business G.F.E's representative, C.G., who said that Victim Business G.F.E purchases and sells used printing equipment. C.G. further said s/he was in the process of sending a refund to a customer of Victim Business G.F.E., when s/he received an email purporting to be from a representative of the customer requesting the funds be sent to another account. The email appeared to be legitimate to C.G., who complied with the request. Upon later learning the customer never received the refund, C.G. tried to stop the transaction through Victim Business G.F.E's bank, but was informed that the funds had already been withdrawn. C.G. filed reports with the Green Bay Police Department and on an online fraud complaint center.

111.    C.G. provided investigators with a series of emails related to the above transaction. One of the emails, dated on or about May 1, 2018, stated the following:

> *Please send the wire transfer to below account details, Please note that we have stopped payment in our previous bank account , this is due to the fact that we have been charged high tax, therefore for now we are currently using our production bank account as stated below.*
>
> *TCF BANK*
> *ACCT NAME: HALL & HALL GLOBAL INC*
> *ROUTING NO: 271972572*
> *ACCT NO:XXXXXX3717*
> *BANK ADDRESS: 1156 MAPLE STREET NAPERVILLE ILLINOIS 60540*

*Please try and have it done today and.*

*Thank you*[.]

112. A review of bank records for the above HALL & HALL TCF Bank account shows that on or about May 1, 2019—the same day the account received the wires from Victim Individual R.U. and Victim Business G.F.E—an approximately $70,460 withdrawal was made. A copy of the withdrawal ticket bears ASANJI's name and shows that approximately: (1) $9,900 was withdrawn in cash (just $100 under the $10,000 CTR threshold for FinCen); (2) $21,720 was withdrawn as a check made payable to ASANJI; and (3) $38,840 was withdrawn as a check made payable to HALL & HALL.

### 8. GODMEKS Inc.

#### a. Corporate Formation

113. On or about April 13, 2018, the same day HALL & HALL was created, GODMEKS Inc. ("GODMEKS") was incorporated with the ILSOS. Its articles list "Uchenna Ani Samuel" as the registered agent and incorporator, with an address of "Unit 1A" at the Lincoln Premises.

#### b. Receipt of Funds from Victim Individual D.P.

114. Between on or about May 2, 2018 and May 8, 2018, checking accounts were opened in the name of GODMEKS at US Bank, JP Morgan Chase Bank, TCF Bank, and BMO Harris Bank. Signature cards for the GODMEKS accounts at US Bank, JP Morgan Chase Bank, and TCF Bank list "Uchenna Samuel" as the authorized signer, while the signature card for the GODMEKS account at BMO Harris Bank lists "Samuel Uchenna" as the authorized signer.

115.    On or about June 25, 2018, the GODMEKS JP Morgan Chase account received a wire transfer from Victim Individual D.P. for approximately $45,925.75.

116.    On or about August 29, 2019, investigators interviewed Victim Individual D.P. who said s/he received an email in March of 2018, addressed from a Jean MOREAU of TD Canada Trust Bank, informing Victim Individual D.P. that an individual with his/her same surname had died intestate, leaving behind an unclaimed account containing approximately $6.9 million.

117.    Victim Individual D.P. previously informed investigators that, in order to claim the funds, Victim Individual D.P. was referred to an attorney in Canada named Pierre DELOUIS of the firm Hall and Hall Chamber (the same putative attorney and law firm used to defraud Victim Individuals J.B., C.H., and R.U., as noted in Sections III.B.3.c, III.B.6.b, and III.B.7.b, above). Victim Individual D.P. further informed investigators s/he sent funds to GODMEKS as part of a payment to DELOUIS and Hall and Hall Chamber for services related to the inheritance.

118.    Victim Individual D.P. previously provided investigators with copies of documents and emails, including an invoice related to the above payment from Hall and Hall Chamber itemizing various legal services totaling $45,925.75, such as:

-Cost to buy form A 1 and F07-01 at the Probate Registry of the Supreme Court of Canada
-Certificate of Appointment of Estate Trustee without a will
-Probate Charge
-Official payment at the High Court of Justice for affidavit of fund claim (Where applicant is non Canadian
-Non-resident tax clearance before the release of certificate

46

*-Our service charge/out of picket expense*

119.     Victim Individual D.P. told investigators that DELOUIS contacted him/her soon after the wire and directed Victim Individual D.P. to contact the bank and recall the funds sent to GODMEKS. Victim Individual D.P. did as DELOUIS requested, ultimately receiving back approximately $41,000. DELOUIS later directed Victim Individual D.P. via phone to wire the money to a different bank account. Victim Individual D.P. said s/he ultimately learned the inheritance was fraudulent due to the additional liens and fees that kept being discovered, preventing him/her from ever obtaining the funds. Eventually, Victim Individual D.P. contacted a number for TD Canada Trust and an individual who answered informed him/her that s/he was the third person who inquired about TD Canada Trust.

120.     Victim Individual D.P. previously informed investigators agents that s/he had been given two phone numbers to contact during his/her involvement in securing the purported inheritance, XXXXXX00051 and XXXXXX89012. On or about August 21, 2019, Victim Individual D.P. said s/he recently called both of the numbers and the same individual s/he recognized as DELOUIS answered both times.

121.     Toll records for Subject Phone 2—which is associated with ANIUKWU and NU-MEKS and listed in bank documents for INNOCORD, GREEN HOUSE, HALL & HALL, GODMEKS, ESIJEMINE, SAMCHINA, and others noted herein— was in contact with XXXXXX00051, one of DELOUIS's numbers, approximately 58 times between on or about February 15, 2018 and April 11, 2018.

47

### 9. SAMCORD Inc.

#### a. Corporate Formation

122.   On or about June 5, 2018, SAMCORD Inc. ("SAMCORD") was incorporated with the ILSOS. Its articles list "Emeka Toni Ibe" as the registered agent and incorporator, with an address of 4935 Washington Boulevard, Unit 2, in Chicago, Illinois. The name Emeka Toni Ibe appears to be a possible variation of IBEKIE's name, reflecting IBEKIE's middle name (*i.e.,* "Emeka"), followed by a nickname of IBEKIE's first name (*i.e.,* "Anthony"), and a shortened version of IBEKIE's surname.

#### b. Receipt of Funds from Victim Individual D.P.

123.   On or about June 6, 2018, a checking account (XXXXXX5398) in the name of SAMCORD was opened at TCF Bank. The signature card lists Emeka Toni Ibe as the authorized signer for the account.

124.   On or about June 14, 2018, the SAMCORD TCF checking account received a wire transfer from Victim Individual D.P. for approximately $12,810.

125.   As previously described in Section III.B.8.b, above, Victim Individual D.P. told investigators that s/he received an email from MOREAU of TD Canada Trust regarding a purported inheritance from a deceased Canadian relative. The foregoing payment to the SAMCORD TCF checking account represented the initial fee to retain the services of putative attorney DELOUIS and Hall and Hall Chamber in securing the inheritance.

48

126.   Included among the records that Victim Individual D.P. provided to agents was a copy of a letter thanking him/her for the signed retainer agreement with Hall and Hall Chamber, which stated:

> ...Please see attached our offshore/subsidiary agent account to make the payment of the retainer deposit. There is a 19% GST/HST Tax charge payable if payment is received in Canada, accordingly, we have waived this charge and have provided our offshore agent account for the payment to be made without the applicable taxes....

Also included in the records received from Victim Individual D.P. were documents reflecting details for SAMCORD accounts at TCF Bank and Fifth Third Bank.

### c.   Receipt of Funds from Victim Individual A.W.

127.   On or about June 15, 2018, a checking account (XXXX XXXX 5622) in the name of SAMCORD was opened at Bank of America. The signature card lists Toni Ibe Emeka (another possible variation of IBEKIE's name) as the President of SAMCORD. Further, on or about June 25, 2018, a checking account (XXXXXX8376) was opened in the name of SAMCORD at Fifth Third Bank. One of the signature cards for this account lists IBEKIE as the authorized signer, while a second card lists IBEKIE and Jennifer GOSHA as authorized signers.

128.   On or about July 6 and July 9, 2018, the Fifth Third Bank account (XXXXXX8376) above received wires from Victim Individual A.W. for approximately $9,228.07 and $15,771.93.

129.   On or about October 24, 2018, Victim Individual A.W. filed a complaint with the ICCC claiming s/he had fallen victim to a romance scam resulting in a loss of approximately $178.030.07. In the complaint, Victim Individual A.W. reported

meeting an individual by the purported name Matthew RUSSO on the online dating website OKCupid.com. According to the complaint, RUSSO claimed that he was a fund manager with Ventcore Portfolio ("Ventcore") in Kent, England.

130.    Victim Individual A.W. reported RUSSO was going to leave Ventcore after the death of his mother and was involved in an arrangement with an individual from Dubai, whereby RUSSO was set to receive a substantial sum of funds, but could not do so due his employment with Ventcore. So, RUSSO arranged for Victim Individual A.W. to be the owner of the shares of approximately $11 million to be deposited in a bank in Switzerland. Victim Individual A.W. was required to pay to open an account in order to withdraw the funds. Victim Individual A. W. reported additional funds were needed to pay the "Cost of Transaction" to move the funds into his/her account in the United States, adding that after the payment was made, s/he was informed there was a "STOP ORDER" on the funds from the United States government.

131.    On or about August 22, 2019, I conducted a telephonic interview of Victim Individual A.W., who confirmed s/he filed the complaint and verified the information in the complaint was correct. Further, Victim Individual A.W. said that s/he had believed s/he was in a relationship with RUSSO, but later came to believe it was a scam after his/her brother brought up concerns regarding the transactions. Victim Individual A.W. explained s/he confronted the scammers and asked for his/her money back. The scammers initially agreed, but required additional funds as part of

50

the process to return the funds. Victim Individual A.W. estimated s/he lost over $267,000 as a result of the scheme.

### 10. ESIJEMINE Lucky Nengite Inc.

#### a. Corporate Formation

132. On or about July 9, 2018, ESIJEMINE Lucky Nengite Inc. ("ESIJEMINE") was incorporated with the ILSOS. Its articles list "Emeka Ibeke" as the registered agent at the Lincoln Premises, and Sulamain Adedotun as the incorporator at 4306 Nutmeg Lane in Lisle, Illinois. Commercial database searches identified an individual by the above name at 4306 Nutmeg Lane, Apt 147, in Lisle, Illinois, with a purported social security number of XXX-XX-3184, however, searches of law enforcement databases did not identify any information related to the above individual.

#### b. Receipt of Funds from Victim Individual A.W.

133. On or about July 11, 2018, a checking account (XXXX XXXX 7376) was opened in the name of ESIJEMINE at Bank of America. The signature card lists Sulaiman Adedotun as the President of ESIJEMINE. Bank statements for the account reflect ESIJEMINE's address as "APT 147" at 4306 Nutmeg Lane, in Lisle.

134. On or about July 17 and July 18, 2018, the ESIJEMINE Bank of America checking account received two wire transfers from Victim Individual A.W., which totaled approximately $234,401.

135. As previously described in Section III.B.9.c, above, Victim Individual A.W. told agents that s/he believed s/he was sending funds to retrieve approximately

$11 million in his/her name from a bank in Switzerland on behalf of a RUSSO, a purported fund manager with Ventcore.

### c. Receipt of Funds from Victim Individual R.A.

136. On or about July 12, 2018, a checking account (XXXXX2296) and saving account (XXXXXX3197) were opened in the name of ESIJEMINE at JP Morgan Chase Bank. The signature cards list Adedotun Sulamain as the President of ESIJEMINE.

137. On or about August 23, 2018, the ESIJEMINE JP Morgan Chase checking account received a wire transfer from Victim Individual R.A. for approximately $6,405.

138. On or about September 9, 2018, Victim Individual R.A. filed a complaint with the ICCC, in which s/he reported having fallen victim to a scam via mail and email, resulting in a loss of approximately $6,405.

139. In the complaint, Victim Individual R.A. reported s/he received a letter in July of 2018, addressed from a Chandler ARNAUD of TD Canada Trust Bank, informing Victim Individual R.A that an individual bearing his/her last name had died intestate, leaving behind an unclaimed account containing approximately $9 million. Victim Individual R.A. reported s/he was referred to an attorney in Canada named Pierre DELOUIS of the firm Hall and Hall Chamber (the same putative attorney and law firm used to defraud Victim Individuals J.B., C.H., R.U., and D.P., as noted in Sections III.B.3.c, III.B.6.b, III.B.7.b, and III.B.8.b, above). In response, Victim Individual R.A. made a $6,405 payment to the ESIJEMINE JP Morgan Chase checking account, which represented half of the fee to retain DELOUIS. According to

Victim Individual R.A., s/he was told that it would be best to use a local JP Morgan Chase account in Illinois to avoid a "19% GST/HST Tax charge" imposed by Canada.

140.    Victim Individual R.A. reported becoming suspicious after informing the persons involved in the supposed inheritance transaction that s/he would travel to Canada to open an account and being told, in response, that an account could be opened on his/her behalf with only two forms of identification. Thereafter, Victim Individual R.A. contacted and spoke with a representative of TD Canada Bank, who informed him/her that s/he needed to be physically present to open a bank account. Victim Individual R.A. then contacted TD Bank's "unclaimed estate dept" through customer service numbers s/he found online and was informed that an account in his/her purportedly deceased relative's name did not exist.

141.    On or about August 28, 2019, investigators interviewed Victim Individual R.A., who confirmed s/he filed the ICCC complaint and stated that the information in it was correct. Victim Individual R.A. also provided agents with copies of documents and emails exchanged with ARNAUD and others in the inheritance scheme.

142.    The emails and documents provided by Victim Individual R.A. appeared to be similar to those provided by Victim Individual R.W. and Victim Individual D.P, as evidenced in the following images:



Image sent to Victim Individual R.A.



Image sent to Victim Individual C.H.



Image sent to Victim Individual R.U.

### 11. SAMCHINA Trucking Inc.

#### a. Corporate Formation

143. On or about July 9, 2018, SAMCHINA Trucking Inc. was incorporated with the ILSOS. Its articles list WASHINGTON and ANIUKWU as incorporators, WASHINGTON as the registered agent, and an address at the Lincoln Premises.

54

### b.     Receipt of Victim Funds

144.   On or about August 27, 2018, a checking account (XXXXX5841) in the name of SAMCHINA was opened at Lisle Savings Bank.[6] The signature card lists ANIUKWU as the authorized signer for the account. Additionally, a Certification of Beneficial Owner of Legal Entity Customers for the account lists ANIUKWU, with an address of the Lincoln Premises, as the president of SAMCHINA.

145.   On or about April 22, 2019, demand-deposit account (XXXXXX7595) in the name of SAMCHINA was opened at West Suburban Bank. The signature card lists ANIUKWU, with an address of the Lincoln Premises, as the authorized signer with Subject Phone 4 as his phone number. Upon lay inspection, the signature on the card appears to be different than previous signatures associated with ANIUKWU,

146.   On or about August July 13, 2019, a checking account (XXXXX2331) in the name of SAMCHINA was opened at Royal Savings Bank. The signature card for the account lists ANIUKWU as the authorized signer with Subject Phone 4 as his phone number.

147.   Investigators learned from bank personnel that on or about June 26, 2019, ANIUKWU deposited a cashier's check for approximately $31,000 into the SAMCHINA West Suburban Bank account, which listed Victim Individual M.S. as the remitter. After depositing this check, ANIKWU attempted to make a wire transfer to Nigeria in the amount of $23,000, for "cleaning containers." Photos

---

[6] Based on a search of the FDIC "BankFind", which allows users to locate FDIC-insured banking institutions, my training and experience, my work on other fraud investigations, as well as my conversations with other agents experienced in investigating bank fraud, I know that Lisle Savings Bank is insured by the FDIC.

obtained from bank-security cameras appear to show ANIUKWU at the counter during the timeframe of the transactions.

148.    On or about June 28, 2019, investigators interviewed Victim Individual M.S., who said that s/he sent a cashier's check for $31,000 via FedEx to SAMCHINA at the Lincoln Premises, on behalf Jim RICCI, an individual s/he met on the online dating website OKCupid.com. Victim Individual M.S. provided investigators with access to the email account s/he used to communicate with RICCI. In a series of emails, RICCI indicates that he has romantic feelings for Victim Individual M.S. and informs him/her of business dealings as a fund manager for Vanguard Investments. Through the emails, RICCI tells Victim Individual M.S. that he has negotiated a substantial business deal, which will result in him receiving a substantial amount of money, but that he needed to utilize Victim Individual M.S's name as a nominee for 188,572 shares of Vanguard Capital Fund due to an employment clause with Vanguard Investments.

149.    Through a series of emails purportedly sent from RICCI, Vanguard Investments, and Entrisag Banking AG, Victim Individual M.S. was instructed to wire $31,000 to SAMCHINA, described as Vanguard Investments' handling agent in Illinois. Victim Individual M.S. was provided with the information for an account in the name SAMCHINA at West Suburban Bank. After Victim Individual M.S. was unable to wire the funds successfully, RICCI instructed him/her to obtain a cashier's check by claiming the funds are for "Payment for purchases," and to send the check to SAMCHINA at the Lincoln Premises.

150.    After s/he sent the funds, Victim Individual M.S. was instructed that s/he needed to make a "Cost of Transfer" payment of $234,000 to process about $11,722,464 in proceeds purportedly earned from the sale of the Vanguard Capital Fund shares.

151.    Many of the emails from RICCI to Victim Individual M.S. appear to have similar, or virtually identical, language to emails from DARIO to Victim Individual C.B. (who are discussed further in Section III.B.4.b, above), as evidenced in the excerpts below:

<u>Email from RICCI to Victim Individual M.S., dated on or about May 24, 2019</u>:

*I have been lucky and traveled through most of Europe and Asia, but still want to find time some day to get to Australia and South America. I would love to go to Argentina to learn how to do the Argentine tango the right way. Do you like to dance?* I like to dance, like to hold hands, romantic movies are okay by me, and I also like documentaries. But I'm willing to explore more and learn new things. I reside here in Santa Ana and I am looking forward to meeting you in person. [Emphasis added.]

<u>Email from DARIO to Victim Individual C.B., dated on or about October 10, 2017</u>:

*I have been lucky and traveled through most of Europe but still want to find time some day to get to Australia and South America. I would love to go to Argentina to learn how to do the Argentine tango the right way.*

*Do you like to dance*? I used to be pretty good but unfortunately my legs cannot do some of the more intricate steps any longer but once a week, I still go to the senior dance here locally and absolutely love it. [Emphasis added.]

<u>Email from RICCI to Victim Individual M.S., dated on or about June 4, 2019</u>:

.....You could see how happy my mother was when she saw me. She just said what touched my heart "Benco" my son! Where have you been? I hope they are not still suffering you with this work? Come let me touch your face! Good boy! I can now rest in peace" this was what she said. My daughter was already with her in the hospital before i arrived so i am very happy to see them all.

***Benco is my second name which is Italian-Spanish. My mother love to call me the name as she was the person that gave me the name. She said it was the name of the only brother she loved so much but died the same year she gave birth to me....*** [Emphasis added.]

<u>Email from DARIO to Victim Individual C.B., dated on or about October 18, 2017</u>:

.... ***Benco is my second name which is Italian-Spanish. My mother love to call me the name as she was the person that gave me the name. She said it was the name of the only brother she loved so much but died the same year she gave birth to me....*** [Emphasis added.]

C.    EVIDENCE OF INTERNATIONAL OUTGOING WIRE TRANSFERS

152.    Agents' review of records associated with the bank accounts described herein have revealed numerous wire transfers to accounts outside the United States, primarily including those in Nigeria and Ghana. For example, on just fourteen accounts at JP Morgan Chase Bank associated with IBEKIE, ANIUKWU, ASANJI, BERRY, EMPERORCHILLS, MEKAS, SAMTONI, INNOCORD, HALL & HALL, AND ESIJEMINE, agents identified over $1,112,867 in outgoing wire transfers, primarily to accounts in Nigeria such as Fidelity Bank PLC in Lagos, to the beneficiary Onuigbo IZUCHUKWU.

58

### D. TRASH PULL AT THE LINCOLN PREMISES

153. On or about May 1, 2019, agents obtained the trash abandoned outside the curtilage of the Lincoln Premises. In that trash, agents found numerous relevant items of evidence, including what appeared to be a printout of an online bank summary, dated on or about February 3, 2017, from Wells Fargo Bank for a business checking account ending in 1499, a business market-rate savings account ending in 4547, an everyday checking account ending in 3694, and a Way2Save savings account ending in 4614 appearing to have the balances altered.

a. Bank records obtained from Wells Fargo establish that on or about February 3, 2017, the date noted on the bank summary recovered from the trash at the Lincoln Premises, Wells Fargo business checking account ending in 1499 and business market-rate savings account ending in 4547 were opened in the name NU-MERKS HEALTHCARE INC. Signature cards for both accounts list IBEKIE as the authorized signer.

b. Further, bank records obtained from Wells Fargo Bank establish that on or about November 9, 2016, a Wells Fargo everyday checking account ending in 3694 and Way2Save savings account ending in 4614 were opened in the name of IBEKIE. Bank statements appear to reflect that these accounts were closed on or about June 26, 2017, and June 23, 2017, respectively.

154. During the May 1, 2019 trash pull at the Lincoln Premises, agents recovered a second, similarly-altered account summary, dated on or about February 5, 2017, which listed the following approximate available balances: $500,800 in the

account ending in 1499; $3,486,113 in the account ending in 4547; $2,663,786.62 in the account ending in 3649; and $1,862,897.01 in the account ending in 4614.

155.    From the trash, agents also recovered numerous letters addressed to various individuals from a John DELON, which were stamped with the logo for TD Canada Trust, a financial institution based out of Canada. The letters inform the addressee that DELON obtained their contact information while searching for the beneficiary of Canadian lottery winnings that had been won by an individual with a similar name as each addressee. The letter offered to present the addressee to the bank as the winner and to share the funds with the addressee. Further, the letters requested each addressee to respond to the email Johnjeandelon@yandex.com with his/her their name, address, telephone, and email.

a.    Based on my training and experience, as well as the training and experience of other agents with whom I have spoken, I know that Yandex is an Internet-services company headquartered in Russia, which maintains servers outside the United States.

156.    During the May 1, 2019 trash pull at the Lincoln Premises, agents also found ripped up envelopes bearing a return address of Box 707, Wheaton, Illinois 60187. Based on the information developed in the course of the investigation to date, agents are aware that similar letters have been returned to Box 707, Wheaton, Illinois, which is the address for the Office of the Circuit Court Clerk for DuPage County. Further, agents recovered several papers with handwritten notes, including one bearing username "JohnJeanDelon Gmail Account," password "JohnJean5206",

and phone number 312-XXX-6004 ("Subject Phone 6"), and another note listing multiple names and phone numbers, including a name with the word "Lottery" next to it. Agents subsequently contacted several of the individuals listed in the note, none of whom recalled having any involvement with any online schemes or sending funds to a bank account in Illinois.

      a.    T-Mobile records reflect SAMTONIMEDICALEQUIPMENTINC at the Alyssa Premises as the subscriber for Subject Phone 6 from on or about February 13, 2019 to June 14, 2019.

    157.   Additionally, agents recovered from the Lincoln Premises trash a paper bearing the words "Off shore Receiving account" and "Numeks Healthcare INC." The paper also included the words "Nigerian Payment Account" with banking information for an account in the name of "Onuigbo Izuchukwu" at Fidelity Bank, which—as noted Section III.C, above—was the recipient of many outgoing international wire transfers for the bank accounts under investigation in this matter.

    158.   Lastly, agents recovered from the trash a T-Mobile document reflecting the purchase of two Android phones bearing the phone numbers for Subject Phone 2 and Subject Phone 3, each in the name of NU-MEKS. Each purchased phone was a Samsung Model SM-G955U, the same make and model as the cell phone that CBP officers found in IBEKIE's possession during his October 1, 2018 border inspection, as described further in Section III.E.1, below.

### E. CBP ENCOUNTERS WITH IBEKIE

#### 1. October 1, 2018 Border Inspection

159. On or about October 1, 2018, CBP officers conducted an inspection and examination of IBEKIE upon his entry into the United States at O'Hare. During the border inspection, IBEKIE presented CBP officers with a Wisconsin driver's license, which listed his address as the Lincoln Premises. IBEKIE told CBP officers that he left the United States on or about August 25, 2018, and had traveled to Nigeria to attend the funeral services for his father, who had purportedly passed away in July, but whose funeral was scheduled for September 1 through September 5, 2018. Further, IBEKIE said that he had visited the Nigerian cities of Lagos, Enugu, and Abuja during his trip.

160. When asked about his current employment, IBEKIE said he worked as a registered nurse for NU-MEKS at the Lincoln Premises. But when CBP officers inquired why NU-MEKS's address was the same as IBEKIE's home address, they noted that IBEKIE had difficulty articulating an answer. IBEKIE informed the CPB officials that he owns NU-MEKS, a purported nursing agency, along with his ex-wife Treonda STEADMAN.

161. IBEKIE informed CBP officers that he had been arrested in or around April 2018, in Lisle, after having been pulled over for forged license plates while driving a friend's car.

162. CBP officers manually examined a Samsung Model SM-G955U phone in IBEKIE's possession in accordance with agency procedures before returning the

62

phone to IBEKIE. On the phone, CBP officers identified several images of apparent financial information, including those reflecting wire transfers to different accounts in various names, as well as images reflecting foreign wire transfers to countries including Indonesia, Ghana, China, Mexico, and Nigeria. CBP officers also found images associating two different addresses with IBEKIE's name: 2084 Mark Circle in Bolingbrook, Illinois, and 673 Hearth Lane, Apt 209, in Carol Stream, Illinois.

### 2. April 5, 2019 Border Encounter

163.    On or about April 5, 2019, CBP officers encountered IBEKIE at O'Hare as he boarded a flight to Dubai, United Arab Emirates. IBEKIE informed the officers that he was going on a family trip to Lagos, Nigeria. He also said that he operates a money-transfer business called African Money Union, located at the Lincoln Premises, and provided officers with the email Africanmoneyunioninc@gmail.com, and Subject Phone 5 as his phone number. Further, IBEKIE told the officers that he operates a scholarship called the "Anthony Ibekie Foundation," which purportedly helps underprivileged youth in Nigeria afford school. IBEKIE added that he was traveling with approximately $8,740 in cash.

a.    According to ILSOS records, African Money Union Inc. ("AFRICAN MONEY UNION") was incorporated on or about June 23, 2017. Its articles list IBEKIE as the registered agent, and IBEKIE and Ngozi Adindu as the directors and incorporators.

b.    According to records obtained from BMO Harris Bank, an account (XXXXXX3525) in the name of AFRICAN MONEY UNION shows numerous counter

deposits in the form of cashier's checks, which reference IBEKIE and various entities associated with the Lincoln Premises, including EMPERORCHILLS, MEKAS, and SAMTONI. The records for the account also show numerous cash deposits and cash withdrawals, what appear to be personal living expenses, as well as international outgoing wire transfers to Nigeria and other locations.

### 3. October 31, 2019 Border Encounter

164. On or about October 31, 2019, CBP officers conducted an inspection and examination of IBEKIE upon his entry into the United States at O'Hare. During the border inspection, IBEKIE presented CBP officers with a customs-declaration form listing the Alyssa Premises as his street address.

165. IBEKIE had a Samsung SM-G965V device in his possession that was using the same phone number as Subject Phone 5.

166. When asked about his current employment, IBEKIE said he worked as a doctor for SAMTONI at the Alyssa Premises. (As noted in ¶ 160, above, about one year earlier, IBEKIE told CBP officials that he worked as a registered nurse for NU-MEKS at the Lincoln Premises.) IBEKIE explained he attended medical school in Belize. When asked if he was certified to practice medicine in the United States, IBEKIE said he assisted in preparing notes that are signed by a certified practitioner.

### F. CBP NOVEMBER 8, 2019 BORDER ENCOUNTER WITH ANIUKWU

167. Through law enforcement databases, I learned that ANIUKWU had departed the United States and was scheduled to arrive at O'Hare International

Airport on or about November 8, 2019, via Air India Flight 127 departing from New Delhi, India.

168. Based on all of the foregoing information described in this affidavit—which was known to me at the time of the November 2019 border encounter with ANIUKWU—I believed that reasonable suspicion existed to support a border search of the digital devices in ANIUKWU's possession upon his arrival into the United States, and arranged for CBP's assistance to conduct an inspection and examination of ANIUKWU upon his arrival to the United States.

169. On or about November 8, 2019, CBP officers conducted an inspection and examination of ANIUKWU upon his entry into the United States at O'Hare on Air India Flight 127 from New Delhi, India to determine his admissibility to enter the United States.

170. During the inspection, ANIUKWU presented CBP officers with a customs-declaration form listing the Alyssa Premises as his street address. ANIUKWU also presented CBP officers with a letter, dated on or about May 24, 2019, bearing the letterhead of AFRICAN MONEY UNION, to verify his employment. The letter, signed in the name of IBEKIE, extended a job offer to ANIUKWU as a "Telephone Customers Service Representative." The letter also listed Subject Phone 5 as the contact number for both IBEKIE and AFRICAN MONEY UNION.

171. I was present at O'Hare International Airport while the CPD officers' interaction with ANIUKWU was ongoing. During their inspection, CBP officers provided me with the customs declaration form and other documents presented by

65

ANIUKWU. CBP officers also provided me with an Apple MacBook Pro laptop (bearing serial number XXXXXXXXHV27) and a Samsung SM-960U Galaxy Note 9 cell phone using the phone number associated with Subject Phone 4, which were in ANIUKWU possession upon his arrival into the United States. I then conducted border searches of the digital devices in ANIUKWU's possession upon his arrival into the United States pursuant to my authority as a customs officer to conduct searches without warrant at the border or its functional equivalent. [7]

### 1. Border Search of ANIUKWU's Laptop

172.    On or about November 8, 2019, at O'Hare, I reviewed certain data stored on the MacBook Pro laptop found in ANIUKWU's possession, in accordance with DHS policies and procedures governing border searches of digital devices. During this review, I saw that the laptop's email application had information related to accounts saniukwu1@gmail.com (**Subject Account 1**) and constantconsultant200@gmail.com (**Subject Account 2**).

173.    Subscriber records subpoenaed from Google—prior to my November 8, 2019 border search—for **Subject Account 1** reflect that the account belongs to "Samuel Aniukwu," with a recovery email of grealtand_uc@yahoo.co.uk, and a recovery phone number of (XXX) XXX-7040. Further, subscriber records obtained from Google—again, prior to my November 8, 2019 border search—for **Subject**

---

[7] As stated previously, this affidavit does not cite or rely upon any information obtained during the border search of ANIUWKU's cell phone, but rather, only upon information obtained during the border search of ANIUWKU's laptop.

**Account 2** reflect that the account belongs to "Opia Samuel," with the same recovery email as **Subject Account 1**, and a recovery phone number of Subject Phone 4.

174. While keeping the MacBook Pro laptop offline (*i.e.*, preventing the laptop from connecting to the Internet), I saw the sender, subject, and preview-text fields of emails stored on the laptop's email application. I did not select or open the emails. I also did not view the content of any email beyond what was apparent in the preview-text pane.

175. During my border search, I saw emails located in the "Drafts – Google" folder associated with **Subject Account 1**. One such draft email appeared to forward a message sent on or about August 9, 2019 from pdelouis@hallandhallchamber.com, the same email address that putative attorney Pierre DELOUIS of Hall and Hall Chamber provided to Victim Individuals J.B, C.H., and R.U.

176. The preview-text pane for two additional emails displayed the following observable text:

> *Thank you for contacting Hall and Hall Chamber, a law firm that specializes in inheritance/will claims and can help you contest a will. You have contacted us to represent you in dealing with your inheritance...*

177. Further, in a folder labeled "Important" that was associated with **Subject Account 2**, I saw an email from Akidiamoke Usman; the preview-text pane for that email included the following observable text:

*my broda, sorry for not updating you for few days now about those client.*
*They are big idiot. i think someone has told them that it's a scam, they*
*are just telling me rubbish, I tried to find out if the amount I gave them*
*which ...*

In the same folder, I saw multiple emails whose preview text reflected personal identifying information for various individuals, including names, addresses, phone numbers, and amounts of money. Several of the emails referenced the words "diplomat", "parcel", or "consignment," while others appeared to request the recipient to contact the individuals mentioned in the preview text, occasionally referred to as "Clients," including an email from sender "tony & CONSTANT" bearing the subject line: "Please call this client 2morrow by 2 PM your time."

      a.      Based on my training an experience, I am familiar of a variation of a romance-fraud scheme in which victims are falsely told that their romantic partner is going to send items of value, such as substantial amount of funds, to them for safekeeping through diplomatic-courier services. Once the items purportedly arrive, the romantic partner or a purported representative of the courier service will contact the victim and request the payment of funds in order to have the shipment released. Further, from my review of a complaint filed with the ICCC in or around July 2018, it appears that Victim Individual C.D.T.T. was defrauded into sending funds to an account in the name of GODMEKS pursuant to this diplomatic-courier variant of romance-fraud schemes.

178.   During my border search of the MacBook Pro laptop, I also saw an email from "Nydia & COSTANT" bearing the subject line "Re,,, SAM OPIA FROM DAVID JACKSON." From my review of a complaint filed with the ICCC in or around October 2016, it appears that Victim Individual J.M. was asked to send $1,320 to the UK International Courier Shipping Company, and that s/he reported interacting with an individual named "Sam Opia," of Chicago, who referred Victim Individual J.M. to an individual named "Anthony Ibekie."

179.   Further, in a folder labeled "Boxbe Waiting List" that was associated with **Subject Account 2**, I saw subject lines and/or preview text of emails from TCF Bank Alerts that referenced online statements for accounts in the name of ESIJEMINE and SETRACO SERVICES INC ("SETRACO").

a.   ILSOS records obtained during the course of the investigation reflect SETRACO was incorporated on or about March 4, 2019, with an agent name "SAMMY MAXWELL," and an agent address of the Lincoln Premises, while ILSOS online databases notes the Lincoln Premises as the address of record for SETRACO.

b.   On or about June 14, 2019, an investigator contacted Victim Individual C.L., who confirmed filing a report with the San Antonio Police Department on or about March 31, 2019, in which s/he reported receiving a solicitation letter from a John DELON of TD Canada Trust Bank, apprising Victim Individual C.L. that s/he had a possible family member who died intestate with an unclaimed account in the amount of $9.2 million. In the report, Victim Individual C.L. said s/he sent funds as requested to TCF Bank account XXXXX7097 in the name of

SETRACO, as well as another account in the name of Jenant Inc. located in Illinois. Victim Individual C.L. further provided investigators with documents bearing the name Pierre DELOUIS and the email address pdelouis@hallhallchamber.com.

180.     During my border search, I additionally observed an email addressed to Sulaiman Adedotun, referencing paperless enrollment for JPMorgan Chase Bank account XXXXXX2296. As noted previously, Adedotun is the listed incorporator of ESEJIMINE, and the listed President and signor for accounts in the name of ESEJIMINE at Bank of America and JP Morgan Chase. Moreover, I saw emails for online banking accounts related to ESIJEMINE at Bank of America and TCF Bank, as well as PayPal emails referencing GODMEKS.

181.     After I completed my onsite border search, the MacBook Pro was returned to ANIUKWU prior to his departure from the port of entry at O'Hare.

## G.     PROBABLE CAUSE TO BELIEVE THAT SUBJECT ACCOUNTS 1 AND 2 CONTAIN EVIDENCE OF FRAUD

182.     Based on the foregoing facts, as well as my training and experience, my knowledge of this investigation, and my consultation with other agents, I believe that bank accounts associated with NU-MEKS, EMPERORCHILLS, MEKAS, SAMTONI, INNOCORD, GREEN HOUSE, GODMEKS, HALL & HALL, SAMCORD, ESIJEMINE, and SAMCHINA, and others are being used to facilitate mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses, through business-email compromise, romance-fraud, and investment-fraud schemes. As noted in this affidavit, each of the foregoing entities is associated with IBEKIE, ANIUWKU,

ASANJI, STEADMAN, BERRY, WASHINGTON, and other co-conspirators known and unknown.

183. Based on my training and experience, as well as the training and experience of other agents with whom I have spoken, I am aware that individuals engaged in financial activity—whether legitimate or fraudulent—typically maintain some form of accounting to track their transactions. These records can be formal books, or can be rudimentary in nature—meant to simply track income earned and expenses incurred—and can reflect evidence of the acquisition and disposition of criminally derived proceeds.

184. Generally, individuals, especially those who are involved in illicit financial transactions, maintain personal and business financial information in locations where it would be secure and readily accessible, such as in their residences, and—in the case of financial transactions involving online banking—on electronic devices such as computers, cell phones, or tablets near their person.

185. Furthermore, based on my training and experience and information obtained from other law enforcement officers who investigate mail and wire fraud, money laundering, conspiracy to commit the foregoing offenses, and related crimes, I know the following:

a. It is common practice for individuals involved in mail and wire fraud to use and maintain computers, cellular phones, smartphones, and other digital devices. They often employ such devices for, among other things: (1) obtaining or storing personal victim profiles, including names, addresses, phone numbers, social

security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, employer or taxpayer identification numbers, bank account numbers, credit card numbers, email addresses, IP addresses, and PIN numbers or passwords for financial institutions or Internet service providers; (2) applying for, modifying, or maintaining bank accounts and/or credit card accounts to facilitate the receipt, transfer, or use of funds obtained from victims through fraudulent means; and (3) keeping records of their crimes.

      b.    Individuals who participate in fraudulent schemes, including those predicated upon online communications with potential victim individuals or businesses, often use digital devices to communicate with their co-conspirators by phone, email, and text message. Oftentimes, they also maintain telephone numbers of their co-conspirators in their cellular telephones or smartphones.

186.    Based on my training and experience, the information disclosed in this affidavit, and information related to me by other law-enforcement agents who specialize in the investigation of mail or wire fraud schemes and related offenses, it is likely that **Subject Account 1** and **Subject Account 2** contain evidence, or were used in furtherance, of the offenses described in Attachment A. What is more, based on my findings during my border search of the MacBook Pro laptop found in ANIUKWU's possession, I believe that a search of **Subject Accounts 1 and 2** will reveal evidence of ANIUKWU's involvement in the fraudulent schemes detailed in this affidavit—including through the use of entities such as ESIJEMINE, HALL &

HALL, GODMEKS, and NUMEKS, among others—as well as the identity of ANIUKWU's co-conspirators and their victims.

187. Further, based on my training and experience in fraud investigations, I believe that a search of email-provider account contents for individuals—like ANIUWKU—engaged in criminal conduct yields investigative leads relating to:

      a.     the identities of participants engaged in and witnesses to mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses;

      b.     the contact information of participants engaged in and witnesses to mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses;

      c.     the timing of communications among participants and other individuals involved in mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses;

      d.     the methods and techniques used in mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses; and

      e.     information regarding the physical location of participants engaged in and witnesses to mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses.

## IV.    SEARCH PROCEDURE FOR SUBJECT EMAIL ACCOUNTS

188. In order to facilitate seizure by law enforcement of the records and information described in Attachment A, this affidavit and application for search warrant seek authorization, pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and

2703(c)(1)(A), to permit employees of Google to assist agents in the execution of this warrant. In executing this warrant, the following procedures will be implemented:

a.   The search warrant will be presented to Google personnel who will be directed to the information described in Section II of Attachment A;

b.   In order to minimize any disruption of computer service to innocent third parties, Google employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II of Attachment A, including an exact duplicate of all information stored in the computer accounts and files described therein;

189.   Google employees will provide the exact duplicate in electronic form of the information described in Section II of the Attachment A and all information stored in those accounts and files to the agent who serves this search warrant; and

190.   Following the protocol set out in the Addendum to Attachment A, law enforcement personnel will thereafter review all information and records received from Google employees to locate the information to be seized by law enforcement personnel pursuant to Section III of Attachment A.

**V.   CONCLUSION**

191.   Based on the above information, I respectfully submit that there is probable cause to believe that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 1341, 1343, 1956, and 371 are located within one or more computers and/or servers found at Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043. By this affidavit and application, I request that the Court issue a search warrant directed to Google

allowing agents to seize the electronic evidence and other information associated with the **Subject Accounts** that is stored on Google's servers following the search procedure described in Attachment A and the Addendum to Attachment A.

FURTHER AFFIANT SAYETH NOT.

*Telephonically*

SIXTO J. LUCIANO
Special Agent
Homeland Security Investigations

Subscribed and sworn
before me this 20th day of April, 2020

Honorable VIRGINIA M. KENDALL
United States District Judge

75

## ATTACHMENT A

### I. SEARCH PROCEDURE

1.      The search warrant will be presented to Google personnel, who will be directed to isolate those accounts and files described in Section II below.

2.      In order to minimize any disruption of computer service to innocent third parties, company employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the computer accounts and files described in Section II below, including an exact duplicate of all information stored in the computer accounts and files described therein.

3.      Google employees will provide the exact duplicate in electronic form of the accounts and files described in Section II below and all information stored in those accounts and files to the agent who serves the search warrant. Google shall disclose responsive data, if any, by sending to **Special Agent Sixto J. Luciano, Homeland Security Investigations, Chicago Cyber Crimes Task Force, 1 Tower Lane, Suite 1600, Oakbrook Terrace, IL 60181,** using the US Postal Service or another courier service, notwithstanding 18 U.S.C. § 2252A or similar statute or code.

4.      Following the protocol set out in the Addendum to this Attachment, law enforcement personnel will thereafter review information and records received from company employees to locate the information to be seized by law enforcement personnel specified in Section III below.

II.    FILES AND ACCOUNTS TO BE COPIED BY EMPLOYEES OF GOOGLE

To the extent that the information described below in Section III is within the possession, custody, or control of Google, which are stored at premises owned, maintained, controlled, or operated by Google, headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043, Google is required to disclose the following information to the government for the following accounts:

**saniukwu1@gmail.com** and **constantconsultant200@gmail.com**

(the "**Subject Accounts**")

a.    All available account contents from inception of account to present, including e-mails, attachments thereto, drafts, contact lists, address books, and search history, stored and presently contained in, or maintained pursuant to law enforcement request to preserve.

b.    All electronic files stored online via Google Drive, stored and presently contained in, or on behalf of the accounts described above.

c.    All search history records stored and presently contained in, or on behalf of the accounts described above including, if applicable, web and application activity history (including search terms), device information history, and location history.

d.    All existing printouts from original storage of all the electronic mail described above.

2

     e.     All transactional information of all activity of the electronic mail addresses and/or individual accounts described above, including log files, dates, times, methods of connecting, ports, dial-ups, and/or locations.

     f.     All business records and subscriber information, in any form kept, pertaining to the electronic mail addresses and/or individual accounts described above, including applications, subscribers' full names, all screen names associated with the subscribers and/or accounts, all account names associated with the subscribers, methods of payment, telephone numbers, addresses, and detailed billing and payment records.

     g.     All records indicating the services available to subscribers of the electronic mail addresses and/or individual accounts described above.

     h.     All account contents previously preserved by Google, in electronic or printed form, including all e-mail, including attachments thereto, and Google Drive stored electronic files for the accounts described above.

     i.     All subscriber records for any Google account associated by cookies, recovery email address, or telephone number to the accounts described above.

Pursuant to 18 U.S.C. § 2703(d), the service provider is hereby ordered to disclose the above information to the government within 14 days of the signing of this warrant.

3

### III. INFORMATION TO BE SEIZED BY LAW ENFORCEMENT PERSONNEL

All information described above in Section II that constitutes evidence, instrumentalities, and fruits concerning violations of Title 18, United States Code, Sections 1341, 1343, 1956, and 371 (the "**Subject Offenses**"), as follows:

1.     Items related to the identity of the user or users of the **Subject Accounts**.

2.     Items related to the physical location of the users of the **Subject Accounts** at or near the times of the **Subject Offenses**.

3.     Items related to the identities and contact information of participants in or witnesses to the **Subject Offenses**.

4.     Financial records, including receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns.

5.     Any general ledgers, journals, and accounting records, including electronic accounting records, for NU-MEKS Healthcare Inc. ("NU-MEKS"), EMPERORCHILLS, MEKAS Construction Inc. ("MEKAS"), HALL & HALL Global Inc. ("HALL & HALL"), GODMEKS Inc. ("GODMEKS"), SAMCORD Inc. ("SAMCORD"), ESIJEMINE Lucky Nengite Inc. ("ESIJEMINE"), SAMCHINA

4

Trucking Inc. ("SAMCHINA"), African Money Union Inc. ("AFRICAN MONEY UNION"), or any other entity associated with Anthony Emeka Ibekie ("IBEKIE"), Uchenna Samuel Aniukwu, aka Samuel Uchenna Aniukwu ("ANIUKWU"), Lasheena Washington ("WASHINGTON"), Williette Asanji ("ASANJI"), Treonda Steadman ("STEADMAN"), Lawrence Berry III ("BERRY"), Chandler Arnaud ("ARNAUD"), Diego Dario ("DARIO"), Pierre Delouis ("DELOUIS"), Jean Drapeaw ("DRAPEAW"), Onuigbo Izuchukwu ("IZUCHUKWU"), Fred Lookas ("LOOKAS"), Steven Kelvin Clark ("STEVEN"), or Siegel Clark ("SIEGEL");

6.     Credit card statements, bank statements, payment records, application forms and all related documentation for any accounts held by NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL;

7.     Billing statements, purchase orders, delivery receipts, invoices, payment records and any other supporting documentation for any goods or services rendered by NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL;

8.     All communications, including written correspondence, mailings, letters, emails, or notes concerning sales or invoicing for any goods or services rendered by NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL;

9.     All communications, including written correspondence, mailings, letters, emails, or notes exchanged between or among IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL concerning: (1) NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, or any other entity associated with the foregoing individuals; (2) the receipt, withdrawal, transfer, expenditure, or use of funds deposited at any bank account; (3) requests or demands for payment of funds issued to any third party, including any individual or business; (4) putative inheritances, lottery winnings, or investments; (5) 5206 Lincoln Avenue in Lisle, Illinois (the "Lincoln Premises"); or (6) 2726 Alyssa Drive, Naperville, Illinois (the "Alyssa Premises").

10.     All communications, including written correspondence, mailings, letters, emails, or notes exchanged between or among IBEKIE, ANIUKWU,

6

WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL, and any third party on any online dating website, including but not limited to OKCupid.com.

11. Any and all federal and state corporate tax records to include 1099, W-2, 940, and 941 forms for NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL;

12. Payroll records for NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL;

13. Any evidence of past or current indebtedness, contracts, promissory notes, mortgage records, vehicle loans, business loans, or student loans for NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, or SIEGEL;

14.    Indicia of occupancy, residency, control or ownership of the Lincoln Premises or the Alyssa Premises, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes, keys, photographs, and bank records; and

15.    All of the non-content records described above in Section II.

8

## ADDENDUM TO ATTACHMENT A

With respect to the search of any information and records received from the free web-based electronic mail service provider, law enforcement personnel will locate the information to be seized pursuant to Section III of Attachment A according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.    searching for and attempting to recover any hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein.

        b.    surveying various file directories and the electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein.

        c.    opening or reading portions of electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein, and/or

        d.    performing key word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such

electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized described in Section III of Attachment A.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.

# Exhibit 2:

Application and Affidavit of IRS-CI SA
Amy C. Mansker in Support of Premises
Search Warrant in Case No. 20 M 215

AO 106 (REV 4/10) Affidavit for Search Warrant

AUSA Saurish Appleby-Bhattacharjee (312) 469-6045
AUSA Paige Nutini, (312) 697-4071

**FILED**
7/8/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

### UNDER SEAL

In the Matter of the Search of:

Case Number:   20M364

The apartment unit located at 797 Oxbow Avenue,
Unit 110, Oswego, Illinois 60543, further described in
Attachment A-1

# APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, AMY C. MANSKER, a Special Agent of the Internal Revenue Service Criminal Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following properties or premises:

### See Attachment A-1

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and fruits.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1341, 1343, 1956, 1349, and 371 | mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses |

The application is based on these facts:

### See Attached Affidavit continued on the attached sheet.

_____
*Applicant's Signature*

AMY C. MANSKER, Special Agent
IRS Criminal Investigation
*Printed name and title*

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: July 8, 2020                1:40 pm

_____
*Judge's signature*

City and State: Chicago, Illinois

SHEILA M. FINNEGAN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                      )

NORTHERN DISTRICT OF ILLINOIS    )

# AFFIDAVIT

## TABLE OF CONTENTS

I.    INTRODUCTION AND AFFIANT BACKGROUND ........................................ 1

II.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH ............................ 3

    A.    Investigative Background and Summary .................................................... 3

    B.    Prior Warrant ............................................................................................. 5

    C.    Receipt of Victim Funds By Various Entities Associated with
         ANIUKWU, IBEKIE, and their Co-Conspirators ...................................... 6

        1.    HALL & HALL Global Inc. ................................................................ 7

            a.    Corporate Formation ................................................................. 7

            b.    Receipt of Funds from Victim Business V.M.C. and
                Victim Individuals R.U. and V.M. ............................................. 7

            c.    Receipt of Funds from Victim Business G.F.E. ....................... 10

            d.    Disposition of Victim Funds Received ..................................... 11

        2.    JENANT Inc. / SETRACO Services Inc. ........................................... 15

            a.    Corporate Formation ............................................................... 15

            b.    Receipt of Funds from Victim Individual C.L. ........................ 15

            c.    Disposition of Funds from Victim Individual C.L. ................. 17

        3.    SAMCORD Inc. ................................................................................. 21

            a.    Corporate Formation ............................................................... 21

            b.    Receipt of Funds from Victim Individual A.W. ....................... 22

            c.    Disposition of Funds from Victim Individual A.W. ................ 23

    D.    Undercover Investigation ......................................................................... 24

        1.    Overview ........................................................................................... 24

        2.    Historical Investigation of Inheritance Scam Letters ...................... 25

            a.    Trash Pull at the Lincoln Premises ......................................... 25

            b.    Letters Received by DuPage County State's
                Attorney Office ........................................................................ 26

        3.    Communications Incident to Undercover Operation ...................... 28

E.  Investigation Leading to the Harlem Premises .......................................... 37

    1.  Controlled Delivery ............................................................ 37

    2.  Additional Information Regarding the Harlem Premises ............... 40

F.  Investigation Leading to the Oxbow Premises ........................................ 41

    1.  Subscriber Information and IP Addresses ........................... 41

        a.  Email Addresses Used to Communicate With the UCA ........ 41

        b.  Personal Email Address of IBEKIE ......................................... 43

        c.  IP Address Tracking the Controlled Delivery ......................... 45

        d.  IP Addresses Appearing to Originate from the
United Kingdom ................................................................... 46

            i.  Subscriber Information, Internet Service Provider,
and Virtual Private Network Services ........................... 46

            ii.  Historical Purchases of VPN Services by ANIUKWU,
IBEKIE, and Their Co-Conspirators ............................. 48

    2.  Surveillance at the Oxbow Premises ................................. 51

    3.  Additional Information Regarding the Oxbow Premises ................. 54

G.  Investigation Leading to the Weber Premises ........................................ 57

    1.  The ANIUKWU Gmail Account .................................................... 57

        a.  Subscriber Information and IP Addresses .............................. 57

        b.  Relevant Communications ...................................................... 58

    2.  The Constant Gmail Account ....................................................... 71

        a.  Subscriber Information .......................................................... 71

        b.  Relevant Communications ...................................................... 72

    3.  Surveillance at the Weber Premises ................................. 77

    4.  Records/Communications with Property Management at the
Weber Premises ................................................................... 79

        a.  Lease Records Obtained from Continental Properties ........... 79

        b.  Email Communications from the ANIUKWU Gmail
Account to Springs at Weber Road ......................................... 80

    5.  Additional Information Regarding the Weber Premises ................. 82

H.  Evidence of Fraud Will Be Found at the Oxbow Premises, the Weber
Premises, and the Harlem Premises ........................................................ 82

2

III.  SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE
      MEDIA.................................................................................................. 85

IV.   PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC
      STORAGE MEDIA.............................................................................. 87

V.    CONCLUSION ...................................................................................... 88

UNITED STATES DISTRICT COURT )
                                                         )
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, AMY C. MANSKER, being duly sworn, state as follows:

## I.     INTRODUCTION AND AFFIANT BACKGROUND

1.     I am a Special Agent with the Internal Revenue Service Criminal Investigation ("IRS-CI") and have been so employed since approximately 2016. As part of my duties as a Special Agent, I investigate criminal violations relating to white-collar crime, including mail, wire, and bank fraud, money-laundering offenses, as well as violations of federal tax laws. In my capacity as a Special Agent, I have participated in the execution of multiple federal search warrants. Additionally, prior to my employment with IRS-CI, I worked as a Police Officer with Naperville Police Department from approximately 2014 through 2016.

2.     This affidavit is made in support of an application for a warrant to search the apartment units located at 797 Oxbow Avenue, Unit 110, Oswego, Illinois 60543, described further in Attachment A-1 (the "**Oxbow Premises**"); 716 South Weber Road, Unit 512, Romeoville, Illinois 60446, described further in Attachment A-2 (the "**Weber Premises**"); and 1419 North Harlem Avenue, Apartment B, Oak Park, Illinois 60302, described further in Attachment A-3 (the "**Harlem Premises**") for evidence, instrumentalities, and fruits described further in Attachment B, concerning mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses, in violation of Title 18, United States Code, Sections 1341, 1343, 1956, 1349, and 371.

3.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law-enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are sufficient to establish probable cause to believe that evidence, instrumentalities, and fruits of violations of Title 18, United States Code, Sections 1341, 1343, 1956, 1349, and 371, are located at the **Oxbow Premises**, the **Weber Premises**, and the **Harlem Premises**.

4.     This affidavit also describes portions of written conversations, which I have summarized. These summaries do not necessarily refer to all of the topics covered during each conversation. In addition, these summaries do not include every conversation made by every writer/author on the topic being described. Portions of the conversations that are quoted are preliminary transcriptions, which may be subject to modification upon further review. For some conversations, I have offered my understandings and/or interpretations of the conversation, which are based upon my experience and knowledge of the investigation to date, the content and context of the conversations, the experience of other investigators with whom I have consulted, as well as my professional training and experience as a law-enforcement agent.

## II.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH

### A.    INVESTIGATIVE BACKGROUND AND SUMMARY

5.    This warrant application stems from an ongoing investigation into individuals in the Northern District of Illinois, and elsewhere, who are suspected of facilitating, or laundering the proceeds of, various online fraud schemes. As detailed further below, this investigation has recently involved use of an undercover agent to communicate with suspected co-conspirators, which, coupled with other information obtained over the course of the investigation, has generated probable cause to believe that evidence of fraud will be found at the **Oxbow Premises**, the **Weber Premises**, and the **Harlem Premises**.

6.    To date, the investigation has identified several individuals who have conducted overt and affirmative acts in the Northern District of Illinois in furtherance of various online schemes and artifices, such as the incorporation of business entities and the opening of bank accounts at financial institutions—including those that are federally insured—in order to facilitate the receipt of funds fraudulently induced from victims through false pretenses, representations, promises, and concealment of material facts, and subsequently transfer the funds to accounts maintained abroad.

7.    The co-conspirators, known and unknown, have used various means to conduct the above overt acts, including the use of telephones, computers, vehicles, correspondence, and the United States Postal Service, evidence of which are believed to be maintained at the **Oxbow Premises**, the **Weber Premises**, and the **Harlem Premises**.

3

8.     In summary, and as explained in more detail herein, the individuals and entities at issue in this investigation were involved in opening accounts at financial institutions in the Northern District of Illinois, and elsewhere, to facilitate the receipt and subsequent transfer of proceeds fraudulently obtained from victims of the following categories of schemes:

a.     <u>Business Email Compromise</u>: a scheme targeting businesses that perform wire transfers. The scheme is typically carried out by: (1) compromising legitimate business e-mail accounts through social engineering or computer-intrusion techniques to gain unauthorized access to the business-email account; (2) blocking or redirecting communications to or from the email account; and then (3) using the compromised email account or a separate fraudulent email account to communicate with personnel from a victim company, attempting to induce the victim company into making a wire transfer under fraudulent pretenses.

b.     <u>Romance Fraud</u>: a scheme to defraud a victim on the Internet, whereby a co-conspirator contacts a victim online and builds trust through an online romance. At some point, the co-conspirator will convince a victim to send money to a predetermined recipient under the false pretense that the victim will either get paid back in the future or that the money being sent is part of a business transaction. Romance scams typically target persons looking for romantic partners or friendship on dating websites and other social-media platforms. The scammers may create profiles using fictitious or fake names, locations, images, and personas, allowing the scammers to cultivate relationships with prospective romance-scam victims. Victims

4

may be convinced to provide money or gifts to the scammers, or may be asked to conduct transactions on behalf of the scammers.

        c.    <u>Inheritance Fraud Scheme</u>: a variation of an online-investment-fraud scheme, in which a victim is tricked into sending money from his/her bank account under the false pretense that the victim is about to receive a substantial inheritance.

        **B.    PRIOR WARRANT**

        9.    On or about April 20, 2020, the Honorable Virginia M. Kendall, United States District Judge, issued a warrant in Case No. 20 M 215 (the "Gmail Warrant"), authorizing the search of two Gmail accounts associated with Samuel Aniukwu, a suspected co-conspirator in the fraudulent schemes under investigation. The application and affidavit of Homeland Security Investigations ("HSI") Special Agent Sixto J. Luciano in support of the Gmail Warrant (the "Luciano Affidavit"), attached hereto as Exhibit 1 and incorporated by reference, details relevant findings of the investigation to date, including, in pertinent part:

        a.    Providing background information regarding the co-conspirators that law enforcement has identified, to date, as being involved in the fraudulent schemes mentioned herein, including Samuel Uchenna Aniukwu ("ANIUKWU") and Anthony Emeka Ibekie ("IBEKIE");

        b.    Summarizing various business entities suspected of being used to facilitate the fraudulent schemes at issue in the investigation, including the corporate

formation of those entities, as well as each entity's receipt of fraudulently obtained funds from a victim individual or victim business; and

c.     Detailing evidence of international outgoing wire transfers of funds suspected to have been generated through the fraudulent schemes as well as interactions between Customs and Border Protection ("CBP") officials, IBEKIE, and ANIUKWU, including evidence of suspected fraud obtained during a border search of digital devices in ANIUKWU's possession.

10.     Rather than repeating verbatim the factual statements in the Luciano Affidavit, which are incorporated by reference herein, the instant affidavit focuses upon: (1) historical evidence of victim funds received by specific entities associated with ANIUWKU and IBEKIE that are relevant here, including HALL & HALL Global Inc., JENANT Inc., SETRACO Services Inc., and SAMCORD Inc.; (2) relevant communications exchanged among an undercover IRS-CI agent and suspected co-conspirators in the fraudulent schemes; and (3) investigators' efforts to establish that those communications exchanged with the undercover agent originated from digital devices located within the **Oxbow Premises,** the **Weber Premises**, and the **Harlem Premises**.

### C.     RECEIPT OF VICTIM FUNDS BY VARIOUS ENTITIES ASSOCIATED WITH ANIUKWU, IBEKIE, AND THEIR CO-CONSPIRATORS

11.     ANIUKWU, IBEKIE, and their known and unknown co-conspirators incorporated or registered several business entities with the Illinois Secretary of State ("ILSOS"), and also created individual bank accounts for each entity. In the course of this investigation, agents have tied bank accounts for these entities—

6

including, in relevant part, HALL & HALL Global Inc., JENANT Inc., SETRACO Services Inc., and SAMCORD Inc.—to the receipt of fraudulently obtained funds from the victim individuals and victim businesses described herein. What follows in Sections II.C.1, II.C.2 and II.C.3 below is a summary of: (1) the creation of the subject business entities and their related bank accounts; (2) the receipt and disposition of fraudulently obtained funds by the entities; and (3) agents' interviews with victims concerning how they were defrauded.

### 1. HALL & HALL GLOBAL INC.

#### a. CORPORATE FORMATION

12. On or about April 13, 2018, Hall & Hall Global Inc. ("HALL & HALL") was incorporated with the ILSOS. Its articles list Williette Asanji ("ASANJI") as the registered agent and "Uchenna Ani Samuel" (a variant of ANIUKWU's name) as the incorporator, both with an address of "Unit 1A" at 5206 Lincoln Avenue in Lisle, Illinois (the "Lincoln Premises"), a property previously associated with IBEKIE and ANIUKWU as noted in the Luciano Affidavit.

#### b. RECEIPT OF FUNDS FROM VICTIM BUSINESS V.M.C. AND VICTIM INDIVIDUALS R.U. AND V.M.

13. On or about April 16, 2018, an account (XXXXXX3717) was opened in the name of HALL & HALL at TCF Bank. The signature card lists "Asanji P Willette" ASANJI as the authorized signer for the TCF Bank account. The same day, on or about April 16, 2018, a checking account (XXXXXX5950) and savings account (XXXXXX2312) were opened in the name of HALL & HALL at JP Morgan Chase

Bank. The signature cards list ASANJI as both the president of HALL & HALL and authorized signer for the JP Morgan Chase accounts.

14. On or about April 25, 2018, the HALL & HALL TCF Bank account received a wire from Victim Business V.M.C. for approximately $6,405. A few days later, on or about May 1, 2018, the account received another wire from Victim Business V.M.C. for approximately $22,962.75. Then, on or about May 4, 2018, the HALL & HALL JP Morgan Chase savings account received a wire in the amount of approximately $125,000 from Victim Business V.M.C.

  a. Based on my training and experience, knowledge of this investigation, and conversations with other investigators involved in this matter, I know that domestic wire transfers conducted within the United States are cleared through the Fedwire funds-transfer system, an electronic interbank funds-transfer system operated by the Federal Reserve. Further, based on my training and experience, and my interviews of Federal Reserve employees in prior investigations, I know that Fedwire does not process wire transfers in Illinois but rather in New Jersey and/or Texas. Thus, any Fedwire transfers received by financial institutions in Illinois, as discussed throughout this affidavit, are interstate wire transactions.

15. On or about October 15, 2019, agents contacted Victim Individual V.M, who said that his/her spouse, Victim Individual R.U., handles the finances related to Victim Business V.M.C.

16. On or about October 15, 2019, agents conducted a telephonic interview with Victim Individual R.U., who said that s/he had received a letter via the U.S.

Postal Service sometime in or around early-April 2018, from an individual purporting to be named Fred Lookas ("LOOKAS") of TD Canada Trust, regarding an individual with the same last name as Victim Individual R.U. who allegedly passed away in Canada and left behind a sizeable inheritance. Victim Individual R.U., whose grandfather had been from Canada, explained that s/he was instructed to send funds in order to obtain the inheritance, allegedly worth $11 million, or else the funds would be turned over to the government of Canada.

17.     Victim Individual R.U. also said that as part of the process to obtain the inheritance, s/he was referred to an attorney in Canada named Pierre Delouis ("DELOUIS") of the firm Hall and Hall Chamber (the same putative attorney and law firm used to defraud Victim Individuals J.B. and C.H., as noted in Sections III.B.3.c and III.B.6.b, in the Luciano Affidavit). Victim Individual R.U. said the payment to the HALL & HALL TCF Bank account for $6,405 constituted a payment to retain the services of DELOUIS, and that s/he believed the payment in the amount of $22,962.75 was possibly for additional attorney fees. Victim Individual R.U. said s/he was also required to make a payment in the amount of $125,000 to settle a purported lien on the alleged inheritance.

18.     Further, Victim Individual R.U. said s/he was informed the payments were being made into an account in Illinois in order to avoid having to pay a tax on the transaction. But Victim Individual R.U. became suspicious of the numerous payments required to obtain the inheritance and—after attempting to verify the individuals and entities with whom s/he was communicating—Victim Individual R.U.

discovered the phone numbers and addresses provided to him/her did not appear legitimate. After s/he confronted the individuals involved in the transaction, Victim Individual R.U. recalled that s/he was contacted by an individual with a slight accent who threatened to turn Victim Individual R.U. into the authorities for fraud.

19. Victim Individual R.U. provided agents email communications and documents s/he exchanged with fredlookas@gmail.com, ued@tdcanadagroup.com, and pdelouis@hallhallchamber.com, which included attachments sent to Victim Individual R.U. with wire instructions for US Bank account (XXXXXXX5229) in the name of GODMEKS INC (a fraudulent entity discussed further in Section III.B.8 of the Luciano Affidavit), TCF Bank account XXXXX5980 in the name of SAMTONI (a fraudulent entity discussed further in Section III.B.4 of the Luciano Affidavit), and TCF Bank account XXXXXX3717 in the name of HALL & HALL. Also included in the emails were attachments purporting to be receipts of international money transfers from LOOKAS to Bank of America accounts XXXXXX4851 and XXXXXX3717 in the name of HALL & HALL, JP Morgan Chase Bank account XXXXXX2312 in the name of HALL & HALL, and TCF Bank account XXXXXX5980 in the name of SAMTONI.

### c.   RECEIPT OF FUNDS FROM VICTIM BUSINESS G.F.E.

20. On or about May 1, 2018—the same day that Victim Individual R.U. sent a wire transfer for approximately $22,962.75 to HALL & HALL TCF Bank account XXXXXX3717—that same TCF Bank account received a wire transfer from Victim Business G.F.E. for approximately $50,000.

21.     On or about October 11, 2019, agents conducted a telephonic interview with Victim Business G.F.E's representative, C.G., who said that Victim Business G.F.E purchases and sells used printing equipment. C.G. further said s/he was in the process of sending a refund due to a customer of Victim Business G.F.E., when s/he received an email purporting to be from a representative of the customer requesting that the funds be sent to another account. The email appeared to be legitimate to C.G., who complied with the request. Upon later learning the customer never received the refund, C.G. tried to stop the transaction through Victim Business G.F.E's bank, but was informed that the funds had already been withdrawn. C.G. filed reports with the Green Bay Police Department and on an online-fraud complaint center.

22.     C.G. provided investigators with a series of emails related to the above transaction. One of the emails, dated on or about May 1, 2018, stated the following:

> *Please send the wire transfer to below account details, Please note that we have stopped payment in our previous bank account , this is due to the fact that we have been charged high tax, therefore for now we are currently using our production bank account as stated below.*
>
> *TCF BANK*
> *ACCT NAME: HALL & HALL GLOBAL INC*
> *ROUTING NO: 271972572*
> *ACCT NO:XXXXXX3717*
> *BANK ADDRESS: 1156 MAPLE STREET NAPERVILLE ILLINOIS 60540*
>
> *Please try and have it done today and.*
>
> *Thank you*[.]

### d.     DISPOSITION OF VICTIM FUNDS RECEIVED

23.     A review of bank records for the above HALL & HALL TCF Bank account shows that on or about May 1, 2018—the same day the account received the

wires from Victim Individual R.U. and Victim Business G.F.E—an approximately $70,460 withdrawal was made. A copy of the withdrawal ticket bears ASANJI's name and shows that approximately: (1) $9,900 was withdrawn in cash; (2) $21,720 was withdrawn as a check (#305855739) made payable to ASANJI; and (3) $38,840 was withdrawn as a check (#305855738) made payable to HALL & HALL.

     a.    Based on my training and experience, I know that financial institutions are required by law to file a currency transaction report ("CTR") with the Financial Crimes Enforcement Network ("FinCEN") for a cash deposit, withdrawal, or exchange of currency exceeding $10,000. I also know, based on my training and experience, that criminal enterprises routinely limit the amount of any individual deposit or withdrawal of unlawfully obtained currency, in an effort to prevent the filing of a CTR and thereby avoid detection by law enforcement. This practice—known as "structuring"—is prohibited under federal law, namely, Title 31, United States Code, Section 5324. Here, as noted above, the cash withdrawal made in ASANJI's name on or about May 1, 2018 was only $100 below the CTR threshold for FinCen.

    24.    On or about April 12, 2018, an account (XXXXXX9530) was opened in the name of "Asanji Willette" at JP Morgan Chase Bank. The signature card lists ASANJI as the authorized signer for the JP Morgan Chase Bank account.

    25.    A review of bank records for the ASANJI JP Morgan Chase Bank account (XXXXXX9530) shows that on or about May 1, 2018—the same day an approximately $70,460 withdrawal was made from the HALL & HALL TCF Bank account in ASANJI's name—an approximately $21,720 deposit was made. A copy of

12

the deposit ticket bears ASANJI's name. The item associated with the deposit ticket was an official check (#305855739) in the approximate amount of $21,720 issued by TCF Bank on or about May 1, 2018, made payable to ASANJI, and appears to be the same check withdrawn from the HALL & HALL TCF Bank account.

26. A review of bank records for the above ASANJI JP Morgan Chase Bank account (XXXXXX9530) shows that on or about May 2, 2018—one day after an approximately $21,720 deposit was made to the ASANJI JP Morgan Chase Bank account (XXXXXX9530)—an approximately $23,000 outgoing wire transfer was made to an account in Nigeria at Access Bank PLC in Lagos to the beneficiary IBEKIE.

27. A review of bank records for the HALL & HALL JP Morgan Chase Bank account (XXXXXX5950) shows that on or about May 1, 2018—the same day an approximately $70,460 withdrawal was made from the HALL & HALL TCF Bank account—an approximately $38,840 deposit was made. A copy of the deposit ticket bears HALL & HALL's name. The deposit item associated with the deposit ticket was an official check (#305855738) in the approximate amount of $38,840 issued by TCF Bank on May 1, 2018 made payable to HALL & HALL with a memo noting "RE: ASANJI WILLETTE" and appears to be the same check withdrawn from the HALL & HALL TCF Bank account.

28. A review of bank records for the HALL & HALL JP Morgan Chase Bank account (XXXXXX5950) shows that on or about May 3, 2018—two days after an approximately $38,840 deposit was made to HALL & HALL JP Morgan Chase Bank

account (XXXXXX5950)—an approximately $47,300 outgoing wire transfer was made to an account in Nigeria at Access Bank PLC in Lagos to the beneficiary IBEKIE.

29.    Based on my training and experience, knowledge of this investigation, and conversations with other investigators, I know that criminal enterprises involved in fraud routinely attempt to conceal the origins of illegally obtained money, including through transfers of funds between accounts belonging to fictional business entities, or wire transfers to foreign banks. Here, as demonstrated above, accounts in the name of HALL & HALL—a fictional business entity associated with IBEKIE, ANIUKWU, and ASANJI—received tens of thousands of dollars in fraudulently obtained funds between mid-April and early-May, 2018. Between on or about May 1 and May 3, 2018, tens of thousands of dollars were withdrawn from these accounts as checks, or in cash withdrawals falling below FinCEN's reporting threshold for CTRs. The withdrawals were, in turn, re-deposited into other accounts in the name of HALL & HALL or ASANJI at other banks. Further, during an approximately two-day period between on or about May 2 and May 3, 2018, tens of thousands of dollars from HALL & HALL or ASANJI bank accounts were wire-transferred to foreign bank accounts in IBEKIE's name. Based on my training and experience, and conversations with other investigators involved in this matter, this sort of financial activity is consistent with a money-laundering scheme designed to hide the origins of funds obtained by fraud.

### 2.   JENANT INC. / SETRACO SERVICES INC.

#### a.   CORPORATE FORMATION

30.   A search of ILSOS online databases disclosed Jenant Inc. ("JENANT") was incorporated on or about December 4, 2018 with the ILSOS. Further, the ILSOS online databases list Jennifer GOSHA ("GOSHA") as the registered agent with an address of "1419 N. Harlem Ave, Apt B, Oak Park, IL 60302" (*i.e.*, the **Harlem Premises**).

31.   ILSOS records obtained during the course of the investigation also reflect that Setraco Services Inc. ("SETRACO") was incorporated on or about March 4, 2019, with an agent name "Sammy Maxwell" ("MAXWELL")[1] and an agent address of "Unit 5" at the Lincoln Premises, a property previously associated with IBEKIE and ANIUKWU as noted in the Luciano Affidavit.

#### b.   RECEIPT OF FUNDS FROM VICTIM INDIVIDUAL C.L.

32.   On or about January 29, 2019, a checking account (XXXXXX9392) was opened in the name of JENANT at TCF Bank. The signature card for this account lists GOSHA as the authorized signer and owner of JENANT. The signature card also lists the **Harlem Premises** as the address for both GOSHA and JENANT.

33.   On or about March 5, 2019, a checking account (XXXXXX7097) was opened in the name of SETRACO at TCF Bank. The signature card for this account lists "SAMMY MAXWELL" as the authorized signer and owner of SETRACO. The

---

[1] MAXWELL is believed to be an alias of ANIUKWU based on records and bank-security footage obtained during the course of this investigation and further described in Section II.C.2.c, below.

signature card lists "Unit 5" at the Lincoln Premises as the address for both MAXWELL and SETRACO.

34.     On or about March 8, 2019, the TCF Bank account (XXXXXX9392) in the name of JENANT received a wire transfer from Victim Individual C.L. for approximately $6,405. On or about March 27, 2019, a deposit was made to the same account for approximately $97,500. The deposit item was a cashier's check (#41816725) dated March 26, 2019 issued by International Bank of Commerce ("IBC Bank") payable to JENANT in the amount of $97,500. The cashier's check lists the remitter as Victim Individual C.L.

35.     On or about March 14, 2019, the TCF Bank account (XXXXXX7097) in the name of SETRACO received a wire transfer from Victim Individual C.L. for approximately $22,962.75. On or about March 27, 2019, a deposit was made to the same account for approximately $80,000. The deposit item was a cashier's check (#6851701494) dated March 25, 2019 issued by Wells Fargo Bank payable to SETRACO in the amount of $80,000. The cashier's check lists the remitter as Victim Individual C.L.

36.     On or about June 14, 2019, an investigator contacted Victim Individual C.L., who confirmed filing a report with the San Antonio Police Department on or about March 31, 2019, in which s/he reported receiving a solicitation letter from a John Delon ("DELON") of TD Canada Trust Bank, apprising Victim Individual C.L. that s/he had a possible family member who died intestate with an unclaimed account in the amount of $9.2 million. In the report, Victim Individual C.L. said s/he sent

16

funds as requested to TCF Bank account XXXXX7097 in the name of SETRACO, as well as another account in the name of JENANT located in Illinois. Victim Individual C.L. further provided investigators with documents bearing the name Pierre DELOUIS and the email address pdelouis@hallhallchamber.com (the same putative attorney used to defraud Victim Individuals J.B. and C.H., as noted in Sections III.B.3.c and III.B.6.b of the Luciano Affidavit, as well as in Section II.C.1.b, above).

### c. DISPOSITION OF FUNDS FROM VICTIM INDIVIDUAL C.L.

37.     A review of bank records for the TCF Bank account (XXXXXX9392) in the name of JENANT shows that on or about March 11, 2019—approximately three days after the account received a wire transfer from Victim Individual C.L. in the amount of $6,405—an approximately $5,000 cash withdrawal was made. A copy of the withdrawal ticket bears GOSHA's name. Further review shows that the funds received from Victim Individual C.L. on or about March 27, 2019, via cashier's check in the amount of approximately $97,500, remained in the TCF Bank account (XXXXXX9392) until approximately October 23, 2019. On or about April 1, 2019, IBC Bank sent a Hold Harmless and Indemnification Agreement to TCF Bank Fraud Protection Services requesting that the funds be returned. On or about October 23, 2019, TCF Bank Fraud Protection Services sent a letter to IBC Bank confirming payment of the hold-harmless claim. On or about the same date, TCF Bank issued a cashier's check (#306010267) payable to IBC Bank in the amount of approximately $97,500. The memo line states, "RE: REF CXXXXXXX DXXX, C38210208."

38. A review of bank records for the TCF Bank account (XXXXXX7097) in the name of SETRACO shows that on or about March 14 and March 15, 2019—around the same time the account received the wire transfer from Victim Individual C.L.— several withdrawals were made from the account as follows:

a. On or about March 14, 2019, an approximately $10,138 withdrawal was made. A copy of the withdrawal ticket bears the name "Sammy M." and shows that approximately: (1) $6,000 was withdrawn in cash (and thus not subject to FINCEN's CTR threshold); and (2) $4,138 was withdrawn as an official check (#305943184) made payable to EREP Acquisition Management LLC. The official check (#305943184) was redeposited into the SETRACO TCF Bank account (XXXXXX7097) on or about the same date it was issued. The check was endorsed by "Sammy M." and the endorsement included the notation, "not use for the purpose [*sic*]";

b. On or about March 14, 2019, an approximately $500 ATM withdrawal was made from the account;

c. On or about March 15, 2019, an approximately $2,650 cash withdrawal (not subject to FINCEN's CTR threshold) was made from the account. A copy of the withdrawal ticket bears the name "Sammy M";

d. On or about March 15, 2019, an approximately $4,138 outgoing wire transfer was made from the account for the benefit of EREP Acquisition Management LLC; and

18

e.      On or about March 15, 2019, an approximately $8,500 outgoing wire transfer was made to an account in Nigeria at Access Bank PLC to the beneficiary IBEKIE.

39.      A review of bank records for the TCF Bank account (XXXXXX7097) in the name of SETRACO shows several withdrawals were made after the account received funds from Victim Individual C.L. on or about March 27, 2019, via cashier's check in the amount of $80,000 as follows:

a.      On or about March 27, 2019, an approximately $3,500 cash withdrawal (not subject to FINCEN's CTR threshold) was made from the account. A copy of the withdrawal ticket bears the name "Sammy M";

b.      On or about March 29, 2019, an approximately $9,000 cash withdrawal (not subject to FINCEN's CTR threshold) was made from the account. A copy of the withdrawal ticket bears the name "Sammy M";

c.      On or about March 29, 2019, an approximately $25,000 outgoing wire transfer was made to an account in Nigeria at Access Bank PLC to the beneficiary IBEKIE; and

d.      The remainder of the funds received from Victim Individual C.L. remained in the account until on or about July 26, 2019, when an official check (#105071730) was issued by TCF Bank payable to SETRACO in the approximate amount of $47,630 in order to close the account.

i.      On or about September 23, 2019, a checking account (XXXXXXXX1606) was opened in the name SETRACO at US Bank. The signature

19

card for this account lists MAXWELL (believed to be the same person as ANIUKWU, for the reasons below) as the authorized signer and President of SETRACO.

      ii.    On or about September 23, 2019, a deposit was made to US Bank account (XXXXXXXX1606) for approximately $47,630. The deposit item was a cashier's check (#105071730) dated on or about July 26, 2019, issued by TCF Bank payable to SETRACO in the approximate amount of $47,630, and appears to be the same check withdrawn from the SETRACO TCF Bank account (XXXXXX7097), as discussed above.

      iii.    On or about September 30, 2019, the US Bank account (XXXXXXXX1606) was closed and a cashier's check (#4319502287) was issued by US Bank payable to SETRACO in the approximate amount of $47,427.50, in order to close the account.

      1)    On or about October 2, 2019, an individual identifying himself as SAMMY MAXWELL cashed a US Bank cashier's check (#4319502287) dated on or about September 30, 2019, made payable to SETRACO in the approximate amount of $47,427.50 at PLS Financial Services, which appears to be the same check as mentioned above, withdrawn from the SETRACO US Bank account (XXXXXXXX1606).

      2)    Photos and video of the foregoing transaction were obtained from PLS Financial Services. Based on my training and experience, knowledge of the investigation, conversations with other investigators involved in this matter, and general familiarity with ANIUWKU's appearance from photographs

and records obtained over the course of the investigation, the individual in the PLS Financial Services photos and video—who identified himself as SAMMY MAXWELL—appears to be ANIUKWU.

        3)    The individual presented a Nigerian passport (#AXXXX8278) in the name of MAXWELL bearing a picture that was similar in appearance to ANIUKWU.

        4)    The individual provided the Lincoln Premises as his address and provided phone number (630) XXX-3378. During a CBP border inspection, on or about November 8, 2019, ANIUKWU was in possession of a phone using number (630) XXX-3378, as further described in Section III.A.1 of the Luciano Affidavit. T-Mobile records identify ANIUKWU as the subscriber associated with this phone number.

40.    Based on my training and experience, as with the above-mentioned financial transactions using HALL & HALL bank accounts, this sort of financial activity is consistent with a money-laundering scheme designed to hide the origins of fraudulently obtained funds.

### 3.    SAMCORD INC.

#### a.    CORPORATE FORMATION

41.    On or about June 5, 2018, Samcord Inc. ("SAMCORD") was incorporated with the ILSOS. Its articles list "Emeka Toni Ibe" as the registered agent and incorporator, with an address of 4935 Washington Boulevard, Unit 2, in Chicago, Illinois. The name Emeka Toni Ibe appears to be a possible variation of IBEKIE's

name, reflecting IBEKIE's middle name (*i.e.*, "Emeka"), followed by a nickname of IBEKIE's first name (*i.e.*, "Anthony"), and a shortened version of IBEKIE's surname.

### b.    RECEIPT OF FUNDS FROM VICTIM INDIVIDUAL A.W.

42.    On or about June 25, 2018, a checking account (XXXXXX8376) was opened in the name of SAMCORD at Fifth Third Bank. One of the signature cards for this account lists IBEKIE as the authorized signer, while a second card lists IBEKIE and GOSHA as authorized signers.

43.    On or about July 6 and July 9, 2018, the Fifth Third Bank account (XXXXXX8376) mentioned above received wire transfers from Victim Individual A.W. for approximately $9,228.07 and $15,771.93.

44.    On or about October 24, 2018, Victim Individual A.W. filed a complaint with the Internet Crime Complaint Center, claiming that s/he had fallen victim to a romance scam resulting in a loss of approximately $178.030.07. In the complaint, Victim Individual A.W. reported meeting an individual by the purported name Matthew Russo ("RUSSO") on the online dating website OKCupid.com. According to the complaint, RUSSO claimed that he was a fund manager with Ventcore Portfolio ("Ventcore") in Kent, England.

45.    Victim Individual A.W. reported RUSSO was going to leave Ventcore after the death of his mother and was involved in an arrangement with an individual from Dubai, whereby RUSSO was set to receive a substantial sum of funds but could not do so due his employment with Ventcore. So, RUSSO arranged for Victim Individual A.W. to be the owner of the shares worth approximately $11 million, to be

deposited in a bank in Switzerland. Victim Individual A.W. was required to pay to open an account in order to withdraw the funds. Victim Individual A.W. reported that additional funds were needed to pay the "Cost of Transaction," to move the funds into his/her account in the United States, adding that after the payment was made, s/he was informed that there was a "STOP ORDER" on the funds from the United States government.

46. On or about August 22, 2019, agents conducted a telephonic interview of Victim Individual A.W., who confirmed s/he filed the complaint and verified the information in the complaint was correct. Further, Victim Individual A.W. said that s/he had believed s/he was in a relationship with RUSSO, but later came to believe it was a scam after his/her brother brought up concerns regarding the transactions. Victim Individual A.W. explained s/he confronted the scammers and asked for his/her money back. The scammers initially agreed but required additional funds as part of the process to return the funds. Victim Individual A.W. estimated s/he lost over $267,000 as a result of the scheme.

c. **DISPOSITION OF FUNDS FROM VICTIM INDIVIDUAL A.W.**

47. A review of bank records for the SAMCORD Fifth Third Bank account shows that on or about July 6, 2018—the same day the account received the wire from Victim Individual A.W.—an approximately $5,000 cash withdrawal (not subject to FinCEN's CTR threshold) was made from the account. A copy of the withdrawal ticket bears IBEKIE's name.

23

48.     A review of bank records for the SAMCORD Fifth Third Bank account shows that on or about July 9, 2018—the same day the account received the wire from Victim Individual A.W.—an approximately $9,000 cash withdrawal (not subject to FinCEN's CTR threshold) was made from the account. No associated drawer name was available on the withdrawal item produced by Fifth Third Bank.

49.     Based on my training and experience, as with the above-mentioned financial transactions using HALL & HALL, SETRACO, and JENANT bank accounts, this sort of financial activity is consistent with a money-laundering scheme designed to hide the origins of fraudulently obtained funds.

### D.     UNDERCOVER INVESTIGATION

#### 1.     OVERVIEW

50.     In or around May 2019, agents conducted a trash pull at the Lincoln Premises, a property previously associated with IBEKIE and ANIUKWU, as noted in the Luciano Affidavit. Among other things, agents recovered form letters from the trash, addressed to multiple individuals as part of an apparent inheritance-fraud scheme. Over the course of the investigation, agents recovered similar form letters from other locations, which ultimately led to an undercover operation to initiate contact with the putative sender of the letters. That undercover operation culminated with the June 2020 controlled delivery of a USPS Express Parcel package to the **Harlem Premises**, which contained a cashier's check for a payment made as part of an inheritance-fraud scheme.

24

51.     As detailed below, this undercover operation—in combination with other information obtained in the investigation, including subscriber information and IP addresses for email accounts used to communicate with the undercover agent, IP addresses tracking the USPS Express Parcel as part of the controlled delivery, and physical surveillance—established probable cause that the **Oxbow Premises**, **Weber Premises**, and **Harlem Premises** each contain evidence, fruits, and instrumentalities of fraud.

### 2.     HISTORICAL INVESTIGATION OF INHERITANCE-SCAM LETTERS

#### a.     TRASH PULL AT THE LINCOLN PREMISES

52.     On or about May 1, 2019, agents obtained the trash abandoned outside the curtilage of the Lincoln Premises. In that trash, agents found numerous relevant items of evidence, including multiple letters addressed to various individuals from a John DELON (the same individual involved in an inheritance-fraud scheme targeting Victim Individual C.L., as discussed in Section II.C.2.b, above), which were stamped with the logo for TD Canada Trust, a financial institution based out of Canada. The letters inform the addressees that DELON obtained their contact information while searching for the next of kin to a deceased customer of TD Canada Trust—with a similar name as each addressee—who died intestate leaving his/her bank account, containing approximately $9.2 million, with an open-beneficiary status. The letter offered to present the addressee to the bank as the next of kin to claim the dormant account and to share the funds with the addressee. Further, the letters requested

that each addressee respond to the email address for DELON specified in the letter, to indicate the addressee's readiness to proceed with the transaction.

53.     During the May 1, 2019 trash pull at the Lincoln Premises, agents also found ripped up envelopes bearing a return address of Box 707, Wheaton, Illinois 60187. Based on information developed in the investigation to date, agents are aware that similar letters have been returned to Box 707, Wheaton, Illinois, which is the address for the Office of the Circuit Court Clerk for DuPage County. (Agents have not determined, however, why this particular return address for the Circuit Court Clerk was used on the subject letters.) Further, agents recovered papers with handwritten notes, including one bearing username "JohnJeanDelon Gmail Account," password "JohnJean5206."

    a.     As noted previously, "5206" is the numerical street address for the Lincoln Premises, the same location where the above-mentioned trash pull occurred.

    **b.     LETTERS RECEIVED BY DUPAGE COUNTY STATE'S ATTORNEY OFFICE**

54.     On or about February 25, 2020, two letters similar to those recovered during the Lincoln Premises trash pull were returned to 503 North County Farm Road, Wheaton, Illinois, which is the address for the DuPage County State's Attorney Office. (Again, agents have not yet determined why this particular return address for the DuPage County State's Attorney Office was used on the subject letters.) Further, on or about March 18, 2020, one similar letter was returned to the same address noted above for the DuPage County State's Attorney Office. The letters were addressed to various individuals from a Peter Pfizer ("PFIZER"); they were also stamped with the

26

logo for Standard Chartered, a financial institution based out of England. The letters inform the addressees that PFIZER obtained their contact information while searching for the next of kin to a deceased customer of Standard Chartered, with a similar name as each addressee, who died intestate leaving his/her bank account (the "Inheritance Account"), containing approximately $11.6 million, with an open-beneficiary status. The letter offered to present the addressee to the bank as the next of kin to claim the Inheritance Account and to share the funds with the addressee. Further, the letters requested that each addressee respond to PFIZER at the email address Ppfizer456@aol.com, to indicate the addressee's readiness to proceed with the transaction.

        a.      Agents submitted the two returned letters along with associated envelopes containing the letters obtained, on or about February 25, 2020, to the IRS-CI National Forensic Laboratory (the "IRS-CI NFL") for fingerprint analysis, on or about March 6, 2020. Results of the fingerprint analysis were received on or about June 4, 2020. The IRS-CI NFL obtained fingerprint exemplars bearing the name Anthony E. Ibekie (FBI# XXXXXXFD1) from the Federal Bureau of Investigation Next Generation Identification Automated Fingerprint Identification System (the "FBI NGI AFIS"). The IRS-CI NFL processed both letters and both envelopes for latent prints. Suitable latent prints developed during processing were searched in the FBI NGI AFIS database and compared to the exemplars obtained for IBEKIE. Results of the fingerprint analysis showed that one latent print located on one of the envelopes was made by Anthony E. Ibekie (FBI# XXXXXXFD1).

         i.      Based on my training and experience, conversations with IRS-CI NFL personnel, conversations with other law enforcement agents, and a review of information obtained from www.fbi.gov/services/cjis/fingerprints-and-other-biometrics/ngi, FBI NGI AFIS is an electronic repository containing biometric and criminal-history information maintained and made available to the criminal-justice community by the Federal Bureau of Investigation. The system uses a fingerprint-matching algorithm to compare latent prints to exemplars maintained in the FBI NGI AFIS database. Users can search latent images against the criminal, civil, and Unsolved Latent File repositories. A search of law-enforcement databases showed that FBI# XXXXXFD1 is associated with IBEKIE, and that IBEKIE has a criminal history as cited herein and in the Luciano Affidavit. Based on this information, I know that fingerprint exemplars for IBEKIE would be located in the criminal repository of the FBI NGI AFIS database.

### 3. COMMUNICATIONS INCIDENT TO UNDERCOVER OPERATION

55.    On or about May 1, 2020, an IRS-CI Special Agent operating in an undercover capacity (the "UCA") sent an email to Ppfizer456@aol.com in response to one of the letters received at the DuPage County State's Attorney Office, purporting to be a relative of one of the addressees, Victim Individual W.B.[2] The UCA informed PFIZER that s/he handles the affairs of Victim Individual W.B. and would like to proceed with the transaction on behalf of Victim Individual W.B.

---

[2] Unless otherwise noted, the UCA's communications with PFIZER or other co-conspirators throughout the undercover operation occurred via email.

56.     On or about May 1, 2020, the UCA received a response from PFIZER, who was using Ppfizer456@aol.com. The response included an attachment reiterating and further expounding on information provided in the initial letter regarding the Inheritance Account. The attachment instructed the UCA to provide her/his full name, address, and mobile number. It also instructed the UCA to confirm her/his willingness and ability to handle the transaction and her/his willingness to sign a non-disclosure agreement. On or about May 3, 2020, the UCA responded with answers to PFIZER's questions.

57.     On or about May 5, 2020, the UCA received a Confidentiality and Trust Agreement, also referred to as a Non-Disclosure Agreement in the text of the contract (the "NDA"), from PFIZER via email with instructions to sign and return the NDA. The NDA stated, in pertinent part, that Victim Individual W.B. agrees to share the total amount received—$11.6 million plus accumulated interest—with PFIZER in the following ratio: 60% for Victim Individual W.B. and 40% for PFIZER. The NDA was signed by PFIZER and dated on or about May 5, 2020. The NDA contained a signature line denoting that the UCA should sign on behalf of Victim Individual W.B. On or about May 6, 2020, the UCA signed and returned the NDA to PFIZER.

58.     On or about May 14, 2020, the UCA received an email from PFIZER acknowledging receipt of the NDA. Attachments to the email included an Application for Transfer of the Estate of My Relative Late Mr. SXXXXXXX BXXXX (the "Bank Application") addressed to The Manager of Operations at the Unclaimed Estate Department (the "UED") of Standard Chartered Group, as well as a Death Certificate

29

for SXXXXXXX BXXXX, the putative deceased customer of Standard Chartered with the Inheritance Account. In the email, PFIZER instructed the UCA to sign the Bank Application laying claim to the money in the Inheritance Account and to email the Bank Application to ued@standardgroupservices.com, with the Death Certificate and a copy of the UCA's identification. On or about May 16, 2020, the UCA submitted all documents to ued@standardgroupservices.com, as instructed by PFIZER.

59. On or about May 18, 2020, the UCA received confirmation from Wyashika Sellar ("SELLAR"), who purported to be Manager of Operations for the UED of Standard Chartered, using ued@standardgroupservices.com to communicate with the UCA. Attached to the email was a letter from SELLAR and a questionnaire (the "Bank Questionnaire") bearing the logo of Standard Chartered Bank. The letter acknowledged receipt of the Bank Application and instructed the UCA to complete the Bank Questionnaire and return it to ued@standardgroupservices.com.

60. The Bank Questionnaire included various questions pertaining to SXXXXXXX BXXXX's personal information, details surrounding his death, details surrounding the Inheritance Account, and the UCA's personal information. On or about May 19, 2020, the UCA forwarded the Bank Questionnaire to PFIZER requesting assistance with the questions pertaining to SXXXXXXX BXXXX. On or about May 19, 2020, the UCA received an email from PFIZER containing the answers to the Bank Questionnaire along with instructions to return the completed Bank Questionnaire to the bank immediately. On or about May 20, 2020, the UCA emailed

the completed Bank Questionnaire to ued@standardgroupservices.com and notified PFIZER that the Bank Questionnaire had been submitted.

61. On or about May 22, 2020, the UCA received an email from SELLAR confirming successful completion of the Bank Questionnaire. Attached to the email was a letter from SELLAR and a Deceased Estate Administration packet bearing the logo of TD Canada Trust. The SELLAR letter confirmed accurate completion of the Bank Questionnaire and instructed the UCA to contact Standard Chartered's affiliate bank, TD Canada Trust. The SELLAR letter provided a contact email for TD Canada Trust of ued@tdcanadagroup.com. Several victims cited in the Luciano Affidavit (*see* Sections III.B.3.c, III.B.6.b, and III.B.7.b, therein) were also instructed to correspond with ued@tdcanadagroup.com. The Deceased Estate Administration packet provided informational material on claiming estates of people who die without known blood relatives and without leaving a will. On or about May 22, 2020, the UCA forwarded the information received from SELLAR to PFIZER.

62. On or about May 24, 2020, the UCA received an email from PFIZER which included an attachment, Referral Letter and Release of Estate, addressed to the UED of TD Canada Trust. PFIZER instructed the UCA to email the Referral Letter and Release of Estate, the SELLAR letter confirming successful completion of the Bank Questionnaire, and the Death Certificate to ued@tdcanadagroup.com. On or about May 27, 2020, the UCA emailed the documents as instructed by PFIZER to ued@tdcanadagroup.com.

63.    On or about May 27, 2020, the UCA received an email from PFIZER instructing her/him to contact PFIZER at peterp968@yahoo.com for all future communications.

64.    On or about May 27, 2020, the UCA received an email from Nikka Avis ("AVIS"), who purported to be the Manager of Operations for the UED of TD Canada Trust, using ued@tdcanadagroup.com to communicate with the UCA. The email confirmed receipt of the documents sent by the UCA on or about May 27, 2020, and instructed the UCA to retain the services of a Canadian attorney to administer the estate. AVIS recommended DELOUIS, a putative attorney with the law firm HALL & HALL, and provided pdelouis@hallhallchamber.com as a contact email address for DELOUIS. Numerous victims cited in the Luciano Affidavit (*see* Sections III.B.3.c and III.B.6.b, therein), as well as in this affidavit (*see* Sections II.C.1.b and II.C.2.b, above), were similarly instructed to correspond with DELOUIS, HALL & HALL, and pdelouis@hallhallchamber.com.

65.    On or about May 28, 2020, the UCA forwarded the information from AVIS to PFIZER. In turn, PFIZER responded to the UCA on or about the same date, instructing her/him that a Canadian lawyer is needed and that it is best to use the putative attorney, DELOUIS, as recommended by AVIS. Attached to the email was a letter (the "Representation Letter") drafted to DELOUIS to be signed by the UCA requesting representation in the matter. PFIZER instructed the UCA to send the Representation Letter to DELOUIS.

66.    On or about May 29, 2020, the UCA had a recorded phone call with PFIZER, who contacted the UCA from a private number. During the call, PFIZER instructed the UCA to send the Representation Letter to DELOUIS, the putative attorney. Further, PFIZER explained that DELOUIS would handle everything with the bank on their behalf, adding that the bank would not require any money to be paid and that arrangements could be made for money owed to DELOUIS to be taken out of the funds from the Inheritance Account. PFIZER also said that he used a calling card to contact the UCA, because it is an international call and thus cheaper to use a calling card. PFIZER then said that the use of the calling card was why his phone number showed up as private. PFIZER provided the following international cell phone number to the UCA to contact him if needed: +44-XXX-XXX-0817. However, PFIZER recommended that the UCA email him if he needed to speak with him, and PFIZER would call him using the calling card, because it would be cheaper.

67.    On or about May 30, 2020, the UCA sent the Representation Letter to DELOUIS at email address pdelouis@hallhallchamber.com. The UCA received a response from DELOUIS, who was using pdelouis@hallhallchamber.com, on or about the same date. The response informed the UCA that DELOUIS intended to verify the existence of the Inheritance Account with the Ministry of Finance and visit TD Canada Trust to present himself as the UCA's solicitor. DELOUIS stated he would contact the UCA at a future date with further instructions to pursue the case.

68.    On or about June 1, 2020, the UCA received an email from DELOUIS, attaching an Attorney Retainer Agreement (the "Retainer Agreement") that the UCA

33

was instructed to sign and return. DELOUIS also said that he would forward bank-account information for the payment of fees outlined in the Retainer Agreement upon receipt of the signed contract. The Retainer Agreement, in turn, provided that the Inheritance Account had supposedly been verified by the Ministry of Finance and TD Canada Trust and contained approximately $13,400,820 with accumulated interest. The Retainer Agreement further provided that HALL & HALL would receive a 1.5% commission of the total sum to be paid, after the UCA received the funds from the Inheritance Account. The Retainer Agreement outlined two mandatory government fees (the "Government Fees") totaling approximately $6,400 that must be paid by the UCA prior to receiving the funds in the Inheritance Account, as follows:

a.    An alleged Probate Registry Processing Fee to be paid to the Canadian Government through one of their accredited payment-receiving brokers, for approximately $3,900; and

b.    An alleged Change of Ownership Processing Fee to be made available to HALL & HALL to process the claim, for approximately $2,500.

69.    On or about June 2, 2020, the UCA forwarded the Retainer Agreement to PFIZER asking if the Government Fees could be taken out of the funds from the Inheritance Account. On or about the same date, the UCA received an email response from PFIZER, who stated that he would see if the Government Fees could be taken out of the funds from the Inheritance Account. PFIZER added that he would pay 40% of the Government Fees if they could not be deducted from the Inheritance Account.

34

70.    On or about June 5, 2020, the UCA emailed the signed Retainer Agreement to DELOUIS and requested the bank-account information for payment of the Government Fees. On or about the same date, the UCA notified PFIZER via email the signed Retainer Agreement had been sent to DELOUIS.

71.    On or about June 5, 2020, the UCA had a recorded phone call with PFIZER, who was using an unknown number. During the conversation, PFIZER instructed the UCA regarding what to say to bank personnel when the UCA wires money to pay the Government Fees. To that end, PFIZER told the UCA to inform the bank that the UCA was wiring money to purchase goods or merchandise. Specifically, PFIZER stated the following, in form or substance:

> But here's what I want to tell you though. 'Cause I'm a banker, part of our job is that, um, when a customer comes to the bank, our job is to make sure that we discourage the customer. The bank does whatever they have to do to keep their customer safe. So, when you go into the bank and you're having a conversation with any of these representatives be careful the kind of words you are using. What I would advise is, um, when you, when it comes to why you're sending the money the purpose of the sending is to for purchase of goods or purchase of, uh, merchandise. That way it doesn't raise a whole lot of question and then them discouraging you from, 'cause sometimes they have a right to refuse. Just so you know.

72.    At the end of his recorded phone call with the UCA on or about June 5, 2020, PFIZER again reiterated the information further described in paragraph 71 and instructed the UCA not to give any details to the bank regarding wiring the Government Fees. Specifically, PFIZER stated the following, in form or substance:

> Don't forget what I mentioned to you about the banker who is gonna help you. Just, uh, don't tell them any details. It's for purchase of goods or merchandise and that should be enough.

35

73.     On or about June 5, 2020, DELOUIS contacted the UCA via email and instructed the UCA to pay the Government Fees through a wire transfer. DELOUIS provided the following account information in the wire instructions:

> Bank Name: Chase
> Bank Address: 1212 Hobson Road Naperville, IL 60543
> Account Number: XXXXX6830
> Routing Number: 071000013
> Swift Code: CHASUS33
> Beneficiary Name: Emetech Solutions Inc
> Beneficiary Address: 797 Oxbow Avenue Oswego, IL 60540 (*i.e.*, the **Oxbow Premises**)

a.      A search of ILSOS online databases disclosed Emetech Solutions Inc. ("EMETECH") was incorporated on or about March 6, 2020. The ILSOS online databases list IBEKIE as the registered agent for EMETECH, with a listed address of 2726 Alyssa Drive, Naperville, Illinois 60565 (the "Alyssa Premises"), which is described further in the Luciano Affidavit as the address associated with fictional business entities under investigation, including SAMTONI Medical Equipment Inc. A review of commercial databases, physical surveillance, analysis of telephone subscriber and toll records, as well as declarations made by IBEKIE to CBP officials indicate that IBEKIE lived at the Alyssa Premises until around late-2019 (described further in Section III.A.2 of the Luciano Affidavit). Further, physical surveillance, driver's license information, analysis of telephone subscriber and toll records, as well as declarations made by ANIUKWU to CBP officials indicate that ANIUKWU lived at the Alyssa Premises until around late-2019 (described further in Section III.A.1 of the Luciano Affidavit).

36

b.      On or about March 10, 2020, a checking account (XXXXX6830) was opened in the name of EMETECH at JP Morgan Chase Bank. The signature card for this account lists Ebuka Elton-John EGBUNAM ("EGBUNAM") as the authorized signer and President of EMETECH. The signature card lists the **Oxbow Premises** as the address for EMETECH.

74.     On or about June 9, 2020, DELOUIS contacted the UCA via email and instructed the UCA to disregard the prior wire instructions and send payment of the Government Fees using a cashier's check payable to Globayo LLC ("GLOBAYO") with an address of the Alyssa Premises.

a.      A search of ILSOS online databases disclosed that GLOBAYO was incorporated on or about June 1, 2017. The ILSOS online databases list Vincent Izuegbu ("IZUEGBU") as the registered agent.

75.     On or about the same date, DELOUIS sent a second email instructing the UCA to send the cashier's check to 1419 N. Harlem Avenue, Suite B, Oak Park, Illinois 60302 (*i.e.*, the **Harlem Premises**).

E.      INVESTIGATION LEADING TO THE HARLEM PREMISES

1.      CONTROLLED DELIVERY

76.     On or about June 15, 2020, the UCA obtained a cashier's check (#1689201121) from Bank of America in the amount of approximately $1,100, made payable to GLOBAYO (the "UCA Check").

77.     On or about June 16, 2020, with the assistance of the U.S. Postal Inspection Service ("USPIS"), agents prepared a U.S. Postal Service Express Mail

37

parcel bearing tracking number EJ199352533US (the "Express Parcel"). Enclosed in the Express Parcel was the UCA Check. Before placing the UCA Check inside the Express Parcel, agents added a handwritten notation to the face of the UCA Check as follows: "For Pierre Delouis – Legal Fees." The Express Parcel was addressed to "Globayo LLC" at the **Harlem Premises**.

78.     On or about June 18, 2020, agents saw a silver BMW sport utility vehicle bearing Illinois license plate 38822US (the "BMW SUV"), driven by a black female, arrive at the **Harlem Premises**. A search of law-enforcement databases disclosed Illinois license plate 38822US is registered to GOSHA at the **Harlem Premises** for a silver 2009 BMW vehicle.[3] The status of the registration is valid, with an expiration date of on or about July 31, 2020.

79.     On or about June 18, 2020, subsequent to the arrival of the BMW SUV, a U.S. Postal Inspector operating in an undercover capacity as a U.S. Postal Carrier conducted a controlled delivery of the Express Parcel containing the UCA Check (the "Controlled Delivery") to the **Harlem Premises**. The Postal Inspector was equipped with a covert device that documented the Controlled Delivery in a contemporaneous audio-video recording, which I have reviewed.

80.     From my review of the audio-video recording of the Controlled Delivery, conversations with other agents with knowledge of this investigation, and general

---

[3]. As discussed above, GOSHA is the registered agent for JENANT, the authorized signer of JENANT's account with TCF Bank, and an authorized co-signer with IBEKIE on the SAMCORD checking account with Fifth Third Bank. Additionally, as outlined below, GOSHA owns the **Harlem Premises**, where DELOUIS instructed the UCA to mail a cashier's check.

familiarity with GOSHA's appearance based on photographs and driver's license records obtained from law-enforcement databases, I know that GOSHA answered the door of the **Harlem Premises**.

81.    The Postal Inspector questioned GOSHA regarding the Express Parcel being addressed to a business entity at a residential address. GOSHA looked at the label on the Express Parcel and confirmed the delivery address was correct. GOSHA further stated that she had been working from home. The Postal Inspector, and other agents who have reviewed the audio-video recording of the Controlled Delivery, understood GOSHA's statement regarding working from home to be an explanation for receiving mail addressed to a business entity at her residence.

82.    GOSHA questioned the Postal Inspector regarding the time of delivery, stating that the Express Parcel should have arrived in the morning instead of in the afternoon. The Postal Inspector, and other agents who have reviewed the audio-video recording of the Controlled Delivery, understood GOSHA's line of questioning to mean that she had knowledge of the Express Parcel and was anticipating its arrival.

83.    GOSHA then signed a PS Form 3849 (USPS We Re-Deliver for You Notification) bearing Express Mail tracking number EJ199352533US. The signature appears to reflect "JGosha." In the Printed Name field on the form, GOSHA wrote "J GOSHA." The form was dated on or about June 18, 2020.

84.    Upon signing PS Form 3849 dated on or about June 18, 2020, bearing Express Mail tracking number EJ199352533US, GOSHA took receipt of the Express Parcel and closed the door, carrying the Express Parcel into the **Harlem Premises**.

## 2. ADDITIONAL INFORMATION REGARDING THE HARLEM PREMISES

85. Agents have associated GOSHA, IBEKIE, and EGBUNAM with the **Harlem Premises** through multiple means. As described below, GOSHA owns and resides at the **Harlem Premises**. Additionally, IBEKIE and EGBUNAM both listed the **Harlem Premises** as their residence when applying to be added to the **Oxbow Premises** lease in April 2020 (EGBUNAM on or about April 27, 2020; and IBEKIE on or about April 29, 2020).

86. A review of LexisNexis Accurint for Law Enforcement[4] ("Accurint") indicates that GOSHA is associated with the **Harlem Premises**. Data obtained from Accurint shows that GOSHA is the owner of the **Harlem Premises**, and that the property was purchased by GOSHA on or about August 7, 2018. Additionally, data obtained from Accurint shows utility-connection records in the name of GOSHA at the **Harlem Premises**.

87. A search of law-enforcement databases shows the **Harlem Premises** listed as the address on GOSHA's Illinois driver's license. Additionally, GOSHA's BMW SUV is registered in Illinois to the **Harlem Premises**.

---

[4] LexisNexis Accurint for Law Enforcement is a commercially available database. According to risk.lexisnexis.com/products/accurint-for-law-enforcement, Accurint is a web-based application that provides law-enforcement personnel access to a comprehensive database of public records and proprietary information drawing from over 13,000 current and historical sources. Based on my training and experience, Accurint is used by law-enforcement personnel to identify various information and possible leads pertaining to subjects of criminal investigations including, but not limited to, associated addresses, telephone numbers, relatives, associates, assets, civil and criminal judgements, businesses, and utility records.

88.     A search of the Cook County Treasurer online database returned property-tax bills for tax years 2018 and 2019 for the **Harlem Premises**. The 2019 tax bill shows a due date of on or about August 3, 2020. Tax bills for both years are addressed to GOSHA at the **Harlem Premises**.

89.     Records obtained from Nicor Gas show that GOSHA is the subscriber for utility services at the **Harlem Premises.** GOSHA contacted Nicor on or about September 5, 2018, to establish utility service for the **Harlem Premises**.

### F.     INVESTIGATION LEADING TO THE OXBOW PREMISES

90.     Agents have associated IBEKIE, ANIUKWU, GOSHA, and EGBUNAM with the **Oxbow Premises** through multiple means. What follows in Sections II.F.1, II.F.2, and II.F.3, below, is a summary of: (1) subscriber information and IP addresses involved in the UCA investigation and Controlled Delivery, or belonging to IBEKIE, that are associated with the **Oxbow Premises**; (2) surveillance tying the above-mentioned co-conspirators to the **Oxbow Premises**; and (3) additional information obtained connecting the above-mentioned co-conspirators to the **Oxbow Premises**.

### 1.     SUBSCRIBER INFORMATION AND IP ADDRESSES

#### a.     EMAIL ADDRESSES USED TO COMMUNICATE WITH THE UCA

91.     Subscriber information for Ppfizer456@aol.com—the initial account that PFIZER used in communicating with the UCA—was obtained from Oath Inc. The subject account showed a subscriber name of "PP." No subscriber address information was available. Subscriber details list the following as the IP address where the email

41

account was registered: 2600:1700:1cb0:2d80:555c:92f6:6900:98b (the "PFIZER AOL IP"), on or about February 3, 2020.

92.     Subscriber information obtained from AT&T showed that the PFIZER AOL IP was registered to ANIUKWU at the **Oxbow Premises**.

93.     Oath Inc. provided a summary of login activity for Ppfizer456@aol.com. Two subsequent logins (the "Additional PFIZER AOL IPs), among others, appeared for the email account as follows:

        a.     IP Address 2600:1700:1cb0:2d80:850:c377:df29:94b1, on or about February 17, 2020; and

        b.     IP Address 2600:1700:1cb0:2d80:50dc:fd5c:6b2e:8bc1, on or about March 4, 2020.

94.     Subscriber information obtained from AT&T showed that the Additional PFIZER AOL IPs were registered to ANIUKWU at the **Oxbow Premises**.

95.     Subscriber information for ued@standardgroupservices.com—the email address to which PFIZER directed the UCA to send the Bank Application, and which SELLAR, the purported Manager of Operations for the UED of Standard Chartered, used to communicate with the UCA—was obtained from Google. The subject account showed a subscriber name of "Standard Group Services" with a creation date of March 30, 2020. Google also provided a summary of login and failed-login activity for ued@standardgroupservices.com (the "Standard Group IPs") as follows:

        a.     IP Address 2600:1700:1cb0:2d80:535:e383:36f2:dc2b, on or about March 30, 2020 (three logins and two failed logins);

42

b.      IP Address 2600:1700:1cb0:2d80:75b7:c9d7:a4c7:2589, on or about March 30, 2020 (two logins);

c.      IP Address 2600:1700:1cb0:2d80:8138:73f:459b:1e7f, on or about March 30, 2020 (one login and two failed logins);

d.      IP Address 2600:1700:1cb0:2d80:b454:753d:afb5:58ba, on or about March 31, 2020 (two logins);

e.      IP Address 2600:1700:1cb0:2d80::fd65:528:7f05:23f, on or about April 1, 2020 (two logins); and,

f.      IP Address 2600:1700:1cb0:2d80:249c:73de:393:f19b, on or about April 15, 2020 (one login).

96.     Subscriber information obtained from AT&T showed that the Standard Group IPs were registered to ANIUKWU at the **Oxbow Premises**.

**b.      PERSONAL EMAIL ADDRESS OF IBEKIE**

97.     As noted in Section II.G.1.b, below, the account aibekie@gmail.com— believed to be used by IBEKIE—has exchanged numerous communications with other co-conspirator email accounts in furtherance of the fraudulent schemes under investigation. Subscriber information for aibekie@gmail.com obtained from Google showed a subscriber name of "Anthony Ibekie."

98.     On or about June 15, 2020, the Honorable Rebecca R. Pallmeyer, Chief United States District Judge, issued pen-trap orders in Case No. 19 GJ 060 (collectively, the "Pen/Trap"), authorizing the installation and use of a pen register and trap-and-trace device on the following email accounts: saniukwu1@gmail.com,

constantconsultant200@gmail.com, aristoblake@gmail.com, aibekie@gmail.com, and Ppfizer456@aol.com.

99.     Results of the Pen/Trap showed that IP address 104.185.26.48 was used to login to aibekie@gmail.com on or about June 17, 2020. Subscriber records obtained from AT&T showed that this IP address is registered to ANIUKWU at the **Oxbow Premises**.

        a.     Subscriber records obtained from AT&T for the PFIZER AOL IP, the Additional PFIZER AOL IPs, and the Standard Group IPs were related to IPV6 IP addresses; the subscriber for those IP addresses was ANIUKWU at the **Oxbow Premises**, as further described in Section II.F.1.a. Agents contacted an AT&T Representative on or about May 19, 2020, who explained that in order for AT&T to obtain IP subscriber records from their system, they must first convert the IPV6 IP address to an IPV4 IP address. The conversion of the IPV6 IP address to the IPV4 IP address for the PFIZER AOL IP, the Additional PFIZER AOL IPs, and the Standard Group IPs was listed on the records provided by AT&T as 104.185.26.48, which was the same IPV4 address listed on the login records provided by Google pursuant to the Pen/Trap for aibekie@gmail.com. The subscriber records for the PFIZER AOL IP, the Additional PFIZER AOL IPs, and the Standard Group IPs also contained information explaining that AT&T U-Verse customers have a unique IP directly provisioned to their account. Based on the information provided by the AT&T Representative as well as previously obtained subscriber records from AT&T, I know that: (1) the subscriber for the IP address obtained from Google for the login to aibekie@gmail.com, on or

44

about June 17, 2020, is ANIUKWU at the **Oxbow Premises**; and (2) the specific email accounts listed above (ppfizer456@aol.com, ued@standardgroupservices.com, and aibekie@gmail.com) were accessed from the **Oxbow Premises** at different times between on or about February 3, 2020, and on or about June 17, 2020.

c.     IP ADDRESS TRACKING THE CONTROLLED DELIVERY

100.    USPIS obtained a list from their internal database of all IP addresses that were used to track the Express Parcel with tracking number EJ199352533US delivered to the **Harlem Premises** through the Controlled Delivery. One of the IP addresses used to track the Express Parcel on or about June 17, 2020 was 2600:1700:1cb0:2d80:fc85:e5c4:3128:1fae. Subscriber records obtained from AT&T showed this IP address is registered to ANIUKWU at the **Oxbow Premises.**

a.     As noted previously, the first four groups of the IPV6 IP addresses for the PFIZER AOL IP, the Additional PFIZER AOL IPs, and the Standard Group IPs were 2600:1700:1cb0:2d80. The first four groups of the IPV6 address used to track the Express Parcel was 2600:1700:1cb0:2d80, which is the same as the first four groups for the PFIZER AOL IP, the Additional PFIZER AOL IPs, and the Standard Group IPs. Based on the information provided by an AT&T Representative as well as previously obtained subscriber records from AT&T, I know that the subscriber for the IP address used to track the Express Parcel is ANIUKWU at the **Oxbow Premises**. I also know that the account aibekie@gmail.com and online tracking information for the Express Parcel were each accessed from the **Oxbow Premises** on or about June 17, 2020, the day before the Controlled Delivery was completed.

45

**d.** **IP ADDRESSES APPEARING TO ORIGINATE FROM THE UNITED KINGDOM**

    **i.** **Subscriber Information, Internet Service Provider, and Virtual Private Network Services**

101.    Subscriber information for peterp968@yahoo.com (one of the accounts that PFIZER used to communicate with the UCA prior to the Controlled Delivery) obtained from Oath Inc. showed a subscriber name of "Peter P." No subscriber address information was available. Subscriber details list the following as the IP address where the account was registered: 5.62.43.171 on or about May 27, 2020. Oath Inc. provided a summary of login activity for peterp968@yahoo.com consisting of four subsequent logins on or about May 27, 2020, from IP address 185.51.228.240. Both IP addresses used to login to peterp968@yahoo are hereinafter collectively referred to as the "PFIZER Yahoo IPs."

102.    Google provided login activity for aibekie@gmail.com pursuant to the Pen/Trap which showed the following logins or attempted logins:

    a.     IP address 5.62.43.146 on or about June 17, 2020, with 62 logins or attempted logins;

    b.     IP address 5.62.43.172 on or about June 17, 2020, with six logins or attempted logins; and

    c.     IP address 172.16.204.18 on or about June 18, 2020, with one login or attempted login.

All three IP addresses, noted within this paragraph, used for logins or attempted logins to aibekie@gmail.com, are collectively referred to as the "IBEKIE Gmail IPs."

46

Pursuant to the Pen/Trap, Google provided information showing an Internet Service Provider ("ISP") of AVAST Software ("AVAST") and an ISP region of England for all of the IBEKIE Gmail IPs.

103.    USPIS obtained a list from their internal database of all IP addresses that accessed tracking information for the Express Parcel delivered to the **Harlem Premises** through the Controlled Delivery, including, in pertinent part:

   a.    IP address 77.234.43.132 three times on or about June 18, 2020;

   b.    IP address 5.62.43.160 one time on or about June 18, 2020;

   c.    IP address 5.62.43.173 three times on or about June 17, 2020; and

   d.    IP address 77.234.43.188 one time on or about June 17, 2020.

All four IP addresses noted within this paragraph that accessed tracking information for the Express Parcel are collectively referred to as the "Tracking IPs."

104.    An online search of publicly available databases showed the ISP for the PFIZER Yahoo IPs, IBEKIE Gmail IPs, and Tracking IPs is AVAST Software in the United Kingdom; therefore, subpoenas could not be issued to the ISP to obtain further information pertaining to these IP addresses.

   a.    However, based on information obtained from AVAST's website (www.avast.com/en-us/secureline-vpn#pc), I know that AVAST is a public limited company incorporated and domiciled in the United Kingdom. AVAST offers a commercially available Virtual Private Network ("VPN") service, which uses bank-grade encryption to tunnel communication through any network. AVAST advertises on its site, "You shouldn't have to worry about employers, advertisers, governments,

47

or your own ISP snooping on what you do online." The AVAST site further states their VPN service "hides your online activities, doesn't log websites visited or app usage," and offers "DNS leak protection."

       b.      According to a publicly available AVAST Annual Report for 2019, AVAST's brand portfolio includes HMA. Based on my training and experience, the training and experience of other agents with whom I have spoken, and online research, I know that HMA is "HideMyAss!," a commercially available VPN service.

       105.   IP subscriber information obtained for aibekie@gmail.com, further described above in Section II.F.1.b, shows an IP address associated with the **Oxbow Premises** was used to login to aibekie@gmail.com on or about June 17, 2020. On or about the same date and one day after, IP addresses registered to AVAST in the United Kingdom were also used with multiple logins or attempted logins to the same email account, as further described above in paragraphs 102 and 104.

       106.   Subscriber information further described in Section II.F.1.c, above, shows that an IP address associated with the **Oxbow Premises** was used to track the Express Parcel on or about June 17, 2020. On or about the same date and one day after, IP addresses registered to AVAST in the United Kingdom were also used to track the Express Parcel further described above in paragraphs 103 and 104.

       **ii.**     **Historical Purchases of VPN Services by ANIUKWU, IBEKIE, and Their Co-Conspirators**

       107.   Records for bank accounts associated with ANIUKWU, IBEKIE, and their co-conspirators show a history of purchasing VPN services as follows:

a. On or about December 7, 2016, a Bank of America checking account (XXXXXXXX5021) was opened in the name of "ANIUKWU Samuel Uchenna" at Bank of America. ANIUKWU was the only authorized signer on the signature card. On or about May 9, 2017, a purchase in the amount of approximately $59.88 was made from this account. The description of the purchase included "AVNGATE HMA PRO V." Based on my training and experience, the training and experience of other agents with whom I have spoken, and online research, I know that "AVNGATE HMA PRO V" is Avangate (2checkout) HideMyAss! Pro VPN, which is a commercially available VPN service.

i. Avangate's public website (www.avangatenetwork.com) notes that Avangate is an affiliate network of software and digital goods merchants. The website provided a list of Avangate's merchants, which includes "HideMyAss by Avast Software." As noted in Section II.F.1.d.i, above, IP addresses registered to AVAST Software were used to access peterp968@yahoo.com, aibekie@gmail.com, and tracking information for the Express Parcel.

b. On or about December 30, 2017, a BMO Harris Bank checking account (XXXXXX4741) was opened in the name of IBEKIE, who was the only authorized signer on the signature card. On or about May 24, 2018, a purchase in the amount of approximately $83.88 was made from this account. The description of the purchase included "AVNGATE HMA PRO VPN." Based on my training and experience, the training and experience of other agents with whom I have spoken, and online research, I know that "AVNGATE HMA PRO VPN" is Avangate

49

(2checkout) HideMyAss! Pro VPN, the same commercially available VPN service that was purchased using ANIUKWU's Bank of America account on or about December 7, 2016. Further, information available on the public website HideMyAss.com indicates that, as of June 23, 2020, the cost of a one-year subscription for HideMyAss! Pro VPN is approximately $83.88.

      c.    On or about May 11, 2019, a BMO Harris Bank checking account (XXXXXX5874) was opened in the name of Berger Services Inc. ("BERGER"). Tonyanika Fogle ("FOGLE") was the only authorized signer listed on the signature card.[5] On or about May 30, 2019, a purchase in the amount of approximately $114.37 was made from this account. The description of the purchase included "2COCOM HMA PRO VPN." Based on my training and experience, the training and experience of other agents with whom I have spoken, and online research, I know that "2COCOM HMA PRO VPN" is Avangate (2checkout) HideMyAss! Pro VPN, the same commercially available VPN service that was purchased using ANIUKWU's Bank of America account on or about December 7, 2016, and IBEKIE's BMO Harris account on or about December 30, 2017.

      d.    Based on my training and experience and the training and experience of other agents with whom I have spoken, I know that VPNs can be used

---

[5] As noted in Section III.A.2 of the Luciano Affidavit, documents filed with the United States Citizenship and Immigration Services indicate that IBEKIE was married to FOGLE from on or about April 27, 2001 through April 7, 2006. Bank records for the BMO Harris Bank account in BERGER's name—for which FOGLE is the sole signatory—also reflect outgoing wire transfers to foreign bank accounts in IBEKIE's name, including as recently as September 11, 2019.

to change the appearance of an individual's geographic location in order to conceal their identity and remain anonymous on the Internet. As noted above, bank records show that ANIUKWU, IBEKIE, and their co-conspirators purchased VPN services offered by AVAST Software in the past. Here, over the same two-day period in June 2020, IP addresses associated with aibekie@gmail.com, PFIZER's email addresses used to communicate with the UCA, and tracking delivery of the Express Parcel, resolved to both the **Oxbow Premises** and AVAST Software in the United Kingdom. Based on my training and experience and the training and experience of other agents with whom I have spoken, I believe that any United Kingdom-associated IP addresses mentioned herein during the period of June 17, 2020, and June 18, 2020, likely reflect the use of a VPN for purpose of masking the true physical location of the users' online activity, including those related to UCA communications and the Controlled Delivery.

### 2. SURVEILLANCE AT THE OXBOW PREMISES

108. Physical surveillance indicates that IBEKIE resides at the **Oxbow Premises**. ANIUKWU has not been seen at the **Oxbow Premises** during the below-described instances of physical surveillance conducted by agents (though multiple IP addresses associated with account activity noted above are subscribed to ANIUKWU at the **Oxbow Premises**). A summary of surveillance activity is as follows:

a. On or about January 23, 2020, law-enforcement personnel saw a beige Mercedes Benz sport utility vehicle (the "MB SUV") bearing Wisconsin license plate AFX7998 parked at the **Oxbow Premises**. A search of law-enforcement databases disclosed Wisconsin license plate AFX7998 is registered to IBEKIE for a

beige 2007 Mercedes Benz with an expiration date of July 25, 2020. The status of the registration is Suspended-Emissions Suspension. On the same date, law-enforcement personnel saw a black Mercedes Benz sedan (the "MB Sedan") bearing Illinois license plate 455508 parked at the **Oxbow Premises**. A search of law-enforcement databases disclosed Illinois license plate 455508 is registered to ASANJI for a black 2008 Mercedes-Benz 4-door with a status of Expired. IBEKIE has been known to drive the MB Sedan, as detailed in Section III.A.4 of the Luciano Affidavit.

b.  On or about January 26, 2020, the MB Sedan was seen at the **Oxbow Premises**.

c.  On or about the following dates, the MB SUV was seen at the **Oxbow Premises**: January 26, 2020; February 3, 2020; February 9, 2020; February 23, 2020; March 14, 2020; March 24, 2020; March 26, 2020; March 30, 2020; April 24, 2020; May 16, 2020; June 6, 2020; June 7, 2020; June 8, 2020, June 13, 2020, and July 1, 2020.

d.  On or about June 5, 2020, law-enforcement personnel saw the MB SUV enter the parking lot of the apartment complex of the **Oxbow Premises** and park there. The driver's side window of the MB SUV was down, and law-enforcement personnel saw a black male driving the vehicle. Based on their general familiarity with IBEKIE's appearance from photographs and driver's license records obtained from law-enforcement databases, law-enforcement personnel were able to positively identify the driver as IBEKIE. Law-enforcement personnel also saw IBEKIE exit the

52

vehicle after parking, retrieve an unknown item from the backseat of the vehicle, and walk towards the **Oxbow Premises**.

   e. On or about June 8, 2020, law-enforcement personnel saw the MB SUV enter the parking lot of the apartment complex of the **Oxbow Premises** and park there. A black male was seen exiting the MB SUV. The individual entered a garage unit that appeared to be an attached garage for the **Oxbow Premises**. Later, on the same date, law-enforcement personnel saw a different black male exit the same attached garage unit and enter a white Kia Soul (the "Kia"). The Kia was seen driving to and parking at the management office of the apartment complex. After a short time, the Kia returned to and parked at the **Oxbow Premises**. Law-enforcement personnel saw a black male exit the Kia and enter the attached garage unit of the **Oxbow Premises**.

   i. The Kia did not have a front or back license plate. Law-enforcement personnel saw a temporary registration from Texas bearing the number 4166428 with an expiration date of on or about July 22, 2020, in the rear window of the Kia. Agents were unable to locate registration information in law-enforcement databases matching the information on the temporary Texas registration. An Operations Specialist was contacted at the Texas Department of Motor Vehicles ("TX DMV") regarding the temporary registration. Personnel at the TX DMV confirmed there is no record of that temporary registration in their system.

   ii. Based on additional records obtained in this investigation, discussed further in the following subsection, IBEKIE and EGBUNAM each

submitted rental applications for the **Oxbow Premises** indicating that the Kia belongs to EGBUNAM.

      f.     On or about June 9, 2020 and July 1, 2020, law-enforcement personnel observed the Kia parked at the **Oxbow Premises**.

      **3.**     **ADDITIONAL INFORMATION REGARDING THE OXBOW PREMISES**

109.    A review of Accurint indicates that both IBEKIE and ANIUKWU are associated with the **Oxbow Premises**. Data obtained from Accurint shows IBEKIE as a registered agent for African Money Credit Union Inc. with the **Oxbow Premises** listed as the address for the registered agent and for the business. Further, data obtained from Accurint shows utility-connection records in the name of ANIUKWU at the **Oxbow Premises**.

110.    Information obtained from Continental Properties, the property-management company for the **Oxbow Premises**, showed that the **Oxbow Premises** is leased to GOSHA (who received the Controlled Delivery at the **Harlem Premises**) with a lease term of December 28, 2019 through March 27, 2021.

      a.     On or about April 29, 2020, IBEKIE applied to be added to the lease for the **Oxbow Premises**, listing his relationship to the primary applicant (*i.e.*, GOSHA) as "Spouse." IBEKIE provided the following information further solidifying other connections developed throughout the course of the investigation:

           i.     Email address: aibekie@gmail.com (further described in Section II.F.1.b, above);

ii.     Phone number: (630) XXX-4947 (further described in Section III.A.2 of the Luciano Affidavit);

iii.     Current Address: the **Harlem Premises**, stating the property is owned, not rented;

iv.     Current Employer: NU-MEKS Healthcare with an address of the Lincoln Premises (further described in Section III.B.1 of the Luciano Affidavit); and

v.     Vehicle Information:

1)     2007 beige Mercedes GL450 with Wisconsin license plate AFX7998 and owner listed as IBEKIE (further described in Section II.F.2)

2)     2008 black Mercedes S550 with Illinois license plate 455508 and owner listed as IBEKIE (further described in Section II.F.2)

3)     2012 white Kia Soul with no plate listed and owner listed as EGBUNAM (further described in Section II.F.2).

b.     On or about April 27, 2020, EGBUNAM applied to be added to the lease of the **Oxbow Premises**. EGBUNAM listed his relationship to the primary applicant (*i.e.*, GOSHA) as "Son." In this application, EGBUNAM provided the following information further solidifying other connections developed throughout the course of the investigation:

i.     Current Address: the **Harlem Premises**, stating the property is owned, not rented; and

55

        ii.      Vehicle Information: 2012 white Kia Soul with "temporary tag" listed for the license plate number and owner listed as EGBUNAM (further described in Section II.F.2).

111.   On or about January 29, 2020, IBEKIE was arrested by the Carol Stream Police Department on charges of domestic battery, interfering with reporting, assault, criminal damage to property, and trespass to real property. A review of the police report from the Carol Stream Police Department disclosed IBEKIE provided the **Oxbow Premises** as his residence. A review of the bail bond associated with this arrest disclosed that ANIUKWU posted bail for IBEKIE.

112.   Records obtained from Nicor Gas show ANIUKWU is the subscriber for utility services at the **Oxbow Premises**. ANIUKWU contacted Nicor on or about December 27, 2019 to stop service on the Alyssa Premises, where both ANIUKWU and IBEKIE are believed to have resided until around late-2019 (described further in Section III.A.1 and III.A.2 of the Luciano Affidavit). ANIUKWU established utility service with Nicor for the **Oxbow Premises** on or about January 6, 2020.

        a.      Nicor records list ANIUKWU's phone number as (630) XXX-4947. On or about October 31, 2019, CBP officials conducted an inspection of IBEKIE at the Chicago O'Hare International Airport ("O'Hare") upon his arrival into the United Sates (described further in the Luciano Affidavit in Section III.A.2 and III.E). During the inspection, IBEKIE had a Samsung SM-G965V phone in his possession utilizing phone number (630) XXX-4947. T-Mobile records identified SAMTONI Medical Equipment Inc (discussed further in Sections III.A.2 and III.B.4 of the Luciano

Affidavit) at the Alyssa Premises as the subscriber for (630) XXX-4947. Nicor records also list ANIUKWU's email address as aristoblake@gmail.com (further described in Section II.G.1.b, below).

### G. INVESTIGATION LEADING TO THE WEBER PREMISES

113. Agents have associated ANIUKWU with the **Weber Premises** through multiple means. On or about April 21, 2020, agents executed the Gmail Warrant, authorizing the search of two of ANIUKWU's accounts: saniukwu1@gmail.com (the "ANIUKWU Gmail Account") and constantconsultant200@gmail.com (the "Constant Gmail Account"). What follows in Sections II.G.1, II.G.2, II.G.3, II.G.4, and II.G.5, below, is a summary of: (1) subscriber information and IP addresses associated with the ANIUKWU Gmail Account and the Constant Gmail Account; (2) relevant communications identified pursuant to a review of the ANIUKWU Gmail Account and the Constant Gmail Account; and (3) additional information obtained connecting ANIUKWU to the **Weber Premises**.

#### 1. THE ANIUKWU GMAIL ACCOUNT

##### a. SUBSCRIBER INFORMATION AND IP ADDRESSES

114. Information obtained from Google for the ANIUKWU Gmail Account showed that the account is subscribed to ANIUKWU.

115. Google provided a summary of login and failed-login activity for the ANIUKWU Gmail Account which included, among others, the following:

a. IP Address 2600:1700:1fc0:9510:4145:2e88:aa06:d998 on or about December 30, 2019 (two logins).

57

116. Subscriber information obtained from AT&T showed the ANIUKWU Gmail Account IP was registered to ANIUKWU at the **Weber Premises**.

### b. RELEVANT COMMUNICATIONS

117. The complete review and analysis of the ANIUKWU Gmail Account has not been completed; however, the excerpts below provide a limited sampling of some communications related to fraudulent activity discovered in the account. The excerpts listed below are not intended to provide an exhaustive compilation of all fraudulent emails in the ANIUKWU Gmail Account.

118. On or about May 15, 2017, an email with the subject line "Fwd: seeeeeee" was sent from the ANIUKWU Gmail Account to IBEKIE at email address aibekie@gmail.com. The body of the email contained the following text:

> ---------- *Forwarded message*---------
>
> *From: KENNEDY FORD <kennedyford@consultant.com>*
>
> *Date: Mon, May 15, 2017 at 2:05 PM*
>
> *Subject: seeeeeee*
>
> *To: saniukwu1@gmail.com*

The email included a Microsoft Word attachment titled "nnukwu ego (1) (1)…..chumo." The attachment included a template letter bearing the logo of Kennedy Ford Associates. The letter was dated on or about March 5, 2017, and signed by "Kennedy Ford" ("KENNEDY"). The letter informs the addressee that KENNEDY is the personal attorney of a deceased individual sharing the same last name as the addressee, and that the deceased individual left behind a bank account, containing

approximately £6.85 million, with an open-beneficiary status. The letter offered to present the addressee to the bank as the next of kin to claim the dormant account and to share the funds with the addressee. Further, the addressee was instructed to reply to kennedyford@consultant.com, to express his/her interest in pursuing the claim. The substantive content of the letter was similar to the Standard Chartered letters described in multiple previous and subsequent sections.

119.     On or about June 7, 2017, an email with the subject line "Proposal" was received by the ANIUKWU Gmail Account from IBEKIE at aibekie@gmail.com. The email instructed ANIUKWU to review the attached document and was signed by IBEKIE as "Director," "Green Visions International." In the signature block of the email, IBEKIE included the phone number (630) XXX-0699, which is also referenced and further described in Section III.A.2 of the Luciano Affidavit. The email had an attachment titled "Samuelaniukwuscan0068," which included a letter addressed to ANIUKWU from IBEKIE, dated on or about June 7, 2017, informing ANIUKWU that he has been nominated as a potential member of the board of directors for African Money Union Inc, which is referenced and further described in Section III.E.2 of the Luciano Affidavit. IBEKIE signed the letter as the "CEO" of African Money Union.

120.     On or about June 10, 2018, an email with the subject line "CHICAGO INVESTMENT SUMMIT UPDATES: PROPOSAL TO APPOINT SENIOR SPECIAL ADVISERS (FOR FOREIGN INVESTMENTS) WITHOUT PAY" was received by the ANIUKWU Gmail Account from IZUEGBU at vincent@globayo.com. IBEKIE was also a recipient on the email. The email was addressed to an unidentified recipient at

[Foreign Official 1]@anambrastate.gov.ng. The body of the email was addressed to "His Excellency [Foreign Official 1]," "Executive Governor Anambra State," proposing the appointment of IZUEGBU, IBEKIE, and ANIUKWU as "Senior Special Advisers to the State." The signature block of the email includes the following: "Dr. Anthony Ibekie," "Team Member"; "Vincent Izuegbu, PhD," "Team Leader"; and "Honorable Samuel Aniukwu," "Team Member." Below are relevant excerpts of background information regarding IZUEGBU, IBEKIE, and ANIUKWU provided in the email and connections to other information developed during the course of the investigation:

      a.    IZUEGBU is the "President & CEO" of GLOBAYO.

      i.    GLOBAYO is the company to which the UCA was directed to pay Government Fees via cashier's check, and IZUEGBU is the registered agent for GLOBAYO according to online ILSOS databases, as further described in Section II.D.3. The UCA Check was made payable to GLOBAYO and delivered to the **Harlem Premises** through a Controlled Delivery, as further described in Section II.E.1.

      b.    IBEKIE is the "CEO of African Money Union" and ANIUKWU is the "Chief Operating Officer of African Money Union."

      i.    African Money Union is referenced and further described in Section III.E.2 of the Luciano Affidavit.

121.   An unsent email was located in the Drafts folder of the ANIUKWU Gmail Account with subject line "LAW FIRM," dated on or about February 14, 2019. The body of the email contained a response letter from DELOUIS stating that DELOUIS intended to verify the existence of the inheritance account with the

Ministry of Finance and visit TD Canada Trust to present himself as the addressee's solicitor. The letter was identical in substantive content to the response received by the UCA from DELOUIS, further described in Section II.D.3. Minor variations existed relating to dates and personalized information.

122.   An unsent email was located in the Drafts folder of the ANIUKWU Gmail Account with subject line "APPLICATION FOR LAWYER," dated on or about February 15, 2019. The body of the email contained a letter addressed to "Pierre" requesting legal representation in claiming an inheritance that was identical in substantive content to the Representation Letter provided to the UCA by PFIZER to send to DELOUIS, further described in Section II.D.3. Minor variations existed similar in nature to those noted in previous paragraphs.

123.   An unsent email was located in the Drafts folder of the ANIUKWU Gmail Account with the subject line "NEED A QUESTION," dated on or about February 15, 2019. The body of the email contained a forwarded message from pdelouis@hallhallchamber.com to an individual believed to be a victim of the scheme (Victim Individual A.S.). The forwarded email was dated on or about August 9, 2018, and instructed Victim Individual A.S. to sign and return a retainer agreement. It further informed Victim Individual A.S. that instructions would be forthcoming on account information to pay approximately $12,810 needed to submit a "bundle" to a bank for a "funds release." The forwarded email was signed by DELOUIS. As further described in Section II.D.3, the UCA was also instructed by DELOUIS to sign a Retainer Agreement and pay fees to release the funds from the Inheritance Account.

124. An unsent email was located in the Drafts folder of the ANIUKWU Gmail Account with subject line "answers in the questionnaire," dated on or about July 25, 2019. The body of the email contained a list of answers that were identical in substantive content to the answers provided to the UCA by PFIZER in response to the Bank Questionnaire, further described in Section II.D.3. Minor variations existed; however, a comparison of the content of the documents is as follows:

| Email Located in Draft Folder of the ANIUKWU Gmail Account | Email Received by the UCA |
|---|---|
| *Ref:TDL05/2019/D3B0908* | *Ref:TDL05/2020/D3B0908* |
| *Mr.SXXXX &Mrs.XXXX GXXXXXX* | *Mr.SXXXX &Mrs.RXXX BXXXX* |
| | |
| *1 Mr SXXXX GXXXXXX* | *1. Mr SXXXX BXXXX* |
| *2 USA* | *2. USA* |
| *3 29/April/19XX* | *3. 29/April/19XX* |
| *4 Extended Relative* | *4. Extended Relative* |
| *5 70 years old (19XX-2009)* | *5. 70 years old (19XX-2010)* |
| *6 9th December 2009, Cardiac Arrest* | *6. 9th December 2010, Cardiac Arrest* |
| *7 Oil & Gas Engineer* | *7. Oil & Gas Engineer* |
| *8 No, he didn't own a company* | *8. No, he didn't own a company* |
| *9 Not Applicable* | *9. Not Applicable* |
| *10 US Dollar Daily interest Checking Account* | *10. US Dollar Daily interest Checking Account* |
| *11 71485448* | *11. 71485448* |
| *12 London UK* | *12. London UK* |
| *13 Branch code and Institution number: 609104* | *13. Branch code and Institution number: 609104* |
| *14 52-54 Stamford Street, London SE1 9LX, United Kingdom* | *14. 52-54 Stamford Street, London SE1 9LX, United Kingdom* |
| *15 Yes, he was married to Mrs. RXXX who died with their only daughter in a car crash* | *15. Yes, he was married to Mrs. RXXX who died with their only daughter in a car crash* |
| *16 Yes, they had only one child, she died with her mother in the car crash.* | *16. Yes, they had only one child, she died with her mother in the car crash.* |

125.   On or about September 21, 2019, the ANIUKWU Gmail Account received an email from aristoblake@gmail.com with the subject line "STANDARD." "HELLO" was typed in the body of the email, which included a Microsoft Word attachment titled "FM SC PFIZER." The attachment included a letter bearing the Standard Chartered logo, dated on or about June 12, 2019, signed by "Mr. Peter Pfizer." The addressee was instructed to reply to email address ppfizer@yandex.com. The substantive content of the letter was substantially the same as the one to which the UCA responded, further described in Section II.D.2.b and Section II.D.3. Minor variations existed between the two letters including the date of the letter, the addressee, the name and year of death of the purportedly deceased customer of Standard Chartered, and the email address of the sender. The first name of the purportedly deceased customer of Standard Chartered was, however, the same as the letter to which the UCA replied.

a.   Based on my training and experience, as well as the training and experience of other agents with whom I have spoken, I know that Yandex is an Internet-services company headquartered in Russia, which maintains servers outside the United States; therefore, subpoenas could not be issued to Yandex to obtain further information pertaining to ppfizer@yandex.com.

b.   Subscriber records for aristoblake@gmail.com obtained from Google show that the account is subscribed to "Aristo Blake," with a recovery-email address of emekarn@yahoo.com. Subscriber records were also obtained from Google for aibekie@gmail.com, as noted previously, which show that account is subscribed to

63

IBEKIE, with the same recovery-email address of emekarn@yahoo.com. Further, a Lease Application Agreement obtained from Continental Properties—the property-management company of the **Weber Premises**—submitted by ANIUKWU listed IBEKIE as ANIUKWU's emergency contact and prior landlord, with a contact email address for IBEKIE at aristoblake@gmail.com.

126.    On or about September 21, 2019, an email with the subject line "Fwd: STANDARD" was sent from the ANIUKWU Gmail Account to an unidentified recipient at seselambo@yahoo.com, with the following text in the body of the email:

> *Date: Sat, Sep 21, 2019 at 3:21 PM*
>
> *Subject: STANDARD*
>
> *To: <saniukwu1@gmail.com>*
>
> *HELLO*

The email appeared to be a forwarded copy of the email described in paragraph 125, above, received by the ANIUKWU Gmail Account from aristoblake@gmail.com. The email included a Microsoft Word attachment titled "FM SC PFIZER." The attachment included a letter bearing the Standard Chartered logo dated on or about June 12, 2019, signed by "Mr. Peter Pfizer," and appeared to be identical to the letter further described in paragraph 125, above.

127.    On or about December 19, 2019, an email with the subject line "Re. email" was sent from the ANIUKWU Gmail Account to an unidentified recipient at seselambo@yahoo.com. The body of the email contained the following text: "EMAIL ID. Peterpf172@gmail.com." The email included a Microsoft Word attachment titled

"FM SC PFIZER." The attachment included a letter bearing the Standard Chartered logo dated June 12, 2019 signed by "Mr. Peter Pfizer," and appeared to be identical to the letter further described in paragraph 125, above, received by the ANIUKWU Gmail Account from aristoblake@gmail.com.

128.    On or about December 19, 2019, an email with the subject line "Re. Format" was sent from the ANIUKWU Gmail Account to an unidentified recipient at seselambo@yahoo.com. The body of the email contained the following text: "Lets start from here." The email included a Microsoft Word attachment titled "FM SC PFIZER." The attachment included a letter bearing the Standard Chartered logo dated on or about June 12, 2019, signed by "Mr. Peter Pfizer," and appeared to be identical to the letter further described in paragraph 125, above, received by the ANIUKWU Gmail Account from aristoblake@gmail.com.

129.    On or about December 23, 2019, an email with the subject line "Re. format" was sent from the ANIUKWU Gmail Account to an unidentified recipient at seselambo@yahoo.com. The body of the email contained the following text: "Mmuo." The email included a Microsoft Word attachment titled "FM SC PFIZER." The attachment included a letter bearing the Standard Chartered logo dated on or about June 12, 2019, signed by "Mr. Peter Pfizer," and appeared to be identical to the letter further described in paragraph 125, above, received by the ANIUKWU Gmail Account from aristoblake@gmail.com.

130.     On or about December 23, 2019, an email with the subject line "Fwd: Re. email" was sent from the ANIUKWU Gmail Account to "Peter Pfizer" at peterpf172@gmail.com. The body of the email contained the following text:

> ---------- *Forwarded message*---------
>
> *From: sese lambo <seselambo@yahoo.com>*
>
> *Date: Mon, Dec 23, 2019 at 9:02 AM*
>
> *Subject: Re: Re. email*
>
> *To: SAMUEL ANIUKWU <saniukwu1@gmail.com>*
>
> *On Thursday, 19 December 2019, 19:06:04 GMT, SAMUEL ANIUKWU*
>
> *<saniukwu1@gmail.com> wrote:*
>
> *EMAIL ID. Peterpf172@gmail.com*

The email included a Microsoft Word attachment titled "DXXXX AXXXXXXXX print." The attachment included approximately 198 letters addressed to various recipients in alphabetical order, all with last names starting with the letters A and B. All of the letters appeared identical with the exception of the addressee names. All of the letters bore the Standard Chartered logo and were dated on or about December 23, 2019, signed by "Mr. Peter Pfizer." The addressees of the letters were instructed to reply to email address ppfizer@yandex.com. The substantive content of the letters was substantially the same as the one to which the UCA responded, further described in Section II.D.2.b and Section II.D.3. Minor variations existed among the letters including the date of the letter, the addressee, the name and year of death of the purportedly deceased customer of Standard Chartered, and the email address of the

sender. The first name of the purportedly deceased customer of Standard Chartered was, however, the same as the letter to which the UCA replied.

131. On or about January 7, 2020, an email with the subject line "Fwd: Re.format" was sent from the ANIUKWU Gmail Account to an unidentified recipient at peterpf172@gmail.com. The body of the email contained the following text:

> ---------- *Forwarded message*---------
>
> *From: sese lambo <seselambo@yahoo.com>*
>
> *Date: Tue, Jan 7, 2020 at 6:28 AM*
>
> *Subject: Re: Re.format*
>
> *To: SAMUEL ANIUKWU <saniukwu1@gmail.com>*
>
> *Nnam print*
>
> *On Friday, 27 December 2019, 12:10:41 GMT, sese lambo <seselambo@yahoo.com> wrote:*
>
> *NEW ONE NNAM PRINT*
>
> *On Monday, 23 December 2019, 13:45:53 GMT, SAMUEL ANIUKWU <saniukwu1@gmail.com> wrote:*
>
> *Mmuo.*

The email included a Microsoft Word attachment titled "RXXX CXXXXXX new year." The attachment included approximately 199 letters addressed to various recipients in alphabetical order, all with last names starting with the letters C and D. All of the letters appeared identical with the exception of the addressee names. All of the letters bore the Standard Chartered logo and were dated on or about January 7, 2020, signed

by "Mr. Peter Pfizer." The addressees of the letters were instructed to reply to email address peterpf172@gmail.com. The substantive content of the letters was substantially the same as the one to which the UCA responded, further described in Section II.D.2.b and Section II.D.3. Minor variations existed among the letters including the date of the letter, the addressee, the name and year of death of the purportedly deceased customer of Standard Chartered, and the email address of the sender. The first name of the purportedly deceased customer of Standard Chartered was, however, the same as the letter to which the UCA replied.

132. On or about January 16, 2020, an email with the subject line "Fwd: STANDARD" was sent from the ANIUKWU Gmail Account to an unidentified recipient at ekwyaniukwu4ever@gmail.com. The body of the email contained the following text:

> ---------- *Forwarded message*---------
>
> *From: SAMUEL ANIUKWU <saniukwu1@gmail.com>*
>
> *Date: Sat, Sept 21, 2019 at 4:00 PM*
>
> *Subject: Fwd: STANDARD*
>
> *To: <seselambo@yahoo.com>*
>
> *Date: Sat, Sep 21, 2019 at 3:21 PM*
>
> *Subject: STANDARD*
>
> *To: <saniukwu1@gmail.com>*
>
> *HELLO*

68

The email appeared to be a forwarded copy of the email further described in paragraph 126 above sent by the ANIUKWU Gmail Account to an unidentified recipient at the email address seselambo@yahoo.com. The email included a Microsoft Word attachment titled "FM SC PFIZER." The attachment included a letter bearing the Standard Chartered logo dated on or about June 12, 2019 signed by "Mr. Peter Pfizer," and appeared to be identical to the letter further described in paragraph 125 above received by the ANIUKWU Gmail Account from aristoblake@gmail.com.

133.    On or about January 16, 2020, an email with the subject line "Re,peter Nwanne" was sent from the ANIUKWU Gmail Account to an unidentified recipient at peterpf172@gmail.com. The body of the email was addressed to "TXXXXX MXXXXXX" and contained a text version of the Standard Chartered letters described in the preceding paragraphs as email attachments. The email was signed "Mr. Peter Pfizer," and directed responses to the email address peterpf172@gmail.com.

134.    On or about January 16, 2020, an email was received by the ANIUKWU Gmail Account from an unidentified sender at ekwyaniukwu4ever@gmail.com. The body of the email was addressed to "TXXXXX MXXXXXX" and contained a text version of the Standard Chartered letters described in the preceding paragraphs as email attachments. The email was signed "Mr. Peter Pfizer" and directed responses to the email address ppfizer@yandex.com.

135.    On or about January 25, 2020, an email with the subject line "Re.secound Reply" was sent from the ANIUKWU Gmail Account to an unidentified recipient at peterpf172@gmail.com. The body of the email contained text, the

69

substantive content of which was identical to the email attachment received by the UCA further described in Section II.D.3. Minor variations existed between the two documents including the addressee, the name and year of death of the purportedly deceased customer of Standard Chartered, and the email address of the sender. The first name of the purportedly deceased customer of Standard Chartered was, however, the same as in the letter to which the UCA replied.

136. On or about February 19, 2020, an email with the subject line "photo" was received by the ANIUKWU Gmail Account from an unidentified sender at peterpf172@gmail.com. The email was then forwarded from the ANIUKWU Gmail Account on the same day to an unidentified recipient at seselambo@yahoo.com. The body of the email contained the text "uchenna." The email included a Microsoft Excel spreadsheet attachment titled "Uzo 03." The attachment included a list containing approximately 1,000 names, all with last names beginning with the letters H through W, and corresponding mailing addresses located in approximately 49 different states.

137. On or about February 19, 2020, an email with the subject line "stamps" was received by the ANIUKWU Gmail Account from an unidentified sender at peterpf172@gmail.com, which was forwarded from the ANIUKWU Gmail Account on the same day to an unidentified recipient at Hallmark_security@hotmail.com. The body of the email contained the text "Emeka canada." The email included two PDF attachments titled "mmagha" and "mmagha 2." Relevant excerpts of the attachments included the following:

70

      a.    A scan or picture of an envelope addressed to IBEKIE at the Lincoln Premises from the DuPage County Circuit Court Clerk with a return address of P.O. Box 707, Wheaton, Illinois, 60187-0707. This is the same return address that was used on inheritance-scam letters found in the trash pull at the Lincoln Premises, and inheritance-scam letters that were returned undeliverable to the Office of the DuPage County Circuit Clerk, further described in Section II.D.2.

      b.    A scan or picture of a Nicor Gas bill addressed to Emperor Chills Inc. ("EMPERORCHILLS") at the Lincoln Premises. As described in Section III.B.2 of the Luciano Affidavit, EMPERORCHILLS—connected to IBEKIE through ILSOS records and to ANIUKWU through bank records—was involved in a business-email-compromise scheme.

## 2. THE CONSTANT GMAIL ACCOUNT

### a. SUBSCRIBER INFORMATION

138.    Subscriber information for the Constant Gmail Account obtained from Google showed the account is subscribed to "Opia Samuel."

      a.    The recovery-email address listed for the Constant Gmail Account was greatland_uc@yahoo.co.uk. This was the same recovery address used for the ANIUKWU Gmail Account, for which ANIUKWU is the listed subscriber.

      b.    The recovery SMS phone number listed on the Constant Gmail Account is (630) XXX-3378. A device using this same phone number was found in ANIUKWU's possession during a CBP inspection conducted on or around November

8, 2019, and T-Mobile records obtained for this phone number identify ANIUKWU as the subscriber, as further described in Section III.A.1 of the Luciano Affidavit.

c.      Google provided a summary of login and failed-login activity for the Constant Gmail Account which included, among others, two logins on or about December 11, 2019, from IP Address 2600:1700:1fc0:9510:984:60f8:414e:aa52 (the "Constant Gmail Account IP").

139.   Subscriber information obtained from AT&T showed the Constant Gmail Account IP was registered to ANIUKWU at the **Weber Premises**.

### b.    RELEVANT COMMUNICATIONS

140.   The complete review and analysis of the Constant Gmail Account has not been completed; however, the excerpts below provide a limited sample of some communications related to fraudulent activity discovered in the Constant Gmail Account. The excerpts listed below do not in any way intend to provide an exhaustive compilation of all fraudulent emails in the Constant Gmail Account.

141.   On or about June 11, 2017, the Constant Gmail Account received an email from aristoblake@gmail.com with the subject line "Emeka Canada." There was an additional unidentified recipient on the email at Hallmark_security@hotmail.com. The body of the email contained the following text:

> *Emeka this is the review of what I did with respect to this format,*
> *kindly let me know your views, I believe you have sent to Sama the*
> *email and password, you can still include it here in you response.*

72

> *I remember you mention that you already have the addresses, you*
> *will need to send them to me, so I can complete the merging and*
> *setting of the mail as it will be sent out to the recipient in a single*
> *window envelope.*
>
> *The second attachment is how the direct mail will appear to the*
> *recipient when they receive and open the mail*
>
> *Tony*
>
> *Director*
>
> *Green Visions International*

The email contained two Microsoft Word attachments titled "Emeka Canada" and "Emeka Canada 2." Both attachments included template letters, one formatted and one not formatted, purportedly from an account manager, Walter Viva ("VIVA"), with National Bank in Ontario, Canada. The substantive content of the letters was similar to the Standard Chartered letter to which the UCA responded, further described in Section II.D.2.b and Section II.D.3. The letters inform the addressee that VIVA obtained their contact information while searching for the next of kin to a deceased customer of National Bank, with a similar name as the addressee, who died intestate leaving his/her bank account, containing approximately $9.2 million, with an open-beneficiary status. The letter offered to present the addressee to the bank as the next of kin to claim the dormant account and to share the funds with the addressee.

142. On or about June 11, 2017, the Constant Gmail Account received another email from aristoblake@gmail.com with the subject line "Idea." The

unidentified recipient at Hallmark_security@hotmail.com was also included on this email. The body of the email contained the following text:

> *Emeka,*
>
> *On another thought, since you have the direct mail addresses and I have sent you a sample of the merged email, i suggest you do the merging yourself and send me the already merged letter in a bulk of 100 each, then i can print it, place the stamp in the single window envelope and put them in the mail, i know you said you have 1500 direct mail addresses, that fine, when we exhaust it we can start using the 3000 (selective pre screened direct mail)I just ordered.*
>
> *God will have mercy on us one day.*
>
> *Please forward our correspondences to Onowu*
>
> *Here is our number*
>
> *Tony 630XXX0699*
>
> *Sama 630XXX5959*
>
> *Onowu 080XXXX11430*

143. On or about June 19, 2017, an unidentified sender at email address Hallmark_security@hotmail.com sent an email to the Constant Gmail Account and aristoblake@gmail.com with the subject line "see the attach…." The email included two attachments, one of which was a Microsoft Excel spreadsheet titled "1500." The spreadsheet included a list of approximately 1,500 names and addresses. This email

appeared to be a response to the email sent by aristoblake@gmail.com requesting addresses from "Emeka" to "complete the merging and setting of the mail."

144.    On or about July 13, 2018, the Constant Gmail Account received an email from Bank of America stating that the debit card associated with account (XXXXXXXX7376) in the name of ESIJEMINE Lucky Inc. has been mailed. On or about July 21, 2018, the Constant Gmail Account received an email from Bank of America stating that the online-banking password had been reset for the account (XXXXXXXX7376). This same account was connected to the receipt of fraudulently obtained funds from Victim Individual A.W. and is further described in in Section III.B.10.b of the Luciano Affidavit.

145.    On or about July 26, 2018, the Constant Gmail Account received an email from JP Morgan Chase Bank notifying the recipient that a new debit/ATM/Pre-paid card had been ordered for a bank account in the name of ESIJEMINE. On or about August 13, 2018, the Constant Gmail Account received an email from JP Morgan Chase notifying the recipient of an account adjustment made to the account (XXXXX2296) in the name of ESIJEMINE. This same account was connected to the receipt of fraudulently obtained funds from Victim Individual R.A. and is further described in Section III.B.10.c of the Luciano Affidavit.

146.    On or about October 24, 2018, the Constant Gmail Account sent an email to an unidentified recipient at email address jacksonifeko@yahoo.com. The body of the email contained a chain of previous email communications between the Constant Gmail Account and jacksonifeko@yahoo.com. One of those previous emails included

75

banking information for an account in the name of MEKAS Construction Inc. at Bank of America (XXXXXXXX1240). This same account was connected to the receipt of fraudulently obtained funds from Victim Business M.W. and is further described in Section III.B.3.b of the Luciano Affidavit.

147.    On or about June 6, 2019, an email was sent from the Constant Gmail Account to an unidentified recipient at blackcatswith@gmail.com. The email informs the recipient that his/her "fund was deposited with TD Trust bank here in Canada." It further instructs the recipient to contact Nikki AVIS at ued@tdcanadagroup.com. The UCA also received communications from AVIS at ued@tdcanadagroup.com, as further described in Section II.D.3 above. The email was signed by "Sam Maxwell"— believed to be an alias of ANIUKWU—who has received fraudulently obtained funds from Victim Individual C.L. as further described in Section II.C.2, above.

148.    On or about June 6, 2019, the Constant Gmail Account sent an email to ued@tdcanadagroup.com with the subject line "Re…bank." The body of the email contained the text, "Hello." Several victims cited in the Luciano Affidavit (*see* Sections III.B.3.c, III.B.6.b, III.B.7.b therein), as well as the UCA (*see* Section II.D.3, above), were also instructed to correspond with ued@tdcanadagroup.com.

149.    On or about December 9, 2019, the Constant Gmail Account received an email from "Peter Pfizer" at email address peterpf172@gmail.com with the subject line "Re.ONE LOVE FOR OLU BANK." The body of the email contained the following text: "This is for the money….anambrastate."

a. Based on my online research, I know that Anambra is a state in Nigeria. As further described in Section III.A of the Luciano Affidavit, several co-conspirators involved in this scheme, including ANIUKWU and IBEKIE, are Nigerian nationals.

### 3. SURVEILLANCE AT THE WEBER PREMISES

150. Physical surveillance indicates that ANIUKWU resides at the **Weber Premises**. A summary of surveillance activity is as follows:

a. On or about April 5, 2020, law-enforcement personnel saw a red Toyota Corolla (the "Corolla") bearing Illinois license plate BV89675 parked inside the garage at the **Weber Premises**. A search of law-enforcement databases disclosed that Illinois license plate BV89675 is registered to ANIUKWU and IBEKIE for a red 2010 Toyota 4-Door with an expiration date of on or about September 30, 2020. The status of the registration is valid.

b. On or about April 10, 2020, law-enforcement personnel observed the Corolla arrive and park at the **Weber Premises**.

c. On or about April 21, 2020, law-enforcement personnel saw the garage door open at the **Weber Premises** and a black male exit the garage. Based on their general familiarity with ANIUKWU's appearance from photographs and driver's license records obtained from law-enforcement databases, law-enforcement personnel were able to positively identify the male exiting the garage as ANIUKWU. ANIUKWU walked to the Corolla and got inside. ANIUKWU backed the Corolla up to the open garage door and exited the Corolla. ANIUKWU opened the trunk of the

77

Corolla and appeared to either load or unload unknown items to or from the trunk. ANIUKWU then got back in the Corolla and was seen leaving the **Weber Premises** heading northbound on Weber Road.

        d.    On or about June 23, 2020, law-enforcement personnel saw the Corolla exit the garage at the **Weber Premises**. Law-enforcement personnel also saw the individual driving the vehicle. Again, based on general familiarity with ANIUKWU's appearance from photographs and records obtained over the course of the investigation, the individual driving the Corolla appeared to be ANIUKWU. Further, law-enforcement personnel confirmed that the license plate on the vehicle was Illinois license plate BV89675, registered to ANIUKWU and IBEKIE. Later, on or about the same date, law-enforcement personnel saw the Corolla return to the garage at the **Weber Premises**.

        e.    On or about June 29, 2020, law-enforcement personnel saw an open garage door at the **Weber Premises**. Law-enforcement personnel saw a black male exit the **Weber Premises** into the attached garage and enter the Corolla parked inside the garage. Law-enforcement personnel saw the individual driving the vehicle as it exited the main entrance of the apartment complex for the **Weber Premises**. Again, based on general familiarity with ANIUKWU's appearance from photographs and records obtained over the course of the investigation, the individual driving the Corolla appeared to be ANIUKWU. Further, law-enforcement personnel confirmed that the license plate on the vehicle was Illinois license plate BV89675, registered to ANIUKWU and IBEKIE.

78

f.     On or about July 7, 2020, law-enforcement personnel saw the Corolla exit the garage at the **Weber Premises**. Law-enforcement personnel also saw the individual driving the vehicle. Again, based on general familiarity with ANIUKWU's appearance from photographs and records obtained over the course of the investigation, the individual driving the Corolla appeared to be ANIUKWU. Further, law-enforcement personnel confirmed that the license plate on the vehicle was Illinois license plate BV89675, registered to ANIUKWU and IBEKIE.

### 4.     RECORDS/COMMUNICATIONS WITH PROPERTY MANAGEMENT AT THE WEBER PREMISES

#### a.     LEASE RECORDS OBTAINED FROM CONTINENTAL PROPERTIES

151.     Information obtained from Continental Properties, the property-management company for the **Weber Premises**, showed that the **Weber Premises** is leased to ANIUKWU with a lease term of on or about November 15, 2019 through November 14, 2020. Continental Properties also provided a copy of ANIUKWU's Illinois driver's license that was obtained during the leasing process.

152.     On or about November 14, 2019, ANIUKWU submitted an online application to Springs at Weber Road (*i.e.*, the apartment complex where the **Weber Premises** is located). In this application, ANIUKWU provided the following information further solidifying other connections developed throughout the course of the investigation:

a.     Email address: saniukwu1@gmail.com (*i.e.*, the ANIUKWU Gmail Account further described in Section II.G.1, above);

b.   Phone number: (630) XXX-3378 (further described in Section III.A.1 of the Luciano Affidavit);

c.   Current Address: the Alyssa Premises (further described in Section II.D.3, above);

d.   Previous Address: the Lincoln Premises (further described in Sections II.C.2, II.C.3, and II.D.2, above);

e.   Emergency Contact and Previous Landlord: IBEKIE with references to the Alyssa Premises and the Lincoln Premises. The phone number listed for IBEKIE is (630) XXX-4947 (discussed further in Section III.A.2 of the Luciano Affidavit). The email address listed for IBEKIE is aristoblake@gmail.com (further described in Section II.G.1.b, above);

f.   Email address listed for ANIUKWU's current employer shows constantconsultant200@gmail.com (the Constant Gmail Account further described in Section II.G.2, above); and

g.   Vehicle Information:

i.   2010 red Toyota Corolla with Illinois license plate BV89675 (further described in Section II.G.3, above).

### b.   EMAIL COMMUNICATIONS FROM THE ANIUKWU GMAIL ACCOUNT TO SPRINGS AT WEBER ROAD

153.   On or about April 3, 2020, an email with subject line "Springs at Weber Rd – COVID-19 Hardship Form" was received by the ANIUKWU Gmail Account from the Assistant Community Manager of Springs at Weber Road (*i.e.*, the apartment complex where the **Weber Premises** is located). The ANIUKWU Gmail Account

80

subsequently forwarded that email to "Peter Pfizer" at peterpf172@gmail.com on or about the same date. The email contained a PDF attachment, which included a form to be completed by ANIUKWU requesting certain relief in relation to his April 2020 rent payment, due to ANIUKWU's income allegedly being impacted by COVID-19.

154.    On or about April 9, 2020, an email was sent from the ANIUKWU Gmail Account to the Assistant Community Manager of Springs at Weber Road with the subject line "Re.Samuel." The email included a PDF attachment of the completed hardship form referenced in the preceding paragraph. On the form, ANIUKWU requested to make a reduced rent payment on or about April 1, 2020.

155.    On or about April 11, 2020, an email was received by the ANIUKWU Gmail Account from the Assistant Community Manager of Springs at Weber Road with the subject line "Springs at Weber Rd – COVID-19 Payment Plan." The email included a payment plan for rent due in or around April 2020 for ANIUKWU to sign.

156.    On or about April 16, 2020, an email was sent from the ANIUKWU Gmail Account to the Assistant Community Manager of Springs at Weber Road. The body of the email contained the following text:

> *Good Morning JXXX.*
>
> *I came to your office yesterday to drop my rent and I knocked hard at the door but no one answered,*
>
> *Kindly call me to schedule an appointment to drop the rent. 630-XXX-3378* [further described in Section III.A.1 of the Luciano Affidavit].
>
> *Samuel.*

81

5.   ADDITIONAL INFORMATION REGARDING THE WEBER PREMISES

157.   A review of Accurint indicates that ANIUKWU is associated with the **Weber Premises**. Data obtained from Accurint shows various utility-connection records in the name of ANIUKWU at the **Weber Premises**.

158.   Records obtained from Nicor Gas show ANIUKWU is the subscriber for utility services at the **Weber Premises.** ANIUKWU contacted Nicor on or about November 15, 2019, to establish utility service for the **Weber Premises**.

  a.   Nicor records list ANIUKWU's phone number as (630) XXX-3378. During a CBP border inspection on or about November 8, 2019, ANIUKWU was in possession of a device using phone number (630) XXX-3378, as further described in Section III.A.1 of the Luciano Affidavit. T-Mobile records identify ANIUKWU as the subscriber for this phone number.

  b.   Nicor records list ANIUKWU's email address as saniukwu1@gmail.com (*i.e.*, the ANIUKWU Gmail Account further described in Section II.G.1, above).

**H.   EVIDENCE OF FRAUD WILL BE FOUND AT THE OXBOW PREMISES, THE WEBER PREMISES, AND THE HARLEM PREMISES**

159.   Based on the foregoing facts, the facts set forth in the Luciano Affidavit, as well as my training and experience, my knowledge of this investigation, and my consultation with other agents, I believe that bank accounts associated with NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, and others are being used to facilitate mail and wire fraud,

82

money laundering, and conspiracy to commit the foregoing offenses, through business-email compromise, romance-fraud, and investment-fraud schemes. As noted in this affidavit and in the Luciano Affidavit, each of the foregoing entities is associated with IBEKIE, ANIUWKU, GOSHA, EGBUNAM, and other co-conspirators known and unknown.

160.    Based on my training and experience, as well as the training and experience of other agents with whom I have spoken, I am aware that individuals engaged in financial activity—whether legitimate or fraudulent—typically maintain some form of accounting to track their transactions. These records can be formal books, or can be rudimentary in nature—meant to simply track income earned and expenses incurred—and can reflect evidence of the acquisition and disposition of criminally derived proceeds.

161.    Generally, individuals, especially those who are involved in illicit financial transactions, maintain personal and business financial information in locations where it would be secure and readily accessible, such as in their residences or vehicles, and—in the case of financial transactions involving online banking—on electronic devices such as computers, cell phones, or tablets near their person. Here, in particular, subjects of this investigation have been demonstrated to use vehicles registered to other individuals, or bearing what appear to be false or fictitious registration information. Such efforts to dissociate particular vehicles from particular persons are commonly used by persons involved in illicit financial transactions to avoid detection by law enforcement, including during use of a vehicle as part of the

illicit transactions, such as traveling to and from banks or financial institutions to deposit or withdraw fraudulently obtained funds, or traveling to and from residences of fellow co-conspirators.

162.　Furthermore, based on my training and experience and information obtained from other law enforcement officers who investigate mail and wire fraud, money laundering, conspiracy to commit the foregoing offenses, and related crimes, I know the following:

　　　a.　It is common practice for individuals involved in mail and wire fraud to use and maintain computers, cellular phones, smartphones, and other digital devices. They often employ such devices for, among other things: (1) obtaining or storing personal victim profiles, including names, addresses, phone numbers, social security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, employer or taxpayer identification numbers, bank account numbers, credit card numbers, email addresses, IP addresses, and PIN numbers or passwords for financial institutions or Internet service providers; (2) applying for, modifying, or maintaining bank accounts and/or credit card accounts to facilitate the receipt, transfer, or use of funds obtained from victims through fraudulent means; and (3) keeping records of their crimes.

　　　b.　Individuals who participate in fraudulent schemes, including those predicated upon online communications with potential victim individuals or businesses, often use digital devices to communicate with their co-conspirators by

phone, email, and text message. Oftentimes, they also maintain telephone numbers of their co-conspirators in their cellular telephones or smartphones.

163.    Based on my training and experience, the information disclosed in this affidavit as well as the Luciano Affidavit, and information related to me by other law-enforcement agents who specialize in the investigation of mail or wire fraud schemes and related offenses, it is likely that the **Oxbow Premises**, the **Weber Premises**, and the **Harlem Premises**, and any digital devices therein, contain evidence of the offenses described in Attachment B.

## III.    SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

164.    Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.*, computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.    Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant.

This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search onsite.

        b.    Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

    165.   In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

    166.   In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## IV.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

167.    Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A-1, Attachment A-2, and Attachment A-3 so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

168.    The review of electronically stored information and electronic storage media removed from the premises described in Attachment A-1, Attachment A-2, and Attachment A-3 may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law-enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3)

87

contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

       c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

       d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

169.    The government will return any electronic storage media removed from the premises described in Attachment A-1, Attachment A-2, and Attachment A-3 within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## V.    CONCLUSION

170.    Based on the above information, I respectfully submit that there is probable cause to believe that mail and wire fraud, money laundering, and conspiracy to commit the foregoing offenses, in violation of Title 18, United States Code, Sections 1341, 1343, 1956, 1349, and 371, have been committed, and that evidence, instrumentalities, and fruits relating to this criminal conduct, as further described in Attachment B, will be found in the **Oxbow Premises**, as further described in

Attachment A-1; the **Weber Premises**, as further described in Attachment A-2; and the **Harlem Premises**, as further described in Attachment A-3.

171.    I therefore respectfully request that this Court issue a search warrant for the apartment units located at 797 Oxbow Avenue, Unit 110, Oswego, Illinois 60543, more particularly described in Attachment A-1; 716 South Weber Road, Unit 512, Romeoville, Illinois 60446, more particularly described in Attachment A-2; and, 1419 North Harlem Road, Apartment B, Oak Park, Illinois 60302, more particularly described in Attachment A-3, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

AMY C. MANSKER
Special Agent
IRS Criminal Investigation

Subscribed and sworn
before me this 8th day of July, 2020

Honorable SHEILA M. FINNEGAN
United States Magistrate Judge

**ATTACHMENT A-1**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

The premises located at 797 Oxbow Avenue, Unit 110, Oswego, Illinois 60543 (the "**Oxbow Premises**"). The **Oxbow Premises** is one of several apartment buildings located within an apartment complex, Springs at Oswego. The entrance to the apartment complex is located on Oxbow Avenue to the west of Fifth Street. Upon entering the complex, Oxbow Avenue splits at a Y-intersection and continues in two directions, south and west, to complete a continuous loop around the apartment complex. The apartment building for the **Oxbow Premises** is the second building when traveling south on Oxbow Avenue from the Y-intersection and is located to the east of Oxbow Avenue and west of Fifth Street. The building is clearly marked with a large light-colored placard denoting "797" in blue lettering. The **Oxbow Premises** is an apartment unit located on the first floor of a two-story building. The apartment building is grey and blue with white trim and sections of brick façade. Each unit has a separate entry. All entry doors are located on the first floor and accessed individually from the outside. The entrance for the **Oxbow Premises** is a blue door clearly marked with a light-colored placard denoting "110" in blue lettering located near the southeast corner of the apartment building. The unit includes an attached garage. The **Oxbow Premises** includes the entire property located at 797 Oxbow Avenue, Unit 110, Oswego, Illinois 60543, including but not limited to any parking spaces, garages, storage spaces, curtilage, and appurtenances that are assigned to or associated with 797 Oxbow Avenue, Unit 110, Oswego, Illinois 60543, as well as the

following vehicles if parked at the **Oxbow Premises**: (1) a beige Mercedes Benz sport utility vehicle bearing Wisconsin license plate AFX7998; (2) a black Mercedes Benz sedan bearing Illinois license plate 455508; and (3) a white Kia Soul bearing Texas temporary registration number 4166428.





**ATTACHMENT A-2**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

The premises located at 716 South Weber Road, Unit 512, Romeoville, Illinois 60446 (the "**Weber Premises**"). The **Weber Premises** is one of several apartment buildings located within an apartment complex, Springs at Weber Road. The entrance to the apartment complex is located west of Weber Road off of Grand Haven Circle. The apartment building for the **Weber Premises** is located on the east side of the apartment complex and sits to the west of Weber Road and the Access Road and south of Grand Haven Circle. The building is clearly marked with a large dark-colored placard denoting "716" in white lettering. The **Weber Premises** is an apartment unit located on the first floor of a two-story building. The apartment building is dark green and light green with brown trim and sections of brick façade. Each unit has a separate entry. All entry doors are located on the first floor and accessed individually from the outside. The entrance for the **Weber Premises** is a brown door clearly marked with a dark-colored placard denoting "512" in white lettering located near the northwest corner of the apartment building. The unit includes an attached garage. The **Weber Premises** includes the entire property located at 716 South Weber Road, Unit 512, Romeoville, Illinois 60446, including but not limited to any parking spaces, garages, storage spaces, curtilage, and appurtenances that are assigned to or associated with 716 South Weber Road, Unit 512, Romeoville, Illinois 60446, as well as the following vehicle if parked at the **Weber Premises**: a red Toyota Corolla bearing Illinois license plate BV89675.







**ATTACHMENT A-3**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

The premises located at 1419 North Harlem Avenue, Apartment B, Oak Park, Illinois 60302 (the "**Harlem Premises**"). The **Harlem Premises** is a multi-unit, two-story building containing townhouses. The building is light-brown in color and constructed of brick. The building is marked with a black placard on the west side of the building denoting 1419 1421. The building is located south of LeMoyne Parkway and north of Greenfield Street on the east side of Harlem Avenue. The **Harlem Premises** is an apartment unit located on the first floor of the two-story building. Each unit has a separate entry. All entry doors are located on the first floor and accessed individually from the outside. The unit includes a detached garage located at the east end of the building with entrance gained through the alley that runs behind the building. The south entrance to the alley is located off of Greenfield Street and the north entrance to the alley is located off of LeMoyne Parkway. The **Harlem Premises** includes the entire property located at 1419 North Harlem Avenue, Apartment B, Oak Park, Illinois 60302, including but not limited to any parking spaces, garages, storage spaces, curtilage, and appurtenances that are assigned to or associated with 1419 North Harlem Avenue, Apartment B, Oak Park, Illinois 60302, as well as the following vehicle if parked at the **Harlem Premises**: a silver BMW sport utility vehicle bearing Illinois license plate 38822US.





## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities and fruits concerning violation of Title 18, United States Code, Sections 1341, 1343, 1956, 1349, and 371, as follows:

1.      Financial records, including receipts, checks, bank and savings and loan records of deposit, withdrawal and wire transfer, statements and other bank records, letters of credit, credit card statements, money orders, cashier's checks, passbooks, cancelled checks, certificates of deposit, loan records, customer account information, income and expense summaries, cash disbursement journals, financial statements, and state and federal income tax returns.

2.      Any general ledgers, journals, and accounting records, including electronic accounting records, for NU-MEKS Healthcare Inc. ("NU-MEKS"), EMPERORCHILLS, MEKAS Construction Inc. ("MEKAS"), HALL & HALL Global Inc. ("HALL & HALL"), GODMEKS Inc. ("GODMEKS"), SAMCORD Inc. ("SAMCORD"), ESIJEMINE Lucky Nengite Inc. ("ESIJEMINE"), SAMCHINA Trucking Inc. ("SAMCHINA"), African Money Union Inc. ("AFRICAN MONEY UNION"), JENANT Inc. ("JENANT"), SETRACO Services Inc. ("SETRACO"), EMETECH Solutions Inc. ("EMETECH"), GLOBAYO LLC ("GLOBAYO") or any other entity associated with Anthony Emeka Ibekie ("IBEKIE"), Uchenna Samuel Aniukwu, aka Samuel Uchenna Aniukwu and Sammy Maxwell ("ANIUKWU"), Lasheena Washington ("WASHINGTON"), Williette Asanji ("ASANJI"), Treonda Steadman ("STEADMAN"), Lawrence Berry III ("BERRY"), Jennifer Gosha

("GOSHA"), Tonyanika Fogle ("FOGLE"), Ebuka EGBUNAM ("EGBUNAM"), Chandler Arnaud ("ARNAUD"), Diego Dario ("DARIO"), Pierre Delouis ("DELOUIS"), Jean Drapeaw ("DRAPEAW"), Onuigbo Izuchukwu ("IZUCHUKWU"), Fred Lookas ("LOOKAS"), Steven Kelvin Clark ("STEVEN"), Siegel Clark ("SIEGEL"), Peter Pfizer ("PFIZER"), Wyashika Sellar ("SELLAR"), or Nikka Avis ("AVIS");

3.    Credit card statements, bank statements, payment records, application forms and all related documentation for any accounts held by NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, SIEGEL, PFIZER, SELLAR, AVIS, or any other entity associated with the foregoing individuals;

4.    Billing statements, purchase orders, delivery receipts, invoices, payment records and any other supporting documentation for any goods or services rendered by NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS,

2

STEVEN, SIEGEL, PFIZER, SELLAR, AVIS, or any other entity associated with the foregoing individuals;

5.    All communications, including written correspondence, mailings, letters, emails, or notes concerning sales or invoicing for any goods or services rendered by NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, SIEGEL, PFIZER, SELLAR, AVIS, or any other entity associated with the foregoing individuals;

6.    All communications, including written correspondence, mailings, letters, emails, or notes exchanged between or among IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, SIEGEL, PFIZER, SELLAR, or AVIS concerning: (1) NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, or any other entity associated with the foregoing individuals; (2) the receipt, withdrawal, transfer, expenditure, or use of funds deposited at any bank account; (3) requests or demands for payment of funds issued

3

to any third party, including any individual or business; (4) putative inheritances, lottery winnings, or investments; (5) 797 Oxbow Avenue, Unit 110, Oswego, Illinois 60543 (the "**Oxbow Premises**"); (6) 716 S. Weber Road, Unit 512, Romeoville, Illinois 60446 (the "**Weber Premises**"); (7) 1419 N. Harlem Avenue, Apartment B, Oak Park, Illinois 60302 (the "**Harlem Premises**"); (8) 5206 Lincoln Avenue in Lisle, Illinois (the "Lincoln Premises"); or (9) 2726 Alyssa Drive, Naperville, Illinois (the "Alyssa Premises").

7.    All communications, including written correspondence, mailings, letters, emails, or notes exchanged between or among IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, SIEGEL, PFIZER, SELLAR, AVIS, and any third party on any online dating website, including but not limited to OKCupid.com.

8.    Any and all federal and state corporate tax records to include 1099, W-2, 1120, 1120S, 1065, 940, and 941 forms for NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN,  SIEGEL, PFIZER, SELLAR, or AVIS;

4

9.     Payroll records for NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, or any other entity associated with IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, SIEGEL, PFIZER, SELLAR, or AVIS;

10.     Any evidence of past or current indebtedness, contracts, promissory notes, mortgage records, vehicle loans, business loans, or student loans for NU-MEKS, EMPERORCHILLS, MEKAS, HALL & HALL, GODMEKS, SAMCORD, ESIJEMINE, SAMCHINA, AFRICAN MONEY UNION, JENANT, SETRACO, EMETECH, GLOBAYO, IBEKIE, ANIUKWU, WASHINGTON, ASANJI, STEADMAN, BERRY, GOSHA, FOGLE, EGBUNAM, ARNAUD, DARIO, DELOUIS, DRAPEAW, IZUCHUKWU, LOOKAS, STEVEN, SIEGEL, PFIZER, SELLAR, AVIS, or any other entity associated with the foregoing individuals;

11.     Indicia of occupancy, residency, control or ownership of the **Oxbow Premises**, the **Weber Premises**, the **Harlem Premises**, the Lincoln Premises, or the Alyssa Premises, such as utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes, keys, photographs, and bank records;

12.     Cash in excess of $500;

13.     Any evidence of past or current purchases or use of Virtual Private Network services or software;

5

14.     Any digital device, printer, or electronic-storage media used to facilitate the above-listed violations, and forensic copies thereof, that is: (1) located in any common areas of the **Oxbow Premises**, **Weber Premises**, or **Harlem Premises**; (2) located inside rooms or containers at the **Oxbow Premises**, **Weber Premises**, or **Harlem Premises** that are associated with IBEKIE, ANIUKWU, EGBUNAM, or GOSHA; and (3) concealed on the person of IBEKIE, ANIUKWU, EGBUNAM, or GOSHA if they are present during execution of the warrant at the **Oxbow Premises**, **Weber Premises**, or **Harlem Premises**.

15.     With respect to any digital device or electronic-storage media used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.     evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.     evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     evidence of the attachment of other devices;

6

d.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.      evidence of the times the device was used;

f.      passwords, encryption keys, and other access devices that may be necessary to access the device;

g.      applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.      records of or information about Internet Protocol addresses used by the device;

i.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

j.      records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

k.      records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from the any digital devices and all telephone numbers

7

accessed through any push-to-talk functions, as well as all received or missed incoming calls;

l.      records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any digital device;

m.      Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations.

8

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A-1, Attachment A-2, and Attachment A-3 so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A-1, Attachment A-2, and Attachment A-3 may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

    a.    examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

    b.    searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law-enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

    c.    surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

    d.    opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the premises described in Attachment A-1, Attachment A-2, and Attachment A-3 within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.