UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SAMUEL UCHENNA ANIUKWU | No. 20 CR 352<br><br>Susan E. Cox<br>Magistrate Judge |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF
MOTION FOR PRETRIAL DETENTION UNDER 18 U.S.C. § 3142**

The UNITED STATES OF AMERICA, through JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits this memorandum in support of its motion for pretrial detention of defendant Samuel Uchenna Aniukwu. Because defendant poses a serious flight risk and a danger to the community, he should remain detained pending trial in this matter.

**FACTUAL AND PROCEDURAL BACKGROUND**

On July 16, 2020, Samuel Uchenna Aniukwu ("defendant") was arrested on a criminal complaint charging him and two others—Anthony Emeka Ibekie ("Ibekie") and Jennifer Gosha ("Gosha")—with conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349. (ECF 1 ("Complaint"), incorporated by reference.)

A. **Offense Conduct**

As the complaint alleges, since in or around 2016, defendant has incorporated or registered several business entities in the Northern District of Illinois along with Ibekie, and other known and unknown co-conspirators. Defendant and Ibekie have also created bank accounts for these entities in the Northern District of Illinois either together, or with others, including co-defendant Gosha. These bank accounts, in turn,

have collectively received hundreds of thousands of dollars in funds obtained through business-email-compromise, romance-fraud, and inheritance-fraud schemes. These funds have also been disposed by defendant and his co-conspirators through: (1) cash withdrawals in amounts deliberately designed to avoid bank-reporting requirements; (2) interbank transfers to conceal the source of the funds; and (3) wire transfers to foreign bank accounts, including those in co-defendant Ibekie's name.

For his part, defendant (using his own name or variants of it) incorporated or registered numerous entities with the Illinois Secretary of State ("ILSOS"), including: (1) African Entertainers Chicago Inc.; (2) African Money Credit Union, Inc.; (3) Godmeks Inc.; (4) Green House for Food Industry Inc.; (5) Indigenous People of Biafra American Chapter NFP; (6) Innocord Inc.; (7) Nigerian Christian Association Corporation; (8) Samchina Trucking Inc.; (7) Samekacyl Trucking Inc.; (9) Samtoni Medical Equipment Inc.; and (10) Setraco Services Inc. The majority of these entities were registered at 5206 Lincoln Avenue, in Lisle, Illinois (the "Lincoln Premises"), where defendant and Ibekie lived together until 2019. Other entities were registered at 2726 Alyssa Drive, in Naperville, Illinois (the "Alyssa Premises"), where defendant and Ibekie resided after leaving the Lincoln Premises, as well as 797 Oxbow Avenue, Unit 110, in Oswego, Illinois (the "Oxbow Premises"), Ibekie's current residence (and the address where he was arrested). What is more, defendant is the authorized signer on several bank accounts in the names of these entities—held at different federally-insured financial institutions—which collectively received hundreds of thousands of dollars in fraudulent funds.

Defendant is also the owner and user of numerous email addresses—including saniukwu1@gmail.com (the "ANIUKWU Gmail Account")—utilized in furtherance of schemes to defraud. Pursuant to a search warrant for the ANIUKWU Gmail Account, agents obtained and reviewed numerous emails tying defendant, Ibekie, and others to inheritance-fraud schemes. These schemes involved use of the assumed identities John Delon and Peter Pfizer (putative representatives of Standard Chartered Bank), and Pierre Delouis (a putative attorney with alleged Canadian law firm Hall & Hall Global Inc.), among others, in an effort to defraud victims into paying substantial sums in order to recover a fictional inheritance. Many of the same assumed identities and methods were discovered in the course of an undercover operation, which began with email communications exchanged with Peter Pfizer and Pierre Delouis, and ended with the controlled delivery of fraudulently obtained funds to Gosha, at her residence, around June 18, 2020.

### B.  Evidence Found During Execution of Search Warrant

While arresting defendant, agents executed a search warrant for his home at 716 South Weber Road, Unit 512, in Romeoville, Illinois (the "Weber Premises"). Agents seized multiple digital devices from the Weber Premises, including cellphones, thumb drives, and a MacBook Pro (the same laptop computer found in defendant's possession during a November 2019 border search at Chicago O'Hare International Airport). These devices collectively have several-hundred gigabytes of memory, which continue to be reviewed by agents for pertinent data. An initial review of the devices, however, is revealing.

Specifically, on one of defendant's cell phones, agents found numerous saved images of Standard Chartered letters that are identical, or nearly identical, to letters used to defraud other victims, including those seen in the undercover operation:

| Letter on Defendant's Phone | Letter Emailed to UCA |
|---|---|

 

The account JohnJeanDelon@gmail.com was saved on the phone. This same assumed identity—John Delon—was used to defraud multiple victims in inheritance-fraud schemes. Moreover, during a May 2019 trash pull at defendant's former home, agents found a handwritten note bearing the password for this same Gmail account. (*See* Complaint, ¶ 22.) The account ued@standardcharteredservices.com was also saved on defendant's phone, and numerous emails from that account (also stored on the

4

phone) were exchanged with suspected inheritance-fraud victims. These emails were signed by "Wyashika Sellar," a putative "Operations Manager" of the "Unclaimed Estate Department" of "Standard Chartered Financial Group." This same assumed identity—using email address ued@standardgroupservices.com—communicated with the undercover agent. (*See* Complaint, ¶ 59.) Agents also found applications installed on defendant's phone bearing the names "Incognito Caller ID," "Fake call – Prank," and "Caller ID Faker," each of which appears to be used to mask the true identity of a caller by generating fictitious caller IDs. And defendant's MacBook laptop showed utilization of the software "HideMyAss!," a Virtual Private Network ("VPN") tool used to mask the true IP address and physical location of a particular computer or device. As discovered in the investigation, the same VPN tool was used by co-conspirators in this case to mask IP addresses associated with their fraudulent emails and web searches. (*See* Complaint, Exhibit 2 ("Mansker Affidavit"), ¶¶ 101–107.)

Further, agents recovered numerous pertinent items of physical evidence from the Weber Premises, including: (1) multiple identification cards bearing defendant's photograph but different signatures, as well as numerous passport-size photographs of defendant (*see* Ex. 1, attached hereto); (2) bundles of currency and uncashed money orders collectively totaling thousands of dollars (*see* Ex. 2–3); (3) handwritten account and password information for the ANIUKWU Gmail Account, and an account for Hall & Hall, the alleged law firm where putative attorney Delouis is employed (*see* Ex. 4); (4) ILSOS records for numerous business entities, including African Money Union Inc., Barrington Farms, Inc., Indigenous People of Biafra American Chapter NFP,

5

Nigerian Christian Association Corp., and Samchina Trucking Inc. (*see* Exs. 5, 7); and (5) tax documents relating to business entities used in furtherance of various schemes to defraud at issue here, including Samchina Trucking and Jenant Inc. (*see* Ex. 6).

### C. Defendant's Foreign Connections

As detailed in the complaint and its attachments, defendant is a Nigerian national with extensive foreign ties. Defendant's border-crossing records show two recent foreign trips, to Dubai and India, each using a different passport. (*See* Ex. 8.) On his return from India in November 2019, defendant was subject to a border search, which led to the issuance of a warrant for the ANIUKWU Gmail Account (and another email account under defendant's control). Passports seized from the Weber Premises during execution of the search warrant include multiple visas in defendant's name for travel to India. (*See* Ex. 9.) Agents did not, however, recover Nigerian passport bearing number AXXXX8278 in the name of "Sammy Maxwell," which defendant used to withdraw fraudulently obtained funds from a bank account in the name of Setraco Services Inc. in October 2019. (*See* Ex. 16; Mansker Affidavit ¶ 39(d)(iii).) Yet, as noted above, several unused passport-size photographs of defendant's face were recovered from the Weber Premises. (*See* Ex. 1.)

Further, documents seized from defendant's home indicate that he has minor-aged children in India, including two named "Emperor" and "Churchill." (*See* Ex. 10.) Notably, defendant is the incorporator of Emperorchills (an apparent portmanteau of his children's names), a fictional business entity that has received substantial sums of fraudulent funds in bank accounts that defendant opened. (*See* Complaint, ¶ 19(a).) Agents also seized education records from India bearing the defendant's name, which

6

appear to be fraudulent. For instance, defendant possessed an apparent degree from Global Open University (*see* Ex. 11), a diploma-mill scam which was closed by Indian authorities in 2015.[1] Defendant also possessed a putative "statement of marks" from Mahatma Gandhi University (*see* Ex. 12), but a query for his enrollment number on the university's website returned the following results:



On defendant's phone, agents found several communications and photographs depicting a large mansion, which defendant calls his "compound," under construction in Nigeria. These communications also suggest that defendant and potentially Ibekie are building the "compound" together, using funds obtained from various fraudulent schemes. (The foregoing assertions are based on a preliminary review of the subject devices and communications, which—as noted above—is ongoing.)

---

[1] *See* "Punjab Police bust fake degree racket of Global Open University, Nagaland," *available at* https://www.hindustantimes.com/punjab/punjab-police-bust-fake-degree-racket-of-global-open-university-nagaland/story-O8qPe7rYULQ0ZHGaAvOXpJ.html (last accessed July 20, 2020).

7

### D. Defendant's Sham Marriage for Immigration Purposes

Based on the government's discussions with the U.S. Pretrial Services Office, it appears that defendant identified Lasheena Washington as his wife and only family member in the United States. But defendant's purported marriage to Washington is a sham (*see* Ex. 13), part of a failed bid to secure permanent residency in the United States. Under penalty of perjury, defendant claimed to the United States Citizenship and Immigration Services ("USCIS") that he was married to Washington who—in fact—is co-defendant Ibekie's current or former partner, with whom Ibekie shares a child. In a *Mirandized* interview, co-defendant Gosha told agents that there was "no way" Aniukwu and Washington were married, a statement corroborated by agents' pre-arrest surveillance, which found Washington (or her car) at Ibekie's residence on multiple occasions, but never once at defendant's residence.

USCIS did not fall for defendant's ploy, denying his application for permanent residency based, in part, on his failure to establish a bona-fide marital relationship with Washington. USCIS also deemed defendant ineligible for adjustment of status because he is a visa overstay, who was "unlawfully present in the United States" at the time he applied for permanent residency. (*See* Ex. 14–15.)

Further, text messages that defendant exchanged with Washington—which were recovered from his phone during execution of the search warrant—establish that: (1) their marriage is fictitious; and (2) Washington appears to be a knowing co-conspirator in the schemes at issue:[2]

---

[2] The below images include text-message excerpts in reverse-chronological order.

8





**ARGUMENT**

Detention prior to trial is appropriate if the Court finds that there is no condition or combination of conditions that will both assure the appearance of the person as required and assure the safety of any other person and the community. 18 U.S.C. § 3142(e)(1). In this case, the defendant poses both a risk of flight and a danger to the community that cannot be alleviated with conditions of release, particularly given his demonstrated facility in conducting complex cyber-fraud schemes through the use of assumed identities, ready access to substantial fraudulent funds, lack of ties to the community, possession of fraudulent identity and education records, and extensive foreign connections.

18 U.S.C. § 3142(g) specifies the various factors the Court should weigh in determining whether to detain a defendant pretrial. These include: (1) the nature and circumstances of the offenses; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g)[3]. A finding of either danger to the community or a flight risk is sufficient to detain a defendant awaiting trial; a court need not find both to detain a defendant under the Bail Reform Act. *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985). Considering these factors in their totality, there are no conditions

---

[3] The Federal Rules of Evidence do not apply at a detention hearing. *See* Fed. R. Evid. 1101(d)(3); *see also* 18 U.S.C. § 3142(f).

of release that will reasonably assure the appearance of the defendant as required or reasonably assure the safety of the community.

    **A.    The Nature and Circumstances of the Offense and the Weight of the Evidence**

Defendant's crimes, at their core, involve the use of deceptive means that make effective pretrial supervision unlikely, if not impossible. As of the complaint's filing, the government already amassed extensive evidence tying defendant to inheritance-fraud, business-email-compromise, and romance-fraud schemes. These schemes were furthered through the: (1) creation of fictitious business entities and numerous bank accounts in those entities' names; (2) money-laundering techniques implemented to occlude the source and provenance of victim funds; and (3) use of sophisticated means designed to hide the true identities of defendant and his co-conspirators, operating behind a veil of anonymity or assumed identities in cyberspace.

Based on information developed through email warrants and other means, the government placed defendant—along with Ibekie—at the center of inheritance-fraud schemes that utilized the same methods and assumed identities discovered during an undercover operation. The government also established that numerous IP addresses used in connection with fraudulent activity were registered in defendant's name.

Evidence seized pursuant to a search warrant for the Weber Premises—which continues to be reviewed as of this filing—further corroborates defendant's status as a prolific fraudster, who played a central role in the schemes at issue. To that end, a preliminary analysis of defendant's digital devices shows that he is the same person as "John Delon" and "Wyashika Sellar," two identities used to induce victims to part

11

with their money in inheritance-fraud schemes. Defendant possessed ILSOS and tax records for the same companies at issue in the investigation, thus establishing his dominion and control over these fictional entities, which have collectively defrauded several-dozen victims out of several-hundred-thousand dollars. He also possessed handwritten notes bearing passwords and other information pertaining to the same email accounts or entities implicated in the complaint. Further, he had substantial cash and money orders on hand, without any legitimate source for these funds.

In sum, extensive and compelling evidence establishes that defendant is at the heart of a wire-fraud conspiracy, in which co-defendants Ibekie and Gosha are also involved. The nature and circumstances of the offense and the weight of the evidence thus militate in favor of detention.

### B. Defendant's History and Characteristics, Flight Risk, and Danger to the Community

The government readily acknowledges that defendant does not have a criminal history. That should hardly give this Court comfort, where the evidence detailed in the complaint, as well as in this memorandum and the enclosed exhibits, illustrates compellingly that defendant is a career fraudster, whose factual assertions cannot—and should not—be trusted.

Defendant held falsified education records, entered a sham marriage, and has a documented history of false statements under oath to USCIS. Further, as confirmed by a review of his emails and digital devices, defendant was instrumental in drafting and sending official-looking letters on bank letterhead to various victims, inducing them to part with their hard-earned money. Simply put, there is no documentation

12

that defendant can tender, no passport he can surrender, nor any bail resources he can offer that merit anything less than this Court's utmost scrutiny and suspicion.[4] Defendant's history and characteristics therefore render him a serious flight risk, and his release on bond would only invite him to turn that risk into reality.

What is more, defendant has extensive foreign ties to Nigeria and India, which augment his flight risk. A Nigerian national whose failed bid for permanent residency has deemed him a visa overstay, defendant is subject to immediate deportation upon conviction in this case. And defendant has ready access to substantial fraudulently obtained funds that would facilitate his flight from prosecution, including tens-of-thousands of dollars transferred to foreign bank accounts in Nigeria. (*See* Complaint, ¶¶ 19(g), (i).) Defendant also has no established ties to the community, as evidenced by three changes of address since mid-2019 (from the Lincoln Premises, to the Alyssa Premises, and now, the Weber Premises). By stark contrast, defendant has family members (including his own children) in India, whom he appears to have visited as recently as November 2019. Evidence obtained from his digital devices also suggests that defendant—along with Ibekie—is constructing a mansion or "compound" in Nigeria, using proceeds of their fraudulent schemes. Having been charged with a federal crime that exposes him to a potentially lengthy term of imprisonment followed by immediate deportation, defendant has every incentive to flee to the safe harbor that he and Ibekie have built abroad, through the fruits of their fraudulent labors.

---

[4] To the extent defendant attempts to post bail resources, the government requests a *Nebbia* hearing requiring defendant to establish the provenance of those resources and prove that they are untainted by fraud.

13

Defendant's known use of fake passports poses another challenge to effective pretrial supervision. As noted previously, during the execution of the warrant at the Weber Premises, agents did not recover the passport in the name of Sammy Maxwell, which defendant previously used to access thousands of dollars of fraudulent funds held in an account for Setraco Services Inc. Defendant also had numerous passport-size photos in his possession, and his release from custody would provide sufficient opportunity to create false identification documents that would aid his flight.

Lastly, defendant's economic danger to the community cannot be understated. Over a several-year period, defendant and his co-conspirators—using sophisticated means and technology—hid their identities from innumerable victims and generated hundreds of thousands of dollars in fraudulently obtained funds. Defendant's own digital devices show clear markers of illegitimate use, including applications designed to mask his caller ID, and the same VPN software that agents found co-conspirators had used to hide their true IP addresses and physical location (which demonstrates, in itself, that location-monitoring will not prove an effective solution here). And there are no conditions of release that will simultaneously: (1) mitigate concerns of over-breadth and restraints on defendant's First Amendment rights; while (2) obviating the economic danger to others that he poses if he can access Internet-capable digital devices. *See United States v. Silvious*, 512 F.3d 364, 371 (7th Cir. 2008) ("[A] total ban on the use of computers with access to the Internet is in most cases an overbroad condition[.]"). Further, no conditions of release can compel defendant to identify all

14

assets within his custody or control, and the source of those assets, without raising Fifth Amendment concerns.

Absent a full tracing of defendant's assets or a complete restriction of his access to Internet-capable digital devices, no conditions or combination of conditions will reasonably assure defendant's appearance as required or the safety of the community. Accordingly, defendant's history and characteristics, extensive foreign connections and palpable flight risk, and the danger he poses to the community all collectively—and heavily—weigh in favor of detention.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court order defendant detained pending trial.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: *s/ Saurish Appleby-Bhattacharjee*
Saurish Appleby-Bhattacharjee
Paige Nutini
Assistant United States Attorneys
219 S. Dearborn Street
Chicago, Illinois 60604
(312) 469–6045

Dated: July 20, 2020