UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 352-1 |
| v. | Honorable Steven C. Seeger |
| SAMUEL UCHENNA ANIUKWU | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For his involvement in various internet fraud schemes that defrauded innocent victims—many of them elderly—out of hundreds of thousands of dollars, defendant pled guilty to wire fraud and money laundering charges. For the reasons set forth below, the United States respectfully requests that the Court sentence defendant to a term of imprisonment of 87 months, which is at the low end of the advisory Guidelines range of 87 to 108 months' imprisonment, to be followed by a three-year term of supervised release.

### I.    Corrections to the Presentence Investigation Report

The government makes the following correction to the Presentence Investigation Report (PSR): regarding paragraph 6, Christopher Kadonsky is a special agent with Internal Revenue Service—Criminal Investigations, not Homeland Security Investigations. PSR ¶ 6.

### II.    Advisory Guidelines Calculation

The government agrees with the criminal history calculation set forth in the PSR. Defendant's total offense level is 29 and his criminal history category is I,

1

resulting in an advisory Guidelines range of 87 to 108 months' imprisonment. PSR ¶ 80.

It appears that the only Guidelines dispute between the parties is regarding loss amount, which the government calculated at an intended loss amount of $3,599,473.15. Based on this figure, the Probation Office correctly applied an increase of +18 pursuant to Guideline § 2B1.1(b)(1)(J), instead of the +16 contemplated in defendant's plea agreement. Beyond referencing the plea agreement itself, which contained a lower loss amount figure, defendant makes no argument as to why the loss amount of $3,599,473.15 is incorrect. As set forth in the plea agreement itself, and as all parties are well aware, the Guidelines calculations in defendant's plea agreement are "preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely." Dkt. 232 at ¶ 10(e). As such, the Court should adopt the Guidelines range calculated by the PSR, which is 87 to 108 months' imprisonment.

### III. Application of Section 3553(a) Sentencing Factors

After calculating the Guidelines range, the Court must consider what sentence is appropriate for the individual defendant in light of the factors set forth in 18 U.S.C. § 3553(a). *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018). Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. Considering the Section 3553(a) factors, the government requests that the Court impose a term of imprisonment of 87 months to be followed by a three-year term of supervised release with the conditions identified in the PSR. The government also requests that the Court order restitution in the amount of $865,976.88. Such a sentence is sufficient,

but not greater than necessary to satisfy the statutory sentencing objectives of 18 U.S.C. § 3553(a).

A.     The Nature and Circumstances of the Offense and the History and Characteristics of Defendant Support a Guidelines Sentence

In mitigation, defendant is a 50-year-old man who has no other criminal history convictions. Despite experiencing what defendant describes as a "very hard" childhood in Nigeria, defendant took his education seriously and was able to obtain numerous degrees, including a master's degree in human resources. Even while incarcerated, defendant completed classes and obtained certificates in an effort to better himself. And since his release from pretrial detention, defendant has done well on bond.

Additionally, after being charged in this case, defendant accepted responsibility for his conduct, pled guilty, and agreed to cooperate with the government. This included meeting with the government for proffer protected interviews and trial preparation sessions. And although the government is not filing a motion on defendant's behalf pursuant to § 5K1.1—as is further discussed below—defendant's willingness to accept responsibility for his conduct and cooperate with the government should be something the Court considers in its analysis of the 3553(a) factors.

In aggravation, defendant used his education and his intelligence to prey on vulnerable victims over the course of many years. From 2017 to 2020, defendant engaged in an inheritance fraud scheme, a romance fraud scheme, and a business email compromise scheme—all with the goal of bilking innocent victims out of

hundreds of thousands of dollars; victims like Dale Helms, who testified at co-defendant Anthony Ibekie's trial. As the Court heard firsthand from Mr. Helms, he was a school-bus driver for many years who eventually worked his way up to owning a charter bus company. Mr. Helms lost over $27,000 to the inheritance fraud scheme defendant engaged in, which represented his entire life savings. The loss attributed to defendant's fraud is not abstract; it represents real victims who suffered real pain.

Further, while the government acknowledges defendant's cooperation attempts, it also stands behind its decision to not file a § 5K1.1 motion on defendant's behalf. To characterize this decision as one of lacking "integrity" or simply part of the government's "own trial strategy" (*see* Dkt. 369 at 6-7) is simply wrong. Certainly, the government has an interest in rewarding cooperation when warranted, but that interest must be balanced with the government's duty to seek justice and duty of candor to the Court. Without getting into the specifics of what were two proffer protected trial preparation interviews that the government had with defendant prior to Ibekie's trial, the government's trial team assessed defendant's credibility during these interviews based on his demeanor, his responses to questions asked, and the substance of his statements, among other things. That assessment led the government to decide it was not comfortable calling defendant as a witness at trial.

Even as recent as his interview with the Probation Office in preparation of the PSR, defendant made statements that cause the government to question his credibility. For example, defendant reported to Probation that he has been married to Lasheena Washington since 2016, that she resides in Arizona, and that she plans

4

on moving to Illinois to be with him. PSR ¶ 51. But text messages between defendant and Washington—recovered from one of defendant's devices pursuant to a July 2020 search warrant—paint a different picture: that defendant's marriage to Washington was (and is) a sham and that Washington was a co-conspirator in defendant's fraud who helped receive fraudulent funds from victims via bank accounts in Washington's name. For example, on May 12, 2020, the two had the following exchange:

| | |
|---|---|
| Washington: | Also I should still be receiving payment from you. There's absolutely no way we should still be married this is taking extremely too long. |
| Aniukwu: | It's not my our fault. |
| Aniukwu: | It will end this summer according to the lawyer. |
| Washington: | This is interfering with my personal life. |

*See* Sealed <u>Exhibit A</u> at ¶¶ 72-76.[1] Further, on December 9, 2019, defendant and Washington had the following exchange regarding funds received from romance fraud Victim E.D.:

| | |
|---|---|
| Aniukwu: | Take any amount you can. Like 7k or 8k and tomorrow then another withdraw |
| Washington: | Ok |
| Aniukwu: | Can we meet in Walmart Glen alley after you make withdrawal? |
| Washington: | Yeah |
| Washington: | Who is it from? |

---

[1] Exhibit A contains a cellebrite extraction report of text message communications between defendant and Lasheena Washington. Given the sensitive nature of some of the communications—including reference to victims—the government is submitting Exhibit A under seal.

Aniukwu:              What?

Aniukwu:              What?

Washington:      Who was it sent from

Aniukwu:              [Victim E.D.]

Exhibit A at ¶¶ 205-215.

Further, defendant reported to Probation that he owned and was employed by Samchina Trucking, a company that involved purchasing vehicles from the United States and then shipping them to Nigeria for resale, from 2017 to 2020, and that he was making approximately $80,000 per year. PSR ¶ 72. But Samchina Trucking was not a legitimate business; it was one of the fraudulent companies used to open bank accounts and accept victim funds. In fact, a review of the Samchina Trucking related bank records do not reflect any deposits that are identifiable to the sale of vehicles. Many deposits are cash and the majority are from known victims of defendant's schemes or individuals who appear likely to be victims. In total, a review of the Samchina bank records reflects that there was only one wire out that purportedly was for the purchase of a vehicle—a December 13, 2019 wire for $9,500 with the instruction "purchasing a truck," funded from a $20,000 deposit into the account the previous day by Victim E.D.

In short, while defendant accepted responsibility for his conduct in this case and made efforts to cooperate, the government does not believe he provided the substantial assistance required to qualify for a § 5K1.1 motion. On balance, the nature and circumstances of the offense and defendant's history and characteristics—

both aggravating and mitigating—support a low-end Guidelines sentence of 87 months' imprisonment.

B. A Guidelines Sentence is Necessary to Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public from Further Crimes of Defendant

A low-end Guidelines sentence is necessary to promote respect for the law and provide just punishment in this case. Defendant's crimes were very serious and had very real and lasting impacts on the lives of numerous victims. A low-end Guidelines sentence of 87 months' imprisonment will send a message regarding that seriousness and will provide the punishment deserved.

A low-end Guidelines sentence in this case also will afford adequate deterrence, both specific and general. Regarding specific deterrence, though defendant does not have a criminal history and has done well while on pretrial release, his crimes were extensive and varied, reflecting a disregard for the law. And as recent as his PSR related interview, defendant provided questionable information to the Probation Officer, again referencing an apparent disregard for the law. A low-end Guidelines sentence will provide specific deterrence to defendant so that he does not re-offend and will protect the public from any future crimes. Such a sentence will also provide general deterrence—and send a message that these crimes will not be tolerated—to other individuals who may be engaged in or considering engaging in fraudulent schemes, particularly internet-based schemes, thinking it is an easy way to make some money.

7

## IV.   Supervised Release

The government recommends a three-year term of supervised release, and agrees with the conditions of supervised release set forth in the PSR. The recommended conditions will assist the Probation Officer with monitoring the defendant's conduct and compliance without being overly burdensome.

## V.   Conclusion

For the reasons set forth above, the government respectfully requests that the Court impose a low-end Guidelines sentence of 87 months' imprisonment, to be followed by a three-year term of supervised release. The government also requests that the Court order joint and several restitution with defendant's co-defendants in the amount of $865,976.88.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

By:   */s/ Paige A. Nutini*
PAIGE A. NUTINI
MEGAN DEMARCO
Assistant U.S. Attorneys
219 South Dearborn Street, Room 500
Chicago, IL 60604
(312) 353-5300

Dated: September 25, 2024